FILED
2007 Dec-10 PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| RAMOND BEAVER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PFIZER, INC.; G. D. SEARLE, LLC. | ) | |
| (hereinafter "Searle") a subsidiary of | ) | |
| PHARMACIA CORPORATION, | ) | CIVIL ACTION NO. _____ |
| (hereinafter "Pharmacia"), a Foreign | ) | |
| Corporation; MONSANTO COMPANY; | ) | |
| TERRI R. ALLEN, (hereinafter "Allen"), | ) | |
| an Individual, KRISTIE GENOVA, | ) | *Pending Transfer to MDL-1699* |
| (hereinafter "Genova"), an Individual, | ) | *(In re Bextra and Celebrex* |
| LESLIE HOOPER, (hereinafter "Hooper"), | ) | *Marketing Sales Practices and* |
| an[] Individual, DIANN LOPER, | ) | *Products Liability Litigation)* |
| (hereinafter "Loper"), an Individual and | ) | |
| WINWOOD UMPHLETT, (hereinafter | ) | |
| "Umphlett"), an Individual, and fictitious | ) | |
| Defendants A, B, C and D being those | ) | |
| persons, firms or corporations whose actions | ) | |
| inactions, fraudulent suppression, fraud, | ) | |
| scheme to defraud and/or other wrongful | ) | |
| conduct caused or contributed to the | ) | |
| Plaintiff's injuries and damages, and whose | ) | |
| true names and identities are presently | ) | |
| unknown to the Plaintiff but will be | ) | |
| substituted by amendment when ascertained, | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL

TO:    United States District Court for the Northern District of Alabama

Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, Defendants Pfizer Inc. ("Pfizer") (improperly captioned in Plaintiff's Complaint as "Pfizer, Inc."), G.D. Searle LLC ("Searle") (improperly captioned in Plaintiff's Complaint as "G. D. Searle, LLC."), and Pharmacia Corporation ("Pharmacia") (improperly captioned in Plaintiff's Complaint as "Monsanto Company") (collectively, the "Removing Defendants"), with full reservation of all defenses, file this Notice of Removal of this civil action from the Circuit Court of Colbert County, State of Alabama, to the United States District Court for the Northern District of Alabama, Northwestern Division, and state as follows:

Plaintiff's counsel (or its affiliates) has, for the fifteenth time, filed an action in Alabama state court against substantially these same defendants and fraudulently joined at least one alleged, non-diverse pharmaceutical representative defendant. As detailed below, the Eleventh Circuit has spoken definitively against the "common strategy" employed by plaintiffs in pharmaceutical products liability cases such as this one of fraudulently joining individual non-diverse pharmaceutical representatives in an effort to defeat federal court jurisdiction. *Legg v. Wyeth*, 428 F.3d 1317, 1320 (11th Cir. 2005). In thirteen of these fourteen prior attempts, the Alabama federal district court has maintained federal jurisdiction over the case pending its transfer to the multi-district litigation proceeding. (The sole exception was decided before *Legg*.) Here, Plaintiff filed suit against the Removing Defendants and their alleged

2

pharmaceutical representatives (also called detailers), Terri R. Allen, Kristie Genova, Leslie Hooper, Diann Loper, and Winwood Umphlett (collectively, the "Detailer Defendants"). Only Ms. Hooper is alleged to be an Alabama citizen, so it is only her presence in this suit that possibly could affect this Court's jurisdiction. As shown below, however, Plaintiff has no reasonable possibility of prevailing against *any* of the Detailer Defendants, including Ms. Hooper, as a matter of law. Moreover, none of the Detailer Defendants detailed the prescription drug at issue here in Alabama— the place where Plaintiff alleges he was injured and his prescribing physician practiced—and they therefore have no factual nexus to this action. Accordingly, Ms. Hooper is fraudulently joined and her presence in this action does not defeat this Court's diversity jurisdiction.

Moreover, in recent removals involving similar allegations made by Plaintiff's counsel against other detailers of the Removing Defendants, Alabama federal courts have stayed or deferred proceedings pending transfer to the Multidistrict Litigation ("MDL") Court, *see*, *e.g.*, *Dunlap v. Pfizer, Inc.*, No. 7:07-cv-45-HGD (N.D. Ala. Jan. 10, 2007) (Davis, J.) (granting motion to stay pending transfer to the MDL despite plaintiff's joinder of detailer in an effort to defeat diversity jurisdiction); *Morris v. Pfizer Inc.*, No. 2:06-cv-349-MEF (M.D. Ala. May 26, 2006) (Fuller, J.) (denying plaintiff's motion to expedite ruling on motion to remand, whereupon the case transferred to the MDL court); *McGrady v. Pfizer, Inc.*, No. 2:06-cv-431-MEF

3

(M.D. Ala. May 23, 2006) (Fuller, J.) (same); *Jackson v. Pfizer, Inc.*, No. 2:05-cv-841-F (M.D. Ala. Dec. 5, 2005) (Walker, J.) (same); *Hall v. Pfizer, Inc.*, No. 2:05-cv-941-F (M.D. Ala. Nov. 21, 2005) (McPherson, J.) (same); *Beverly v. Pfizer, Inc.*, No. 05-0542-M (S.D. Ala. Nov. 17, 2005) (Milling, J.) (same); *Thomas v. Pfizer, Inc.*, No. 2:05-cv-824-F (M.D. Ala. Nov. 15, 2005) (Fuller, J.) (same); *Nelson v. Pfizer, Inc.*, No. 2:05-cv-832-F (M.D. Ala. Oct. 20, 2005) (Fuller, J.) (same); *see also Allen v. Pfizer Inc.*, No. 7:07-cv-01100-LSC (N.D. Ala. Oct. 15, 2007) (Coogler, J.) (case transferred to MDL without order); *Darty v. G.D. Searle, LLC*, No. 2:07-cv-00671-SLB (N.D. Ala. Aug. 6, 2007) (Blackburn, J.) (same) (opinions collected at **Exhibit 1**),[1] or denied remand, *see, e.g.*, *McCluskey* v. *Merck & Co.*, No. 07-AR-0232-S (N.D. Ala. Mar. 7, 2007) (Acker, J.) (denying plaintiff's motion to remand and granting defendants' motion to stay); *Conner v. G.D. Searle LLC*, No. CV 06-PT-843-E (N.D. Ala. June 1, 2006) (Propst, J.) (same); *Gordon v. Pfizer Inc.*, No. CV-06-RRA-703-E, 2006 WL 2337002 at *9 (N.D. Ala. May 10, 2006) (Armstrong, Magistrate J.) (denying remand and finding "no reasonable possibility" that the plaintiff would be able to establish a claim against detailer and therefore dismissing him with prejudice), *adopted as Opinion of the Court* (N.D. Ala. May 22, 2006) (Johnson, J.) (opinions collected at **Exhibit 2**).

      1.     The Removing Defendants, as well as the Detailer Defendants, are the

---

[1] Removing Defendants will be filing a motion to stay all proceedings pending MDL transfer.

only named defendants to the action filed in the Circuit Court of Colbert County, State of Alabama, bearing the caption *Ramond Beaver v. Pfizer, Inc., et al.*, Civil Action No. CV-07-900105.  On November 7, 2007, Plaintiff filed this action for alleged damages resulting from his use of Celebrex, an FDA-approved prescription medication.  Compl. ¶ 1 (attached hereto as **Exhibit 3**).

2.    On September 6, 2005, the Judicial Panel on Multidistrict Litigation ("JPML") issued an order, pursuant to 28 U.S.C. § 1407, establishing an MDL proceeding in the Northern District of California (MDL-1699) for cases such as this one involving Celebrex.  *See In re Bextra & Celebrex Mktg., Sales Pracs. & Prods. Liab. Litig.* 391 F. Supp. 2d 1377 (J.P.M.L. 2005).  Accordingly, like the numerous cases addressed above, this case is expected to become a "tag-along" action transferable to MDL-1699 pursuant to Rules 7.4 and 7.5 of the Rules of Procedure of the JPML.  *See* Rules of Procedure of the Judicial Panel on Multidistrict Litig., 199 F.R.D. 425 (J.P.M.L. 2001).  As noted, Removing Defendants will soon be filing a Motion to Stay all proceedings in this Court pending transfer.

## I.    THIS COURT HAS DIVERSITY JURISDICTION OVER THIS ACTION.

3.    This Court has federal diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because: (1) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (2) the requisite diversity of citizenship exists between Plaintiff and the properly joined Defendants.

5

### A.    The Amount-In-Controversy Requirement Is Satisfied.

4.    Based on the allegations in Plaintiff's Complaint, the amount in controversy plainly exceeds $75,000, exclusive of interests and costs. Plaintiff expressly alleges that "[t]he amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter," Compl. ¶¶ 90, 99, 110, 129, 144, which includes this Court. Plaintiff seeks unlimited compensatory and punitive damages with respect to a "heart attack" allegedly caused by his use of Celebrex. *E.g.*, *id.* ¶¶ 1, 20, 96; *see also*, *e.g.*, *id.* ¶ 87 (also seeking "substantial sums of money [expended] for medical, hospital, and related care"); *id.* ¶ 88 (alleging "intense anxiety, distress, fear, pain, suffering and distress secondary to physical injury and damages"); *id.* ¶ 89 (alleging "economic and non economic loss"); *id.* ¶ 117 (seeking unlimited "compensatory and punitive" damages); *id.* at 34 (unnumbered "WHEREFORE" paragraph) (seeking unlimited damages).

5.    Given the severity of the injuries alleged and the other allegations in Plaintiff's Complaint, it is facially apparent that the amount-in-controversy requirement is satisfied. *See Williams v. Best Buy Co.*, 269 F.3d 1316, 1319 (11th Cir. 2001) ("removal from state court is proper if it is facially apparent from the complaint that the amount in controversy exceeds the jurisdictional requirement"); *see also*, *e.g.*, *Sanderson v. Daimler Chrysler Motor Corp.*, No. 07-559, 2007 U.S. Dist. Lexis 75431, at *4 (S.D. Ala. Oct. 9, 2007) (allegation of "serious and

6

permanent disfigurement and scarring to [plaintiff's] face and body" plainly satisfies jurisdictional minimum requirement); *McCluskey*, *supra*, slip op. at 12 (denying remand and stating "there is also no dispute that the jurisdictional amount-in-controversy requirement has been met" based on identical allegations); *Gordon*, *supra*, 2006 WL 2337002, at *1 (same). As noted, Plaintiff alleges that Celebrex caused him to suffer a heart attack, an alleged injury sufficiently "serious and permanent," *see Sanderson*, *supra*, to satisfy the amount-in-controversy threshold.

6.    Moreover, while Removing Defendants deny any wrongdoing, in other product liability cases in which liability was found, Alabama juries routinely render verdicts in excess of $75,000, exclusive of interest and costs, as evidenced by the cases attached to this Notice as **Exhibit 4**. Likewise, as the Eleventh Circuit has recognized, appellate courts have upheld verdicts in excess of $75,000, in cases where a medical product was alleged to have caused serious injury. *See generally Toole v. McClintock*, 999 F.2d 1430 (11th Cir. 1993) (citing award of $400,000 in compensatory and $5,000,000 in punitive damages in a product liability case); *Benford v. Richards Med. Co.*, 792 F.2d 1537 (11th Cir. 1986) (citing award of $165,000 in compensatory and $100,000 in punitive damages in a medical product liability case). Moreover, in other personal injury actions in which the plaintiffs alleged lesser injuries, Alabama federal courts have recognized that "[i]t is not uncommon in these circumstances for Alabama juries to award compensatory

7

damages in excess of the jurisdictional prerequisite, even before punitive damages are considered." *Hester v. Bayer Corp.*, Civil Action 01- 1301, slip op. at 8-9 (M.D. Ala. Dec. 21, 2001) (DeMent, J.) (denying Motion to Remand and holding that defendant had met its burden of demonstrating that the amount in controversy more likely than not exceeded $75,000 when complaint alleged "significant muscle problems" caused by a prescription medication) (attached hereto as **Exhibit 5**).  Therefore, the amount in controversy plainly exceeds $75,000.

### B.    Complete Diversity Of Citizenship Exists Between The Properly Joined Parties.

7.     There is complete diversity between Plaintiff and the properly joined defendants.   Plaintiff is, and was at the time he filed this action in state court, a resident and citizen of Alabama.  *See* Compl. ¶¶ 2-3.

8.     Defendant Pfizer was at the time of filing of this action, and still is, a corporation existing under the laws of Delaware, with its principal place of business in New York.  *See* Compl. ¶ 4.  Accordingly, Pfizer is not now, nor was it at the time of filing this action, a citizen of Alabama for purposes of determining diversity.  *See* 28 U.S.C. § 1332(c)(1).

9.     Defendant Pharmacia was at the time of filing of this action, and still is, a corporation existing under the laws of Delaware, with its principal place of business in New Jersey.  *See* Compl. ¶¶ 4, 6.  Accordingly, Pharmacia Corporation is not now, nor was it at the time of filing of this action, a citizen of Alabama for purposes of

8

determining diversity.  28 U.S.C. § 1332(c)(1).

10.    Defendant Searle was at the time of filing of this action, and still is, a limited liability company whose sole member is (and was) Pharmacia & Upjohn Company LLC, which is a limited liability company whose sole member is (and was) Pharmacia Corporation, which is (and was) a corporation existing under the laws of Delaware, having its principal place of business in New Jersey.  Thus, for jurisdictional purposes, Searle is a citizen of Delaware and New Jersey.  *See e.g.*, *Rolling Greens MHP, LP v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (holding that a "limited liability company is a citizen of any state of which a member of the company is a citizen"); *see also* 28 U.S.C. § 1332(c)(1). Accordingly, Searle is not now, nor was it at the time of filing this action, a citizen of Alabama for purposes of determining diversity.  *See* 28 U.S.C. § 1332(c)(1).

11.    In 1933, an entity known as Monsanto Company ("1933 Monsanto") was incorporated under the laws of Delaware.  On March 31, 2000, a subsidiary of 1933 Monsanto merged with Pharmacia & Upjohn, Inc., and 1933 Monsanto changed its name to Pharmacia Corporation.  *See* Compl. ¶ 6.  As stated in Paragraph 8, *supra*, Pharmacia is (and was at the time of the filing of this action) a corporation existing under the laws of Delaware, having its principal place of business in New Jersey. Accordingly, Defendant Monsanto Company, is not now, nor was it at the time of filing this action, a citizen of Alabama for purposes of determining diversity.  *See* 28

9

U.S.C. § 1332(c)(1).

12.    The Complaint also names Terri R. Allen, Kristie Genova, Leslie Hooper, Diann Loper, and Winwood Umphlett (each alleged to have been a detailer for Pfizer) who are citizens and residents, respectively, of Mississippi, Arkansas, Alabama, Mississippi, and Mississippi. Compl. ¶¶ 8-12. The presence in this suit of Defendants Allen, Genova, Loper, and Umphlett has no bearing on this Court's jurisdiction because there is complete diversity between Plaintiff and each of these non-Alabama detailers (who are nonetheless not proper defendants in this action). Further, the presence in this suit of Ms. Hooper (an Alabama citizen) does not destroy diversity jurisdiction because she is fraudulently and improperly joined in an attempt to defeat diversity and prevent removal. As such, her citizenship is disregarded in determining whether diversity jurisdiction exists. *See*, *e.g.*, *Legg*, 428 F.3d at 1325; *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998).

13.    The Complaint also purports to state claims against unnamed, fictitious defendants identified as defendants A through D. *See* Caption of the Complaint. For purposes of removal, "the citizenship of defendants sued under fictitious names shall be disregarded." 28 U.S.C. § 1441(a).

## II.    THE DETAILER DEFENDANTS ARE FRAUDULENTLY JOINED.

14.    The doctrine of fraudulent or improper joinder prevents a plaintiff from defeating federal diversity jurisdiction by simply naming in-state defendants

10

where there is no reasonable possibility the plaintiff can establish a cause of action against that defendant. *See, e.g., Triggs*, 154 F.3d at 1287; *Crowe v. Coleman*, 113 F.3d 1536, 1540 (11th Cir. 1997); *Gordon*, 2006 WL 2337002, at *9 (finding "no reasonable possibility" that the plaintiff would be able to establish a cause of action against the detailer and thus dismissing him with prejudice).

15.    To defeat a removing defendant's allegation that non-diverse parties have been fraudulently joined, plaintiffs must have a "reasonable basis" upon which they could recover against the non-diverse party; a "merely theoretical" basis is not enough. *Legg*, 428 F.3d at 1324-25 & n.5; *see also McCluskey, supra*, slip op. at 7; *Gordon*, 2006 WL 2337002, at *2. Here, as in *Legg*, there is no "reasonable basis" that Plaintiff can establish a cause of action against the Detailer Defendants.

16.    In *Legg*, the plaintiffs brought a pharmaceutical product liability action in Alabama state court against several pharmaceutical companies and three detailers. Defendants removed the case to federal court contending that the plaintiffs fraudulently joined the detailers. Recognizing the improper "common strategy employed" in pharmaceutical product liability cases such as this in which the plaintiffs "name local parties, often . . . local sales representatives, as defendants, thus defeating [a defendant's] right to remove a case to federal court," the Eleventh Circuit reiterated that the "removal process was created by Congress to protect defendants." *Id.* at 1320, 1325. In *Legg*, the removing defendants submitted a sworn affidavit from

11

one detailer who was not even a citizen of the plaintiffs' home state, a second detailer who had never detailed the product in question, and a third detailer who had detailed the drug in question to doctors but answered their questions based on information provided to him by his employer. *Id.* at 1321. Here, each of the Detailer Defendants has submitted a similar affidavit. *See* Affidavits of Defendants Allen, Genova, Hooper, Loper and Umphlett (collectively, "Detailer Affs."), attached hereto as **Exhibit 6**. Not only are four of the five Detailer Defendants not citizens of Alabama (*see* Compl. ¶¶ 8-12; Detailer Affs. ¶ 2), but each of the Detailer Defendants "never detailed Celebrex in Alabama" (Detailer Affs. ¶ 6)—the place where Plaintiff alleges his prescribing physician practices and he was injured (*see* Compl. ¶¶ 3, 8-12).

17.    Applying Alabama law to similar circumstances, the Eleventh Circuit in *Legg* found "no reasonable possibility" that the detailers could be held liable on the plaintiffs' claims. *Legg*, 428 F.3d at 1324; *see also id.* at 1325 n.5 (stating the potential for legal liability "must be reasonable, not merely theoretical") (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)).    The Eleventh Circuit emphasized:    "As the Supreme Court long ago admonished, 'the Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court.'" *Id.* at 1325 (quoting *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907)).

B LBC1 766326 v1
2902026-000072 12/7/2007

18.    Fraudulent joinder may be shown by a lack of a factual or legal basis for a plaintiff's claims.  In this case, Plaintiff's claims fail for both reasons.  *See, e.g.*, *Owens v. Life Ins. Co. of Ga.*, 289 F. Supp. 2d 1319, 1323-24 (M.D. Ala. 2003).

19.    Plaintiff asserts causes of action against defendants generally for negligence, defective design, failure to warn, breach of express warranty of merchantability, breach of implied warranty of merchantability, fraud, and negligent misrepresentation.  Plaintiff appears to base his claims on the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD").[2]  *See generally* Compl.  Although the Complaint scarcely references the Detailer Defendants and makes virtually all allegations against "Defendants" generically, Plaintiff's claims against the Detailer Defendants are based on their alleged role as a conduit for their employer.  *See, e.g.*, Compl. ¶ 137 ("The misrepresentations of and/or active concealment by Defendants were perpetuated directly and/or indirectly by Defendants, its [sic] sales representatives, employees, distributors, agents and/or detail persons.").  But the law is well settled that "those who are only conduits through which faulty information is supplied by one person to a third person cannot be held liable for fraud unless they acted in bad faith." *Legg*, 428 F.3d at 1324 (citing *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 463 (Ala. 2000); *see, e.g.*, *McCluskey*, slip op. at 11-12 (finding "no reasonable basis" to predict that detailers, who served as mere conduits for their

B LBC1 766326 v1
2902026-000072 12/7/2007

employers, could be held liable under a fraud-based theory). Because there is no reasonable possibility in law or fact that Plaintiff could recover against the detailers, they have been fraudulently joined and their presence in this action cannot defeat removal. This conclusion accords with the findings of numerous MDL and Alabama federal courts, which have held in pharmaceutical product liability cases involving prescription medication that plaintiffs cannot pursue claims against detailers and that their joinder does not defeat diversity.[3]

### A.    Plaintiff Fails To State Legally Cognizable Claims Against The Detailer Defendants.

20.    Plaintiff fails to state any legally sufficient basis for relief against the Detailer Defendants. *See*, *e.g.*, *Legg*, 428 F.3d at 1324-25; *Crowe*, 113 F.3d at 1540.

### 1.    Plaintiff Fails to State Legally Cognizable Claims Against the Detailer Defendants for Violation of the AEMLD or for Breach of Warranty.

21.    Plaintiff cannot establish a viable claim against the Detailer Defendants for violation of the AEMLD or for breach of express or implied warranty because pharmaceutical representatives are not the requisite manufacturers or sellers of prescription medicines. *See*, *e.g.*, *Turner v. Azalea Box Co.*, 508 So. 2d 253, 254 (Ala. 1987). To establish liability under the AEMLD, "the plaintiff must prove that

---

[2]  It appears that any negligence and defective design claims are brought pursuant to the AEMLD. Even if they are not, however, they still fail.

[3]  *See*, *e.g.*, *Gordon*, *supra*; *Conner*, *supra*; *In re Prempro Prods. Liab. Litig. (Graham v. Wyeth)*, No. 4:03CV1507, 2006 WL 617981, at *1 (E.D. Ark. Mar. 8, 2006); *In re Baycol Prods. Liab. Litig.*, MDL 1431 (March 26, 2004) (**Exhibit 7**); *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 287 (S.D.N.Y. 2001).

14

the defendant manufactured and/or sold the allegedly defective product." *Id.* (citing *Atkins v. American Motors Corp.*, 335 So. 2d 134 (Ala. 1976)). "[P]harmaceutical representatives are not considered sellers or distributors under Alabama law" of the prescription drugs they detail. *Gordon*, 2006 WL 2337002, at *8; *see also*, *e.g.*, *McCluskey*, slip op. at 9-11 (same); *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 287 (S.D.N.Y. 2001) (same); Detailer Affs. ¶¶ 7, 8 (Detailer Defendants had no role in the manufacture or sale of Celebrex).

22.    Nor can Plaintiff state a claim for breach of express or implied warranty against the representatives because they are not "sellers" under Alabama law. *See* Ala. Code §§ 7-2-313(1), 7-2-314(1), 7-2-315, 7-2-103(1)(d) (express and implied warranty claims refer to the creation of warranties by the "seller"); *Gordon*, 2006 WL 2337002, at *8 ("[B]ecause pharmaceutical representatives are not considered sellers or distributors under Alabama law, [the detailer] cannot be liable as a warrantor of Bextra under claims for breach of warranty."); *Rezulin*, 133 F. Supp. 2d at 286 ("seller" who makes warranties about a prescription medicine is the "pharmaceutical manufacturer," and not the pharmaceutical representative); *e.g.*, Detailer Affs. ¶ 8 (Detailer Defendants did not "sell" Celebrex). Accordingly, the Detailer Defendants cannot be liable under the AEMLD or a warranty theory.

### 2.    Plaintiff Fails to Establish Legally Cognizable Claims for Failure to Warn.

23.    Plaintiff's failure to warn claims likewise fail. First, in products liability

15

actions premised on a negligence (or wantonness) theory, "[t]he defendant must be either the manufacturer or seller of the injury-producing article." *Norton Co. v. Harrelson*, 176 So. 2d 18, 20 (Ala. 1965).  As explained above, pharmaceutical representatives in general, and Ms. Hooper and her detailer co-defendants in particular, are neither manufacturers nor sellers of prescription medicines.  *See* § II(A)(1), *supra*; Detailer Affs. ¶¶ 7, 8.  Second, under Alabama law, a prescription drug manufacturer satisfies its duty to warn under the AEMLD or as against negligent failure to warn claims by distributing an adequate warning to the prescribing physician.  *See*, *e.g.*, *Stone v. Smith Kline & French Labs.*, 447 So. 2d 1301, 1305 (Ala. 1984) (holding that an adequate warning to the prescribing physician, but not to the ultimate consumer, is sufficient as a matter of law to avoid liability under the AEMLD in the case of a prescription drug); *Gurley v. American Honda Motor Co.*, 505 So. 2d 358, 361 (Ala. 1987) (holding that, as a matter of law, a manufacturer cannot be held liable for negligent failure to warn where it distributed the product with reasonable warnings); *Purvis v. PPG Indus., Inc.*, 502 So. 2d 714 (Ala. 1987).

24.    Stated simply, under Alabama law, pharmaceutical representatives have no duty to warn plaintiffs directly.  As another court has remarked in this context, there is "no authority for the proposition that the sales representatives, as opposed to the manufacturer, had any duty to warn" and, as noted, "any duty to warn that [the pharmaceutical manufacturer] or its sales representatives had was owed not to

16

Plaintiff, but to Plaintiff's physicians" under the learned intermediary doctrine. *Johnson v. Parke-Davis*, 114 F. Supp. 2d 522, 525 (S.D. Miss. 2000) (holding that "Plaintiffs have no cause of action against the named sales representatives for failure to warn" and denying motion to remand) (citing *Wyeth Labs., Inc. v. Fortenberry*, 530 So. 2d 688, 691 (Miss. 1988)); *see Rezulin*, 133 F. Supp. 2d at 282.

25.    Further, as addressed below, Plaintiff's Complaint fails to state sufficient facts to support a failure to warn claim against the Detailer Defendants for failing to warn Plaintiff or his physician. *See Bell Atlantic Corp. v. Twombley*, 127 S. Ct. 1955, 1964-65 (2007) (although Federal Rule of Procedure 8 requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," a plaintiff is required to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"); *see also* Ala. R. Civ. P. 8.  Plaintiff fails to allege any facts to demonstrate that the Detailer Defendants had any knowledge or information independent of the information provided to them from their employer.    To the contrary, they had none.    *See* Detailer Affs. ¶ 5. Consequently, in no event could Plaintiff state a cognizable cause of action against them for failure to warn Plaintiff or his physician.  In any event, as explained, the Detailer Defendants never even detailed Celebrex in Alabama. *See* Detailer Affs. ¶ 6.

### 3.    Plaintiff's Fraud-Based Claims Fail.

26.    Plaintiff also cannot sustain his claims against the Detailer Defendants

17

for fraudulent and negligent misrepresentation because the Complaint fails to comply with the "particularity" requirement of Rule 9(b). *See* Fed. R. Civ. P. 9(b) (requiring that allegations of fraud be stated with particularity); Ala. R. Civ. P. 9(b) & Committee Comments on 1973 Adoption of Rule 9(b) (stating that the Alabama rule is identical to the federal rule). Particularity "requires a plaintiff in pleading fraud to distinguish among defendants and specify their respective role in the alleged fraud." *Gordon*, 2006 WL 2337002, at *6 (internal quotation omitted); *see also Lyons v. American Tobacco Co.*, No. Civ. A. 96-0881-BH-S, 1997 WL 809677, at *5 (S.D. Ala. Sept. 30. 1997) (observing that there is "no better admission of fraudulent joinder" of a non-diverse defendant than a plaintiff's failure "to set forth any specific factual allegations" against that defendant). Thus, a plaintiff must allege the time, place, content, and speaker of the allegedly fraudulent misrepresentations. *McAllister Towing & Trans. Co. v. Thorn's Diesel Serv., Inc.*, 131 F. Supp. 2d 1296, 1302 (M.D. Ala. 2001); *Estate of Scott v. Scott*, 907 F. Supp. 1495, 1498 (M.D. Ala. 1995); *see* Ala. R. Civ. P. 9(b), Committee Comments on 1973 Adoption of Rule 9(b) (stating plaintiff must show the "time, place and the contents or substance of the false representations, the fact misrepresented, and an identification of what has been obtained"). Mere "general allegations do not meet the Rule 9(b) requirements." *Rezulin*, 133 F. Supp. 2d at 284.

27.    Plaintiff fails to plead with the requisite particularity. Plaintiff merely

18

alleges generically that "Defendants . . . fraudulently misrepresented to . . . users and/or consumers of the drug, including Plaintiff, the safety and efficacy of the drug." Compl. ¶ 131.  The Complaint fails to specify the time, place, or content of *any* particular representations made by the Detailer Defendants.  Nor does the Complaint name the prescribing physician to whom any allegedly fraudulent misrepresentations were made.  Because Plaintiff fails to plead these fraud-based claims with the requisite particularity, Plaintiff cannot state a claim for fraud.  *See United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) ("this Court has endorsed the dismissal of pleadings for failing to meet Rule 9(b)'s standards"); *Gordon*, 2006 WL 2337002, at *7 (holding that "Plaintiff's allegations fail to allege the essential elements of fraud and misrepresentation"); *Mixon v. Cason*, 622 So. 2d 918, 920 (Ala. 1993) ("The plaintiff did not plead with the specificity required by Rule 9(b)" and "the trial court properly dismissed").

28.    Further, Plaintiff's fraud-based claims fail because the Detailer Defendants' knowledge about the alleged benefits and risks of the prescription medication Celebrex came from their employer and the FDA-approved labeling, and they therefore lacked the required personal culpability in any alleged fraud.  *See* Detailer Affs. ¶ 5; *Legg*, 428 F.3d at 1324 (under Alabama law, a sales representative cannot be held liable unless he "personally participate[d] in the tort") (quoting *Turner v. Hayes*, 719 So. 2d 1184, 1188 (Ala. Civ. App. 1997)); *McCluskey*, slip op. at 11-12

19

(holding that there was "no reasonable basis" to predict that detailers, who served as mere conduits for their employers, could be held liable under a fraud-based theory).

## B.    No Factual Basis Exists For Plaintiff's Claims Against The Detailer Defendants.

29.    In addition to there being no legal basis for Plaintiff's claims against the Detailer Defendants, there is likewise no factual basis for them. *See*, *e.g.*, Detailer Affs. ¶¶ 5-10; *Legg*, 428 F.3d at 1324-25 (grounding fraudulent joinder analysis on similar sales representative's affidavit). Indeed, not one of the Detailer Defendants has ever detailed Celebrex in Alabama, and accordingly there is no factual nexus between Plaintiff's claims and the Detailer Defendants. *See* Detailer Affs. ¶ 6.

30.    Thus, notwithstanding Plaintiff's boilerplate allegations, there is no factual basis for his claims against the Detailer Defendants who never met with the Plaintiff, *see* Detailer Affs. ¶ 10, and have never made any presentations to the general public. *Id.* ¶ 9. They have played no role in developing Celebrex or disseminating information about the medication beyond that provided by their employer. *Id.* ¶¶ 5, 7. Further, the Complaint fails to allege what information they allegedly misrepresented to or concealed from Plaintiff or his prescribing physician. *See*, *e.g.*, Compl. ¶ 15; *see generally In re Rezulin Prods. Liab. Litig.*, 168 F. Supp. 2d 136, 140 (S.D.N.Y. 2001) (finding fraudulent joinder where such specific allegations are lacking). In light of all these inadequacies, Plaintiff has no "reasonable possibility" of recovery, and the Detailer Defendants are fraudulently

20

joined.  *See Legg*, 428 F.3d at 1324-25 (grounding fraudulent joinder analysis on detailer affidavits); *see also*, *e.g.*, *Gordon*, 2006 WL 2337002, at *6 ("Without any competent evidence that [the detailer] made knowing misrepresentations or acted in bad faith—and particularly in light of [his] statement that he had no specialized knowledge about Bextra and relied entirely on information provided to him by Pfizer—there is 'no reasonable possibility' that an Alabama court would conclude that he is liable for fraud or misrepresentation") (quoting *Legg*, 428 F.3d at 1324).

31.    Therefore, no factual or legal basis exists for Plaintiff's claims against any of the Detailer Defendants, including Ms. Hooper—the only detailer alleged to be a citizen of Alabama.   The Detailer Defendants are fraudulently joined and the presence of Ms. Hooper cannot destroy this Court's diversity jurisdiction.

## III    PROCEDURAL REQUIREMENTS FOR REMOVAL ARE SATISFIED.

32.    All other requirements for removal have been met.  On November 9, 2007, Defendants Pfizer and Pharmacia were served with a copy of the Summons and Complaint, and no Defendant was served on an earlier date.  This Notice of Removal is being filed within 30 days of the service of the Complaint and is timely under 28 U.S.C. § 1446(b).  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999) (holding that the thirty day time period under the removal statute begins to run from the date of formal service).  All properly joined Defendants have joined in or consented to this Notice of Removal.  28 U.S.C. § 1446(a); *see Clay v.*

21

*Brown & Williamson Tobacco Corp.*, 77 F. Supp. 2d 1220, 1222 n.3 (M.D. Ala. 1999) (fraudulently or improperly joined defendants need not consent to removal). Although their consent is not necessary because they have been fraudulently and improperly joined, the Detailer Defendants, who are represented by the undersigned, nonetheless consent in this removal.

33.    The United States District Court for the Northern District of Alabama, Northwestern Division, embraces the county in which the state court action was initially filed and thus this Court is a proper forum for this action pursuant to 28 U.S.C. §§ 8l(a)(1) and 1441(a).

34.    Copies of all process, pleadings and orders are collectively attached to this Notice of Removal at **Exhibit 8** pursuant to 28 U.S.C. § 1446(a).

35.    Defendants are filing written notice of this removal with the Clerk of the State Court in which the action initially was filed pursuant to 28 U.S.C. § 1446(d). Copies of the Notice of Filing of Notice of Removal together with a copy of this Notice of Removal are being served upon Plaintiff's counsel pursuant to 28 U.S.C. § 1446(d).

36.    If any question arises as to the propriety of the removal of this action, Removing Defendants respectfully request the opportunity to present a brief and oral argument in support of their position that this case is removable.

WHEREFORE, Removing Defendants respectfully remove this action from

22

the Circuit Court of Colbert County, Alabama, bearing case No. CV-07-900105, to

this Court pursuant to 28 U.S.C. § 1441.

Dated this 7th day of December, 2007.

_____
Lawrence B. Clark
Attorney for Defendants

OF COUNSEL:
BARKER, DONELSON, BEARMAN,
CALD WELL & BERKOWITZ, P.C.
Wachovia Tower, Suite 1600
420 Twentieth Street North
Birmingham, Alabama 35203
Telephone:   (205) 328-0480
Facsimile:   (205) 322-8007

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2007, a true and correct copy of the
foregoing was served via U.S. mail, post-prepaid, and addressed to the following
counsel of record:

Navan Ward, Jr.
Andy D. Birchfield, Jr.
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
234 Commerce Street
Montgomery, AL  36103-4160

_____
Of Counsel

B LBC1 766326 v1
2902026-000072 12/7/2007

FILED

2007 Dec 10 PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

2007 Jun 13 PM 02:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

Case 3:08-cv-02219-SRB    Document 1-2    Filed 02/20/2008    Page 2 of 24
Case 7:07-cv-01100-LSC    Document 1    Filed 06/11/200    Page 2 of 100
CM/ECF - U.S. District Court Northern District of Alabama - Docket Report    Page 1 of 2

STAY, TRANSFERRED MDL

# U.S. District Court
## Northern District of Alabama (Western)
## CIVIL DOCKET FOR CASE #: 7:07-cv-00045-HGD

Dunlap v. Pfizer Inc. et al
Assigned to: Magistrate-Judge Harwell G Davis, III
Cause: 28:1441 Petition for Removal- Product Liability

Date Filed: 01/05/2007
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 01/05/2007 | 1 | NOTICE OF REMOVAL by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc., from Circuit Court of Tuscaloosa County, Alabama, case number 63-CV-06-900022. ( Filing fee $ 350, receipt number: 200 232639 )filed by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc. (Attachments: # 1 Notice of Removal part 2)(AHI) (Entered: 01/09/2007) |
| 01/05/2007 | 2 | NOTICE of Certificate of Filing Notice of Removal by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc. (AHI) (Entered: 01/09/2007) |
| 01/05/2007 | 3 | ANSWER to Complaint by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc.(AHI) (Entered: 01/09/2007) |
| 01/08/2007 | 4 | NOTICE of Corporate Disclosure by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc. (AHI) (Entered: 01/09/2007) |
| 01/08/2007 | 5 | MOTION to Stay all proceedings pending transfer to MDL by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc.. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D) (AHI ) (Entered: 01/09/2007) |
| 01/10/2007 | | ORDER granting 5 Motion to Stay. Signed by Judge Harwell G Davis III on 1/10/07. (LBG, ) (Entered: 01/10/2007) |
| 03/02/2007 | 6 | ORDER Transferring Case to MDL: ORDER of Judicial Panel on Multidistrict Litigation transferring this case to the Northern District of California for inclusion in MDL 05-1699; certified copy of docket entries and documents requested by transferee clerk emailed to Clerk of Court in District of Northern Dist of California. (MNH) (Entered: 03/02/2007) |
| 03/02/2007 | 7 | NOTICE of transmittal letter to the Northern District of California. Copies of transfer order, docket sheet and files emailed as requested to be included in MDL. (MNH) (Entered: 03/02/2007) |

Case 3:08-cv-02215-SRB    Document 1-2    Filed 02/20/2008    Page 3 of 24
Case 7:07-cv-01100-LSC    Document 1    Filed 06/11/200    Page 3 of 100  Page 2 of 2
CM/ECF - U.S. District Court Northern District of Alabama - Docket Report

## PACER Service Center
### Transaction Receipt

04/11/2007 13:55:29

| PACER Login: | hd0020 | Client Code: | |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 7:07-cv-00045-HGD |
| Billable Pages: | 1 | Cost: | 0.08 |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HENRY C. MORRIS, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) CASE NO. 2:06-cv-349-MEF |
| | ) |
| PFIZER, INC., *et al.*, | ) |
| | ) |
| Defendants. | ) |

## O R D E R

Upon consideration of the plaintiff's Motion to Expedite Ruling on Motion to Remand

(Doc. #16) filed on May 25, 2006, it is hereby

ORDERED that the motion is DENIED.

DONE this 26th day of May, 2006.

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

OZZIE JACKSON,                           )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        CASE NO. 2:05-cv-841-F
                                         )
PFIZER, INC., *et. al.*,                 )
                                         )
        Defendants.                      )

## ORDER

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 14) filed on September 26, 2005. The Court has considered the arguments in support of and in opposition to this motion. It is hereby ORDERED as follows:

1.   Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 14) is GRANTED and this case is STAYED pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

2.   A ruling on Plaintiffs' Motion to Remand (Doc. # 8) filed on September 7, 2005, is WITHHELD pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

DONE, this 5th day of December, 2005.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| ROSE M. NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:05-cv-832-F |
| | ) | |
| PFIZER, INC., *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings

Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 16) filed on September 26,

2005. The Court has considered the arguments in support of and in opposition to this motion.

It is hereby ORDERED as follows:

1.  Defendants' Motion for a Stay of All Proceedings Pending Transfer to
    Multidistrict Litigation Proceeding (Doc. # 16) is GRANTED and this case is
    STAYED pending a final decision from the Panel on Multidistrict Litigation
    on transfer of this case to the multi-district litigation proceeding.

2.  A ruling on Plaintiffs' Motion to Remand (Doc. # 8) filed on September 7,
    2005 is WITHHELD pending a final decision from the Panel on Multidistrict
    Litigation on transfer of this case to the multi-district litigation proceeding.

DONE this 20th day of October, 2005.

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

Case 3:08-cv-02215-SRB    Document 1-2    Filed 02/20/2008    Page 8 of 24
Case 7:07-cv-01100-LSC    Document 1    Filed 06/11/200,    Page 8 of 100
Case 2:05-cv-00824-EF-SRW    Document 23    Filed 11, 2005    Page 1 of 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| KATIE THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO. 2:05-cv-824-F |
| | ) | |
| PFIZER, INC., *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 14) filed on September 26, 2005. The Court has considered the arguments in support of and in opposition to this motion. It is hereby ORDERED as follows:

1. Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 14) is GRANTED and this case is STAYED pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

2. A ruling on Plaintiffs' Motion to Remand (Doc. # 7) filed on September 7, 2005 is WITHHELD pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

DONE this 15th day of November, 2005.

_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| DONALD L. MCGRADY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No.: 2:06-cv-431-MEF |
| | ) |
| PFIZER, INC., *et. al.*, | ) |
| | ) |
| Defendants. | ) |

## ORDER

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings

Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 5) filed on May 22, 2006.

The Court has considered the arguments in support of and in opposition to this motion. It is

hereby ORDERED that the motion is GRANTED and this case is STAYED pending a final

decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district

litigation proceeding.

DONE this 23rd day of May, 2006.

_____
/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM RANDOLPH HALL, SR., | ) | |
| As the Administrator of the Estate of | ) | |
| WILLIAM RANDOLPH HALL, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:05-cv-941-F |
| | ) | |
| PFIZER, INC., *et. al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This cause is before the Court on Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 9) filed on 21 October 2005. The Court has considered the arguments in support of and in opposition to this motion. It is hereby ORDERED as follows:

1. Defendants' Motion for a Stay of All Proceedings Pending Transfer to Multidistrict Litigation Proceeding (Doc. # 9) is GRANTED. This cause is STAYED pending MDL transfer to *In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation, MDL-1699.*

2. A ruling on Plaintiffs' Motion to Remand (Doc. # 7) filed on 7 October 2005 is WITHHELD pending a final decision from the Panel on Multidistrict Litigation on transfer of this case to the multi-district litigation proceeding.

3. Defendant's Motion for Leave to File Reply (Doc. # 12) is DENIED as

Case 3:08-cv-02219-SRB    Document 1-2    Filed 02/20/2008    Page 11 of 24
Case 7:07-cv-01100-LSC    Document 1    Filed 06/11/2007    Page 11 of 100

Case 2:05-cv-0094 EF-VPM    Document 14    Filed 11/ 2005    Page 2 of 2

MOOT.

DONE this 21ST day of November, 2005.

/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ANN BEVERLY, etc.,                    :
                                      :
      Plaintiff,                      :
                                      :
vs.                                   :    CIVIL ACTION 05-0542-M
                                      :
PFIZER INC., et al.,                  :
                                      :
      Defendants.                     :

ORDER

The Court heard from counsel this date by telephone on

the Notice of Parties' Planning Meeting (Doc. 15) and the

status of this action.  It appears that this action will be

transferred as a tag-along action to the Northern District of

California within the next several days, to become a part of

MDL-1699, *In re Bextra and Cellebrex Marketing, Sales,*

*Practices and Products Liability Litigation.*  Therefore,

Defendants' Motion for a Stay of All Proceedings Pending

Transfer to Multidistrict Litigation Proceeding (Doc. 7) is

**GRANTED.**

Plaintiff's Motion for Expedited, Emergency Ruling (Doc.

10) is **MOOT.**  Plaintiff's Emergency Motion to Remand and

Motion for Sanctions (Doc. 9), with supporting brief (Doc.

11), and Defendants' Reply Brief (Doc. 13) will be considered

if and when this action is remanded to this District.

The fictitious parties set out in the complaint are

hereby **STRICKEN** since fictitious party pleading is not generally recognized under the Federal Rules of Civil Procedure. See e.g., Fed.R.Civ.P. 10(a); 28 U.S.C. § 1441(a); Rommell v. Automobile Racing Club of America, Inc., 964 F.2d 1090, 1098 n.14 (11th Cir. 1992); Weeks v. Benton, 649 F.Supp. 1297, 1298 (S.D. Ala. 1986).

   Counsel for the parties are to ensure that all future filings contain the correct and proper names of the corporate Defendants as more fully set out in Defendants' Answer (Doc. 2).

   DONE this 17th day of November, 2005.

                              s/BERT W. MILLING, JR.
                              UNITED STATES MAGISTRATE JUDGE

2

TRANSFERRED MDL

# U.S. District Court
## Northern District of Alabama (Western)
## CIVIL DOCKET FOR CASE #: 7:07-cv-01100-LSC

Allen v. Pfizer Inc. et al
Assigned to: Judge L Scott Coogler
Case in other court: Tuscaloosa County Circuit Court, 07-
900125
Cause: 28:1441 Petition for Removal- Product Liability

Date Filed: 06/11/2007
Date Terminated: 10/16/2007
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 10/15/2007 | 16 | ORDER of Judicial Panel on Multidistrict Litigation transferring this case to the Northern District of California for inclusion in MDL 05-1699; case electronically sent to ND of CA; (BST) Modified on 10/16/2007 (BST, ). (Entered: 10/16/2007) |
| 08/28/2007 | | NOTICE--The parties are NOTIFIED that due to administrative changes in the Tuscaloosa Courthouse, COURTESY COPIES in this cause shall now be sent to The Federal Building and Courthouse, 1118 Greensboro Avenue, Room 316, Tuscaloosa, Alabama 35401. The law clerk can be reached by telephone at 205-752-7040. (BST, ) (Entered: 08/28/2007) |
| 08/16/2007 | 15 | MOTION to Expedite *Ruling on Motion for Remand* by Michael A Allen. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D) (Ward, Navan) (Entered: 08/16/2007) |
| 07/13/2007 | 14 | REPLY Brief filed by Plaintiff Michael A Allen re:13 Reply to Response to Motion *to Remand* filed by Michael A Allen. (Attachments: # 1 Exhibit Exhibit A# 2 Exhibit Exhibit B# 3 Exhibit Exhibit C# 4 Exhibit Exhibit D# 5 Exhibit Exhibit E)(Ward, Navan) (Entered: 07/13/2007) |
| 07/06/2007 | 13 | REPLY to Response to Motion re 2 MOTION to Stay filed by Pfizer Inc.. (Attachments: # 1 Exhibit A-D# 2 Exhibit E-H)(Henry, G) (Entered: 07/06/2007) |
| 07/05/2007 | 12 | RESPONSE in Opposition re 7 MOTION to Remand filed by Pfizer Inc.. (Attachments: # 1 Exhibit A# 2 Exhibit b# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E# 6 Exhibit F# 7 Exhibit G# 8 Exhibit H# 9 Exhibit I# 10 Exhibit J)(Henry, G) (Entered: 07/05/2007) |
| 06/29/2007 | 11 | ANSWER to Complaint *of Colburn's Northport Pharmacy* by Colburn's Northport Pharmacy, Inc..(Henry, G) (Entered: 06/29/2007) |
| 06/25/2007 | 10 | Supplement to 9 Plaintiff's Opposition to Defendants Motion to Stay All Proceedings Pending Transfer to Multi-District Litigation Proceeding filed by Michael A Allen. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 |

| | | |
|---|---|---|
| | | Exhibit C# 4 Exhibit 1# 5 Exhibit 2)(Ward, Navan) Modified on 6/26/2007 (BST, ). (Entered: 06/25/2007) |
| 06/15/2007 | 9 | Opposition to *Defendants' Motion to Stay All Proceedings Pending Transfer to Multi-District Litigation Proceeding* filed by Michael A Allen. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4)(Ward, Navan) (Entered: 06/15/2007) |
| 06/15/2007 | 8 | Brief re7 MOTION to Remand *Plaintiff's Brief in Support of Motion to Remand* filed by Michael A Allen. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Exhibit 5# 6 Exhibit 6# 7 Exhibit 7# 8 Exhibit 8# 9 Exhibit 9# 10 Exhibit 10# 11 Exhibit 11# 12 Exhibit 12# 13 Exhibit 13# 14 Exhibit 14# 15 Exhibit 15# 16 Exhibit 16# 17 Exhibit 17# 18 Exhibit 18# 19 Exhibit 19# 20 Exhibit 20# 21 Exhibit 21# 22 Exhibit 22)(Ward, Navan) (Entered: 06/15/2007) |
| 06/15/2007 | 7 | MOTION to Remand by Michael A Allen. (Ward, Navan) (Entered: 06/15/2007) |
| 06/14/2007 | 6 | Corporate Disclosure Statement by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Colburn's Northport Pharmacy, Inc., Pfizer Inc.. (Henry, G) (Entered: 06/14/2007) |
| 06/14/2007 | 5 | NOTICE by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, George A Fields, Shad Fleeman, Brian Robinson, Colburn's Northport Pharmacy, Inc., Pfizer Inc. *Certificate of Filing of Notice of Removal* (Henry, G) (Entered: 06/14/2007) |
| 06/14/2007 | 4 | UNIFORM INITIAL ORDER - with appendices attached. Signed by Judge L Scott Coogler on 6/14/2007. (ADF) (Entered: 06/14/2007) |
| 06/11/2007 | 3 | ANSWER to Complaint with jury demand by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc..(BST, ) (Entered: 06/13/2007) |
| 06/11/2007 | 2 | MOTION to Stay all proceedings pending a transfer to MDL by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc.. (BST, ) (Entered: 06/13/2007) |
| 06/11/2007 | 1 | NOTICE OF REMOVAL by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc., from Tuscaloosa County Circuit Court, case number 07-900125. ( Filing fee $ 350 ), filed by Pharmacia Corporation, Monsanto Company, G.D. Searle, LLC, Pfizer Inc. (Attachments: # 1 exhibits)(BST, ) (Entered: 06/13/2007) |

## PACER Service Center

### Transaction Receipt

12/04/2007 14:24:39

| PACER Login: | hd0020 | Client Code: | |
|---|---|---|---|

| Description: | Docket Report | Search Criteria: | 7:07-cv-01100-LSC |
|---|---|---|---|
| Billable Pages: | 2 | Cost: | 0.16 |

TRANSFERRED MDL

# U.S. District Court
## Northern District of Alabama (Southern)
### CIVIL DOCKET FOR CASE #: 2:07-cv-00671-SLB

Darty v. G.D. Searle, LLC et al
Assigned to: Chief Judge Sharon Lovelace Blackburn
Cause: 28:1332 Diversity-Product Liability

Date Filed: 04/12/2007
Date Terminated: 08/08/2007
Jury Demand: Both
Nature of Suit: 365 Personal Inj. Prod. Liability
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 08/06/2007 | 9 | ORDER of Judicial Panel on Multidistrict Litigation transferring this case to the Northern District of California for inclusion in MDL 1699; copy of docket entries and documents requested by transferee clerk to be e-mailed to SFmdl_Clerk@cand.uscourts.gov (BST) (Entered: 08/08/2007) |
| 05/31/2007 | 8 | MOTION to Expedite *Ruling on Motion for Remand* by James Darty. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C)(Ward, Navan) (Entered: 05/31/2007) |
| 04/25/2007 | 7 | Corporate Disclosure Statement by Pharmacia Corporation, Monsanto Company, Pfizer, Inc, G.D. Searle, LLC. (Henry, G) (Entered: 04/25/2007) |
| 04/18/2007 | 6 | MOTION to Stay by Pharmacia Corporation, Monsanto Company, Pfizer, Inc, G.D. Searle, LLC. (KAM, ) (Entered: 04/18/2007) |
| 04/18/2007 | 5 | ANSWER to Complaint with jury demand by Pharmacia Corporation, Monsanto Company, Pfizer, Inc, G.D. Searle, LLC.(deemed filed 4/12/07)(KAM, ) (Entered: 04/18/2007) |
| 04/18/2007 | 4 | Opposition to re 1 *Plaintiffs Opposition to Defendants Motion To Stay All Proceedings Pending Transfer To Multi-District Litigation Proceeding* filed by James Darty. (Attachments: # 1 Exhibit Exhibit "1"# 2 Exhibit Exhibit "2"# 3 Exhibit Exhibit "3"# 4 Exhibit Exhibit "4")(Ward, Navan) (Entered: 04/18/2007) |
| 04/18/2007 | 3 | RESPONSE in Support re 2 MOTION to Remand to State Court *Motion to Remand Plaintiff's Brief in Support of Motion to Remand* filed by James Darty. (Attachments: # 1 Exhibit Exhibit "1"# 2 Exhibit Exhibit "2"# 3 Exhibit Exhibit "3"# 4 Exhibit Exhibit "4"# 5 Exhibit Exhibit "5"# 6 Exhibit Exhibit "6"# 7 Exhibit Exhibit "7"# 8 Exhibit Exhibit "8"# 9 Exhibit Exhibit "9"# 10 Exhibit Exhibit "10"# 11 Exhibit Exhibit "11"# 12 Exhibit Exhibit "12"# 13 Exhibit Exhibit "13"# 14 Exhibit Exhibit "14"# 15 Exhibit Exhibit "15"# 16 Exhibit Exhibit "16"# 17 Exhibit |

|  |  | Exhibit "17"# 18 Exhibit Exhibit "18"# 19 Exhibit Exhibit "19"# 20 Exhibit Exhibit "20"# 21 Exhibit Exhibit "21"# 22 Exhibit Exhibit "22"# 23 Exhibit Exhibit "23"# 24 Exhibit Exhibit "24"# 25 Exhibit Exhibit "25"# 26 Exhibit Exhibit "26")(Ward, Navan) (Entered: 04/18/2007) |
| 04/18/2007 | 2 | MOTION to Remand to State Court *Motion to Remand* by James Darty. (Ward, Navan) (Entered: 04/18/2007) |
| 04/12/2007 | 1 | NOTICE OF REMOVAL by Pharmacia Corporation, Monsanto Company, Pfizer, Inc, G.D. Searle, LLC, Pharmacia Corporation, Monsanto Company, Pfizer, Inc, G.D. Searle, LLC from Jefferson County, case number 07-900314. ( Filing fee $ 350 rec # 200 235549) (Attachments: # 1 # 2 # 3 # 4 # 5 # 6 # 7 # 8 # 9)(KAM, ) (Entered: 04/17/2007) |

### PACER Service Center
### Transaction Receipt

| 12/04/2007 14:25:21 | | | |
|---|---|---|---|
| **PACER Login:** | hd0020 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:07-cv-00671-SLB |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

# Exhibit 2

FILED
2007 Mar-07  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM D. MCCLUSKEY, as Surviving Spouse and as Personal Representative of the Estate of Mary L. McMcluskey, | } } } } } | |
| Plaintiff, | } } | CIVIL ACTION NO. 07-AR-0232-S |
| v. | } } } | |
| MERCK & CO., INC., a foreign corporation, et al., | } } } | |
| Defendants. | | |

## ORDER

In accordance with the accompanying memorandum opinion, the motion to remand filed by plaintiff, William D. McCluskey (Doc. No. 13), is DENIED.  The motions filed by defendant Merck & Co., Inc. (Doc. No. 2), and by defendants Pfizer, Inc., Pharmacia Corporation, G. D. Searle LLC, Travis Taylor, and Robert Vandelune (Doc. No. 8), to stay all proceedings pending possible transfer of this action for coordinated pretrial proceedings as part of the case, *In re Vioxx Marketing, Sales Practices, and Prods. Liab. Litig.* MDL No. 1657, and the case, *In re Bextra and Celebrex Marketing, Sales Practices and Prods. Liab. Litig.*, MDL-1699, are GRANTED.  This action is hereby STAYED pending the Judicial Panel on Multidistrict Litigation's determination of whether this action will be transferred.  Defendants that moved for the stay shall provide the court with a brief written report on the status of the

MDL Panel's decision on **April 6, 2007** unless the court hears from the MDL Panel before that time.

Plaintiff's motion to dismiss defendant James A. Stewart (Exhibit B to Doc. No. 1) is GRANTED, and plaintiff's action against Stewart is DISMISSED WITHOUT PREJUDICE. The motions to dismiss filed by defendants Cedric Anderson (Doc. No. 4) and Anna Leigh Webb (Doc. No. 5) are GRANTED, and plaintiff's action as against Anderson and Webb is DISMISSED WITH PREJUDICE.

Done this 7ᵗʰ day of March, 2007.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

2

FILED
2006 Jun-01 PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ROGER D. CONNER | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| vs. | ) | CV 06-PT-843-E |
| | ) | |
| G. D. SEARLE, LLC, et al | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OPINION

This cause comes on to be heard on Defendants' Motion for Stay of all Proceedings

Pending Transfer to Multidistrict Litigation Proceeding filed on May 4, 2006 and plaintiff's

Motion to Remand filed on May 5, 2006.

The court starts with a consideration of *Legg v. Wyeth*, 428 F.3d 1317 (11th Cir. 2005).

Contrary to plaintiff's repeated argument that the *Legg* court could not and did not consider the

merits of the remand, that court stated:

> *We may review the merits* of a remand order in considering whether the district
> court abused its discretion by awarding attorneys' fees and costs under 28 U.S.C.
> § 1447(e). (Emphasis added).

The court proceeded to discuss the merits of that case, the facts of which are very similar

to those here.

This court having fully considered the evidence, the briefs, the *Legg* case and the Report

and Recommendation in Dr. Gene N. Gordon v. Pfizer Inc., et al, Civil Action No. 06-RRA-703-

E, concludes that the plaintiff's Motion to Remand should be denied. The defendant's Motion to

Stay will be granted.

This the 1st day of June, 2006.


**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

FILED

2006 May-22  PM 02:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| Dr. GENE N. GORDON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: |
| v. | ) | |
| | ) | CV-06-RRA-703-E |
| PFIZER INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER

In accordance with the memorandum opinion entered contemporaneously herewith, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1.    The motion to remand (doc. 6) is DENIED.

2.    The motion to stay (doc. 5) is GRANTED.

3.    This matter is stayed pending transfer to multidistrict litigation.

4.    Defendant Pollard is DISMISSED, with prejudice.

DONE and ORDERED this 22nd day of May 2006.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

FILED
2007 Dec-10 PM 02:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 3



ELECTRONICALLY FILED
11/7/2007 10:54 AM
CV-2007-900105.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
NANCY L. HEARN, CLERK

IN THE CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA

RAMOND BEAVER    §
                 §
PLAINTIFF,       §
                 §
VS.              §
                 §    CIVIL ACTION NO. $CU$-07-900105
PFIZER, INC.; G. D. SEARLE, LLC.   §
(hereinafter "Searle") a subsidiary of §
PHARMACIA CORPORATION,   §
(hereinafter "Pharmacia"), a Foreign §
Corporation; MONSANTO COMPANY;   §
TERRI R. ALLEN, (hereinafter "Allen"), §
an Individual, KRISTIE GENOVA,   §
(hereinafter "Genova"), an Individual, §
LESLIE HOOPER, (hereinafter "Hooper"), §
and Individual, DIANN LOPER,   §
(hereinafter "Loper"), an Individual and §
WINWOOD UMPHLETT, (hereinafter §
"Umphlett") an Individual, and fictitious §
Defendants A, B, C and D being those §
persons, firms or corporations whose §
actions, inactions, fraudulent suppression, §
fraud, scheme to defraud and/or other §
wrongful conduct caused or contributed to §
the Plaintiff's injuries and damages, and §
whose true names and identities are §
presently unknown to the Plaintiff but will §
be substituted by amendment when §
ascertained,   §
                §
DEFENDANTS.   §
              §

## COMPLAINT

### TRIAL BY JURY IS REQUESTED

1.    This is a civil action brought by Plaintiff, RAMOND BEAVER, for injuries resulting in a heart attack. Plaintiff was prescribed and used the prescription medication CELEBREX (Celecoxib). This action seeks monetary damages for personal injuries pursuant to AL Code Ann. Sec. 11-7-13, damages caused by the drugs named herein and ingested by

1

Plaintiff.

2. Plaintiff, RAMOND BEAVER is an adult resident of Colbert County, Alabama.

3. Plaintiff, RAMOND BEAVER, was an adult resident of Colbert County, Alabama at the time of his injury.

4. Defendant Pfizer Inc. (hereinafter "Pfizer") is a Delaware corporation, and at all times relevant hereto Pfizer was in the business of marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib). Defendant Pfizer is licensed and registered to do business in Alabama and may be served through its registered agent: The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109. 5. Defendant Pharmacia Corporation is a Delaware Corporation licensed and registered to do business in Alabama and can be served through its registered agent: The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109.

6. Defendant Monsanto Company (hereinafter "Monsanto") is the parent of Pharmacia and is a Delaware Corporation. At all times relevant hereto Monsanto through its subsidiary companies was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib). Defendant Monsanto is licensed and registered to do business in Alabama, and may be served through its agent: CSC Lawyers Incorporating Service, Inc.; 150 South Perry Street; Montgomery, Alabama 36104.

7. Defendant G. D. Searle LLC. (hereinafter "Searle") is a subsidiary of Pharmacia Corporation, and is upon information, knowledge and belief an Illinois Corporation, and is registered to do business in Alabama. As such, Defendant Searle can be served through its registered agent: The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109. At all times relevant hereto, Searle as a subsidiary of Pharmacia Corporation and Pharmacia Corporation (hereinafter "Pharmacia"); at all times relevant to this

2

action was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib).

8.     Defendant Terri R. Allen (hereinafter "Allen") is, upon information and belief, over the age of nineteen years and a resident of Forrest County, Mississippi. At all times relevant hereto Defendant Allen was a sales representative employed by Defendant Pfizer, Inc. to call upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Allen may be served at her home address: 17 Belletower Turn, Hattiesburg, Mississippi 39406.

9.     Defendant Kristie Genova (hereinafter "Genova") is, upon information and belief, over the age of nineteen years and a resident of Benton County, Arkansas. At all times relevant hereto Defendant Genova was a sales representative employed by Defendant Pfizer, Inc. to call upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Genova may be served at her home address: 4105 NE Cadbury Avenue, Bentonville, Arkansas 73712.

10.     Defendant Leslie Hooper (hereinafter "Hooper") is, upon information and belief, over the age of nineteen years and a resident of Montgomery County, Alabama. At all times relevant hereto Defendant Hooper was a sales representative employed by Defendant Pfizer, Inc. to call upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Hooper may be served at her home address: 2525 Aimee Drive, Montgomery, Alabama 36106.

11.     Defendant Diann Loper (hereinafter "Loper") is, upon information and belief, over the age of nineteen years and a resident of Forrest County, Mississippi. At all times relevant hereto Defendant Loper was a sales representative employed by Defendant Pfizer, Inc. to call

upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Loper may be served at her home address: 89 Brewer Road, Hattiesburg, Mississippi 39406.

12.    Defendant Winwood Umphlett (hereinafter "Umphlett") is, upon information and belief, over the age of nineteen years and a resident of Lauderdale County, Mississippi. At all times relevant hereto Defendant Umphlett was a sales representative employed by Defendant Pfizer, Inc. to call upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Umphlett may be served at his home address: 1705 Hunters Run, Meridian, Mississippi 39305.

13.    Personal jurisdiction and subject matter jurisdiction are appropriate in this court as to all Defendants, as all Defendants have done business in Colbert County, Alabama, either directly or by agent, and have thus availed themselves of this jurisdiction.

14.    The Plaintiff's claims accrued in whole or in part in this judicial district and the Plaintiff resided in this judicial circuit at the time of his injury.  Some of these Defendants are foreign corporations, which have been and are currently engaged in business, directly or by authorized agent, in this judicial district.  Venue and jurisdiction are therefore proper.  The claims of Plaintiff herein satisfy the jurisdictional amount of this court.

15.    Celebrex is a pharmaceutical treatment for musculoskeletal joint pain associated with osteoarthritis, among other maladies.  Defendants Searle, Pharmacia, Monsanto, Pfizer and Pollard did manufacture, design, package, market and/or distribute this drug.  Defendants Searle, Pharmacia, Pfizer, Allen, Genova, Hooper, Loper, and Umphlett (hereinafter "Defendants") encouraged the use of this drug in improper customers, misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects.  These

4

Defendants aggressively marketed this drug directly to the consuming public, although only available through prescription, through the use of various marketing mediums, including, but not limited to, print and television advertisements. These Defendants did this to increase sales and profits.

16.    At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and/or sell their product so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by this product. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to the Plaintiff's individual rights, and hence punitive damages are appropriate.

## BACKGROUND

17.    Celebrex is a pharmaceutical treatment for musculoskeletal joint pain associated with osteoarthritis, among other maladies. Defendants Searle, Pharmacia, Monsanto, Pfizer, Allen, Genova, Hooper, Loper, and Umphlett did manufacture, design, package, market, sell and/or distribute this drug. Defendants Searle, Pharmacia, Pfizer, Allen, Genova, Hooper, Loper, and Umphlett (hereinafter "Defendants") encouraged the use of this drug in improper customers, misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects. These Defendants aggressively marketed this drug directly to the consuming public, although only available through prescription, through the use of various marketing mediums, including, but not limited to, sales representatives and print and television advertisements. These Defendants did this to increase sales and profits.

18.    At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and

5

sell their product so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by this product. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to the Plaintiff's individual rights, and hence punitive damages are appropriate.

19.    This Complaint seeks redress for damages sustained by RAMOND BEAVER, resulting from his use of Celebrex (Celecoxib), manufactured and sold by Pharmacia, G.D. Searle, Monsanto and Pfizer, the Defendants herein.

20.    RAMOND BEAVER was 58 years old on or about December 29, 2005, when he suffered a heart attack due to his use of Celebrex (Celecoxib).

21.    The damages sought herein are the direct and proximate result of Defendants' wrongful conduct in connection with designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the prescription drug Celebrex (Celecoxib).

22.    At all times relevant hereto, Defendants were engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the pharmaceutical drug Celebrex (Celecoxib) throughout the United States.

23.    Had Defendant properly disclosed the risks associated with using Celebrex (Celecoxib), RAMOND BEAVER would not have taken it for treatment of pain associated with injury.

24.    This action is being brought in the Circuit Court of Colbert County, because the amount of recovery sought exceeds the jurisdictional levels of all lower courts.

A.    Facts Regarding Celebrex: Science and other Cox-2 Inhibitors

25.    Celebrex is one of a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are examples of well-known NSAIDs.

26.    NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes.

27.    In addition to decreasing inflammation, the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and as a result, can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

28.    Prostaglandin I2 is the predominant cyclooxygenase product in endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and preventing the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane A2 is a potent platelet aggregator and vasoconstrictor which is synthesized by platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors support it.

29.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be expected, traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause blood clots, rather they actually reduce the risk of clots and help protect heart function.

30.    Defendants and other pharmaceutical companies set out to remedy these ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors that

7

would block only COX-2 production, thus (supposedly) allowing the proper maintenance of gastric tissue while still reducing inflammation.

31.    In making this decision, Defendants and their predecessors in interest either intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke, unstable angina. The vasoconstriction and fluid retention cause the hypertension.

32.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs, in January 1999 and initiated a massive marketing campaign to convince doctors and consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs. In May, 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

33.    Seeking increased market share in this extremely lucrative market, Defendants, and their predecessors in interest, also sought approval of a "second generation" selective COX-2 inhibitor and filed for FDA approval of Valdecoxib (Bextra) on January 16, 2001 for the (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

**B.    Facts Regarding Celebrex's Safety and Defendants' Knowledge Thereof**

34.    The potential for cardiovascular risk of selective COX-2 inhibitors was known to Defendants long before the market launch. By 1997, and prior to the submission of the New Drug Application (the "NDA") for Celebrex, Defendants was aware that, by inhibiting COX-2, Celebrex altered the homeostatic balance between prostacylcin synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954.

35.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as Celebrex, suppressed

the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

36.    Based on the studies performed on Celebrex, other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendants knew when Celebrex was being developed and tested that selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors.  Studies show that selective COX-2 inhibitors, including Celebrex, decrease blood levels of a prostacyclin.  When those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart attack, and stroke.

37.    Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of Celebrex, Defendants failed to take any action to protect the health and welfare of patients, but instead, continued to promote the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

### 1.    Celebrex and Cox-2 Studies Did Not Show Celebrex to be Safe

38.    The defendants touted the Celebrex Long-Term Arthritis Safety Study ("CLASS") as the primary evidence to support its theory that Celebrex was safer for consumers that could not tolorate traditional NSAIDs in their gastrointestinal system.  (CLASS data is found in NDA 20-998/S-009 submitted to the FDA by G.D. Searle on June 12, 2000.  CLASS was submitted to the FDA on June 12, 2000 and reviewed by James Witter, M.D., Ph.D. (FDA Medical Officer) on September 20, 2000.)

### 2.    CLASS

39.    The FDA Medical Officer Review of the CLASS data proves Celebrex is no more efficacious than other traditional NSAIDS and is harmful to consumers.  See generally, FDA Medical Officer Review, NDA 20-998/S-009 submitted to the FDA by G.D. Searle on June 12,

2000 ("FDA CLASS Review"). On April 7, 2005, the FDA issued an *Alert* noting only minimal information is available regarding Celebrex: "The only available data from a long term comparison of Celebrex to other NSAIDs came from the CLASS study...."

40.    Pfizer misrepresented the data in CLASS by using biased authors. According to the *Washington Post* the CLASS authors were either employees of Pharmacia, Celebrex's manufacturer, or paid consultants of the company. Pfizer needed a study to demonstrate that its Cox-2 inhibitor was safer for the stomach than older cheaper medications: CLASS was designed to be that study. Unfortunately, the results of the completed study revealed the truth – Celebrex offered no gastrointestinal (GI) benefit. Instead of releasing the complete –12-month – results from CLASS, Pfizer had only the first six months of data published in the Journal of American Medicine. JAMA 2000,48:1455-1460

41.    "After reviewing the full study, the FDA's arthritis advisory committee concluded that Celebrex offers no proven safety advantage over the two older drugs in reducing the risk of ulcer complications, said FDA spokesman Susan Cruzan." *Washington Post,* August 5, 2001. According to the FDA's review of the CLASS data: "Celecoxib did not demonstrate any statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of CSUGIE (Clinically Significant Upper Gastrointestinal Adverse Events) at any point in the trial although there were trends that favored celecoxib" (FDA CLASS Review)

42.    According to an August 5, 2001 article in the *Washington Post*, editors of the Journal of the American Medical Association (JAMA) and other medical experts, "were flabbergasted" when they realized they had been duped by only being provided with the first six months of CLASS data. The Washington Post reported JAMA editors as saying: "When all of the data were considered, most of Celebrex's apparent safety advantage disappeared."

43.    The "scientific double-cross" boosted sales. "[T]he JAMA article and editorial have likely contributed to Celebrex's huge sales. 'When the JAMA article comes out and

10

confirms the hype, that probably has more impact than our labeling does,' said Robert J. Temple, director of medical policy at the FDA's Center for Drug Evaluation and Research." *Washington Post*, August 5, 2001.

44.    "A total of 36 deaths occurred during the [CLASS] study or during post study follow-up: 19 in the celecoxib group, 9 in the diclofenac group and 8 in the ibuprofen group . . . . Most deaths were cardiovascular in nature." FDA CLASS Review, at 54. The increased number of adverse cardiovascular events in the Celebrex group were not surprising as they were also revealed in the original New Drug Application (NDA) submitted for Celebrex. "In the original NDA, myocardial infarction was noted to occur at a higher rate in celecoxib-treated as compared to placebo treated patients. In the long term trial (Trial 024) that was included in the NDA submission, the predominate (>90%) cause of death for patients taking celecoxib at any does was cardiovascular." FDA CLASS Review at 78.

45.    Public Citizen, a public watchdog organization, reviewed the CLASS data in its entirety. A complete review reveals the combined anginal adverse events was 1.4% in celecoxib (Celebrex) group versus 1.0% in either NSAID group. Specifically, the rate of heart attack in the Celebrex was double that of the other two NSAIDs, 0.2% vs. 0.1%, respectively.

46.    The CLASS data proves that Pfizer knew that its first generation Cox-2 inhibitor, Celebrex, caused a disproportionately and statistically significantly high number of adverse cardiovascular events before it was introduced to the market in January 1999. According to Public Citizen, after CLASS, the FDA recommended a trial to specifically assess the CV risk of COX-2 inhibitors. The Adenoma Prevention with Celecoxib (APC) trial was intended to be this placebo-controlled trial of Celebrex.

### 3.    APC Trial

47.    The Adenoma Prevention with Celecoxib (APC) trial compared the efficacy and safety of celecoxib with placebo. N.ENG. J. MED. 352;11 at 1072. According to the APC trial, the number of deaths from cardiovascular causes was significantly higher in the Celebrex group

when compared to placebo. (0.1% placebo; 0.4% Celebrex 200mg; and 0.9% Celebrex 400mg). Id. at 1075.

48.    The FDA Reported the APC data as follows[1]:

> In the National Cancer Institute's Adenoma Prevention with Celecoxib (APC) trial in patients at risk for recurrent colon polyps, a 2-3 fold increased risk of serious adverse CV events was seen for Celebrex compared to placebo after a mean duration of treatment of 33 months. There appeared to be a dose response relationship, with a hazard ratio of 2.5 for Celebrex 200 mg twice daily and 3.4 Celebrex 400 mg twice daily for the composite endpoint of death from CV causes, myocardial infarction (MI), or stroke.

49.    The dosage noted in the study is important for two reasons: first, there appears to be an association between dosage and the increase in adverse cardiovascular events.  See generally, at 1077. Second, most patients increase dosage. Pfizer knew patients were increasing their dosages as noted in CLASS: "Interestingly ... up to 70% of patients increased their dose for celecoxib." FDA CLASS Review at 7. Thus, Pfizer was aware of the dosage creep.

### 4.    Other Celebrex Trials

50.    Several other Celebrex trials also gave Defendants insight into the cardiovascular risks presented by Celebrex.  The Prevention of Spontaneous Adenomatous Polyps (PreSAP) trial identified the death rate from cardiovascular causes (heart attack, stroke, heart failure, angina, or need for CV procedure) as 3.6% with Celebrex as compared to 2.7% for placebo.

51.    Public Citizen also reviewed the results of Study IQ IQ5-97-02-001 which reflected "the combined rate of all serious cardiovascular adverse events in patients getting a placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6 fold increase in CV risk in those people taking celecoxib. (p=0.03)"[2].  According to Dr. Sidney Wolfe, "The study revealed a significantly increased rate (3.6-fold) of serious CV adverse events

---

[1] April 7, 2005 FDA Alert: www.fda.gov/cder/drug/infopage/celebrex/celebrex-hcp.htm.
[2] *Public Citizen*, January 26, 2005, Dr. Sidney M. Wolfe.

and more than a doubling in the rate of CV deaths in people using celecoxib compared to those using placebo."[3]

### 5.  Cox-2 Studies: VIGOR and APPROVe

52.  Pfizer also had access to other data which indicated a cardiovascular risk with its drugs. Specifically, Pfizer had knowledge of two studies conducted by Merck related to its Cox-2 inhibitor Vioxx – Vioxx Gastrointestinal Outcomes Research (VIGOR) and Adenomatous Polyp Prevention (APPROVe).

### a.  VIGOR

53.  In 2000, The FDA Medical Officer Review of CLASS specifically noted the VIGOR trial and the concern over serious adverse cardiovascular events. FDA CLASS Review at 78.

54.  According to VIGOR (near acronym for Vioxx Gastrointestinal Outcomes Research) Vioxx patients experienced 20% more serious clinical adverse events (statistically significant); they experienced 4.6 times more hypertension events serious enough to warrant discontinuation, 1.7 times more edema events, and 1.85 times as many congestive heart failure adverse events. By two measures of cardiovascular events related to blood clots, Vioxx had twice the risk of naproxen and the results were considered statistically significant.

55.  The VIGOR study comprised the most definitive scientific evidence ever obtained about pharmaceutical products. It was a large, randomized clinical trial, the gold standard of medical research. It was a safety study with endpoints set in advance. As Merck stated many times, it was designed to provide definite proof of safety, convincing enough to silence the most skeptical critics. In medical terms, the VIGOR results raised the question of whether selective inhibition of Cox-2 was a monumental mistake from the start. While the NSAID risks to the GI system were real and sometimes fatal, they were dwarfed by the cardiovascular risks of the

---

[3] Id.

13

arthritis population that needed these drugs on a daily basis. All makers of NSAIDs, including Defendants, were aware of these results.

### b.    APPROVe

56.    Anxious to put safety questions surrounding Vioxx to rest, Merck designed another large scale trial, Adenomatous Polyp Prevention (APPROVe), which was intended to test the drug's ability to prevent or shrink colon polyps, but would also compare the cardiovascular safety of Vioxx to a placebo control. According to the analysis conducted by Public Citizen of the APPROVe data: Vioxx "doubled the risk of any thrombotic cardiovascular event" and "doubled the risk of MI (myocardial infarction a/k/a heart attack)[4]. *Public Citizen*, January 24, 2005, at 15. Despite the available Celebrex data and other information related to Vioxx, Pfizer never paused to re-evaluating the Celebrex data and studies.

57.    The scientific data available during and after Celebrex's approval process made clear to Defendants that their formulation of Celebrex would cause a higher risk of blood clots, stroke and/or myocardial infarctions among Celebrex consumers, alerting them to the need to do additional and adequate safety studies.

58.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and have the highest risk of further cardiovascular events."

59.    Dr. Topol was also the author on the study published in August 2001 in JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who used COX-2 inhibitors.

---

[4] Although Merck claims that the two-fold risk of heart attacks and strokes seen in the APPROVe trial did not emerge until after patients had been taking the drug for 18 months, closer analysis indicates that significant increase in risk of heart attack was evident in as little as 4 months time.

14

60.     Based upon readily available scientific data, Defendants knew, or should have known, that their pre-approval testing of Celebrex did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take Celebrex. Therefore, Defendants' testing and studies were grossly inadequate.

61.     Had Defendants done adequate testing prior to approval and "market launch," rather than the extremely short duration studies done on the small size patient base that was actually done the defendants' scientific data would have revealed significant increases in incidence of strokes and myocardial infarctions among the intended and targeted population of Celebrex consumers. Adequate testing would have shown that Celebrex possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

62.     In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued Celebrex sales.

63.     Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

64.     At the time Defendants manufactured, advertising, and distributed Celebrex to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase Celebrex, but instead would purchase other cheaper and safer NSAIDs.

C.     **Facts Regarding Defendants' Marketing and Sale of Celebrex**

65.     Such an ineffective and unreasonably dangerous drug could only be widely prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the

15

Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and misleading advertising, consumers, including the Plaintiff, would not have purchased Celebrex, a more costly prescriptive drug, ineffective for its intended purposes.

66.    On January 10, 2005 the FDA issued Pfizer a written reprimand for its promotional activities. The reprimand reads: "These five promotional pieces [3 Celebrex and 2 Bextra] variously: omit material facts … and make misleading safety, unsubstantiated superiority, and unsubstantiated effectiveness claims." This was not the Defendants first offense related to its Cox-2 inhibitors. The FDA also reprimanded Pfizer on October 6, 1999 noting: "DDMAC has reviewed these promotional pieces and has determined that they are false or misleading because they contain unsubstantiated comparative claims, misrepresentations of Celebrex's safety profile, and are lacking in fair balance." Ultimately, on April 8, 2005, the New York Times reported the results of an FDA advisory panel: "The February advisory panel voted overwhelmingly that the company should never again advertise the drug [Celebrex]."

67.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive Celebrex as a safer and better drug than its other NSAIDs and, therefore, purchase Celebrex.

68.    Defendants widely and successfully marketed Celebrex throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of Celebrex in order to induce a widespread use and consumption. Celebrex was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff's prescribing physicians.

69.    Despite knowledge of the dangers presented by Celebrex, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for

the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Defendants' product, Celebrex, and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product, Celebrex. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product, Celebrex, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiff.

70.    In an elaborate and sophisticated manner, Defendants aggressively marketed Celebrex directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (e.g., hospitals) to include Celebrex on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payors were compelled to add Celebrex to their formularies. Defendants' marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Celebrex.

71.    Defendants represented that Celebrex was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance, NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-term use. Defendants promoted Celebrex as a safe and effective alternative that would not have the

same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

72.     Celebrex possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, Celebrex was no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Defendants chose not to warn about these risks and dangers.

73.     Defendants knew of these risks before the U.S. Food and Drug Administration (the "FDA") approved Celebrex for sale, but Defendants ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of Celebrex.   Defendants' omission, suppression, and concealment of this important information enabled Celebrex to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

74.     Consequently, Celebrex captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2004 alone, sales of Celebrex exceeded $2 billion, despite the significantly higher cost of Celebrex as compared to other pain relievers in the same family of drugs.

75.     Because Defendants engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted Celebrex as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of Celebrex, Defendants were able to justify pricing Celebrex significantly higher than the cost of generic aspirin. In reality, that price inflation was not justified. Had Defendants disclosed the truth

about Celebrex, Defendants would not and could not have reaped the billions of dollars in Celebrex sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

76.    The Defendants intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of Celebrex from Plaintiff, the public, the medical community, and the regulators. This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of Celebrex, and prevented Plaintiff from obtaining all the material information that would be important to their decisions as reasonable persons to purchase, pay for, and/or use Celebrex.

77.    Defendants' systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiff to purchase, pay for, and/or use Celebrex; and caused Plaintiff's losses and damages as asserted herein.

78.    Had Defendants done adequate testing prior to approval and "market launch," the defendants' scientific data would have revealed significant increases in stroke and myocardial infarction amongst the intended population of Celebrex consumers. Adequate testing would have shown that Celebrex possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

79.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued Celebrex sales.

19

80.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

81.    At the time Defendants manufactured, advertising, and distributed Celebrex to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase Celebrex, but instead would purchase other cheaper and safer NSAID drugs.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

82.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

83.    Defendants, directly or indirectly, negligently and/or defectively designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed the drug Celebrex (Celecoxib).

84.    At all times material hereto, Defendants had a duty to users and/or consumers of Celebrex (Celecoxib), including Plaintiff, RAMOND BEAVER, to exercise reasonable care in the design, testing, inspection, manufacture, assembly, development, labeling, sterilization, licensing, marketing, advertising, promotion, sale, packaging, supply and/or distribution of Celebrex (Celecoxib).

85.    Defendants breached that duty and were negligent in the design, testing, inspection, manufacture, assembly, development, labeling, sterilization, licensing, marketing, advertising, promotion, sale, packaging, supply and/or distribution of Celebrex (Celecoxib) in that: Celebrex (Celecoxib) was defective when put on the market by Defendants; that with such defect, Celebrex (Celecoxib) was reasonably certain to be dangerous when put to normal use;

and that Defendants failed to use reasonable care in designing or making Celebrex (Celecoxib) or in inspecting it for defects. Specifically, Defendants breached their duty by, among other things:

     a.    Failing to include adequate warnings that would alert the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, to the potential risks and serious side effects of the drug;

     b.    Failing to adequately and properly test and inspect the drug before placing the drug on the market;

     c.    Failing to conduct sufficient testing and inspection of the drug which, if properly performed, would have shown that the drug had serious side effects, including, but not limited to, heart attack, stroke, life threatening allergic and/or skin reactions and/or death.

     d.    Failing to adequately warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, of the potential risks and other serious side effects associated with the drug, including, among other things, heart attack, stroke, life threatening allergic and/or skin reactions and/or death;

     e.    Failing to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risks associated with the use of the drug;

     f.    Failing to recall and/or remove the drug from the stream of commerce despite the fact that Defendants knew or should have known of the defective and unreasonably dangerous nature of the drug, including the significant health risks associated with the use of the drug;

     g.    Encouraging misuse and overuse while failing to disclose the side effects of the drug to the medical, pharmaceutical and/or scientific communities, and users and/or consumers, including RAMOND BEAVER, in order to make a profit from sales.

86.    Defendants knew or should have known that Celebrex (Celecoxib) caused unreasonably dangerous risks and serious side effects of which users and/or consumers of the drug, including Plaintiff, were not aware.    Defendants nevertheless advertised, promoted, marketed, sold, distributed and/or supplied Celebrex (Celecoxib) knowing that there were safer methods for pain relief.

87.    As a direct, legal, proximate and producing result of the negligence of Defendants, RAMOND BEAVER sustained substantial injuries including, among other things, a heart attack.  This injury caused extensive pain and suffering and severe emotional distress and substantially reduced RAMOND BEAVER'S ability to enjoy life.  In addition, Defendants' negligence caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

88.    As a direct, legal, proximate and producing result of the negligence of Defendants, RAMOND BEAVER was injured in health, strength and activity and suffered physical injuries as well as mental anguish.  All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to physical injury and damages.

89.    As a direct, legal, proximate and producing result of the negligence of Defendants, RAMOND BEAVER required reasonable and necessary health care treatment and services and had incurred expenses therefore. Defendants' negligence was a contributing cause of Plaintiff's injuries and Plaintiff's economic and non economic loss. As a result of Defendant's negligence, Plaintiff has suffered and will continue to suffer.

90.    By reason of the foregoing, Plaintiff was damaged by the negligence and wanton and willful recklessness of the Defendants.  The amount sought herein exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this matter.

### SECOND CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY
### DEFECTIVE DESIGN

91.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

22

92.    At all times material hereto, Defendants have engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the drug Celebrex (Celecoxib), which is defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiff.

93.    At all times material hereto, Celebrex (Celecoxib) was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed by Defendants in a defective and unreasonably dangerous condition in ways which include, but are not limited to, one or more of the following:

a.    When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe and fit for its intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the drug, including Plaintiff, to risks which exceeded the benefits of the drug;

b.    The drug was insufficiently tested;

c.    The drug caused harmful side effects that outweighed any potential utility;

d.    The drug was not accompanied by adequate labeling or instructions for use to fully apprise the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, of the potential risks and serious side effects associated with its use;

e.    In light of the potential and actual risk of harm associated with the drug's use, a reasonable person who had actual knowledge of this potential and actual risk of harm would have concluded that Celebrex (Celecoxib) should not have been marketed in that condition.

23

94.    At all times the drug Celebrex (Celecoxib) was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed, it was expected to reach, and did reach, users and/or consumers of the drug across the United States, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold.

95.    At all times, RAMOND BEAVER used Celebrex (Celecoxib) for its intended or reasonably foreseeable purpose.

96.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff sustained substantial injuries including, among other things, a heart attack. These injuries caused extensive pain and suffering and severe emotional distress and substantially reduced Plaintiff's ability to enjoy life. In addition, the defective and unreasonably dangerous condition of Celebrex (Celecoxib) caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

97.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff was injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries, caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to physical injury and damages.

98.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff, RAMOND BEAVER, required reasonable and necessary health care treatment and service and had incurred expenses therefore.

99.    By reason of the foregoing, RAMOND BEAVER was damaged by the wanton and willful recklessness of the Defendants, who will be liable to Plaintiff. The amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

### THIRD CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY
### FAILURE TO WARN

100.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

101.    Celebrex (Celecoxib) was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, to the dangerous risks and reactions associated with Celebrex (Celecoxib) when used for its intended or reasonably foreseeable purpose.  Those dangerous risks and reactions included, but were not limited to, heart attack, stroke, life threatening allergic and/or skin reactions and/or death.

102.    At all times, RAMOND BEAVER used the drug for its intended or reasonably foreseeable purpose.

103.    RAMOND BEAVER could not have discovered any defect in the drug through the exercise of care.

104.    Defendants, as manufacturers of a prescription drug, are held to the level of knowledge of an expert in the field.

105.    The warnings that were given by Defendants were not accurate or clear and/or were ambiguous.

106.    Defendants had a continuing duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, of the potential risks and serious side effects associated with the use of Celebrex (Celecoxib).

107.    As a direct, legal, proximate and producing result of Defendant's failure to warn, RAMOND BEAVER sustained harm, including, among other things, a heart attack.  These injuries caused extensive pain and suffering and severe emotional distress and substantially reduced RAMOND BEAVER'S ability to enjoy life.  In addition, Defendants' failure to warn caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

25

108.    As a direct, legal, proximate and producing result of Defendants' failure to warn, RAMOND BEAVER was injured in health, strength and activity and suffered physical injuries as well as mental anguish.    All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injuries and damages.

109.    As a direct, legal, proximate and producing result of Defendants' failure to warn, RAMOND BEAVER required reasonable and necessary health care treatment and services and had incurred expenses therefore.

110.    By reason of the foregoing, RAMOND BEAVER was damaged by the wanton and willful recklessness of the Defendants who will be liable to Plaintiff.    The amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY

111.    Plaintiff realleges all prior paragraphs of this complaint as if fully set out herein.

112.    Defendants Searle, Pharmacia, Monsanto, Pfizer and Pollard (hereinafter "Defendants") made express representations to the consuming public at large through their aggressive marketing and advertising campaigns relative to their product, Celebrex.

113.    Defendants Searle, Pharmacia, Monsanto and Pfizer through their detail sales representatives, including Defendant Pollard, made representations of the safety and efficacy of their product, Celebrex.

114.    Celebrex does not conform to the express representations made through the Defendants' advertising and marketing efforts

115.    Celebrex does not conform to the express representations made by Defendants' agents/sales representatives, including Defendant Pollard.

116.    Defendants' conduct in this matter was a contributing cause of injuries and

26

damages suffered by Plaintiff.

117.    Wherefore, this Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus cost.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

118.    Plaintiff repeats and realleges each of the allegations contained in the Complaint.

119.    Defendant is a "merchant" as defined in *Alabama Code Annotated* § 7-2-104.

120.    Celebrex (Celecoxib) is a "good" as defined *Alabama Code Annotated* § 7-2-105.

121.    At the time that Defendants designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed the drug Celebrex (Celecoxib), Defendants knew of the intended, reasonably foreseeable and/or ordinary use of Celebrex (Celecoxib) and impliedly warranted the drug to be of merchantable quality and safe and fit for such use.

122.    RAMOND BEAVER, in ingesting Celebrex (Celecoxib), reasonably relied upon the skill and judgment of Defendants as to whether Celebrex (Celecoxib) was of merchantable quality and safe and fit for its intended, reasonably foreseeable and/or ordinary use.

123.    In breach of the implied warranty given by Defendants, Celebrex (Celecoxib) was not of merchantable quality or safe or fit for its intended, reasonably foreseeable and/or ordinary use because the product was and is unmerchantable, in a defective condition and unreasonably dangerous and unfit for the intended, reasonably foreseeable and/or ordinary purpose for which it was intended as described above.

124.    In breach of the implied warranty given by Defendants, Celebrex (Celecoxib) was not of merchantable quality or safe or fit for its intended, reasonably foreseeable and/or ordinary use because, among other things:

a.    Use of Celebrex (Celecoxib) carried a risk of, among other things, heart attack, stroke, life threatening allergic and/or skin reactions and/or death;

27

b.     Defendants failed to include adequate warnings with the drug that would alert the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, of the potential risks and serious side effects of the drug;

c.     Defendants failed to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the potential risks and serious side effects associated with the use of the drug.

125.   As a direct, legal, proximate and producing result of Defendants' breach of warranty, RAMOND BEAVER sustained substantial injuries including, among other things, a heart attack. These injuries caused extensive pain and suffering and severe emotional distress and substantially reduced RAMOND BEAVER'S ability to enjoy life. In addition, Defendants' failure to warn caused Plaintiff to expend substantial sums of money for medical, hospital and related care.

126.   As a direct, legal, proximate and producing result of Defendants' breach of warranty, RAMOND BEAVER has been injured in health, strength and activity and suffered physical injuries as well as mental anguish.  All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injuries and damages.

127.   As a direct, legal, proximate and producing result of Defendants' breach of warranty, RAMOND BEAVER required reasonable and necessary health care treatment and services and had incurred expenses therefore.

128.   As a result of Defendant's breach of warranty, Plaintiff has suffered and will continue to suffer.

129.   By reason of the foregoing, RAMOND BEAVER has been damaged by the wanton and willful recklessness of the Defendants who will be liable to Plaintiff.  The amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

## SIXTH CAUSE OF ACTION
### FRAUD

130.    Plaintiff repeats and realleges each of the allegations contained in the Complaint.

131.    Defendants recklessly, knowingly, intentionally, and fraudulently misrepresented to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, the safety and efficacy of the drug and/or recklessly, knowingly, intentionally and fraudulently concealed from the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, material, adverse information regarding the safety and efficacy of Celebrex (Celecoxib).

132.    Defendants' misrepresentations were communicated to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, with the intent that they reach users and/or consumers of the drug, including RAMOND BEAVER.

133.    Defendants either knew or should have known that the representations were false.

134.    Defendants made the misrepresentations and/or actively concealed information concerning the safety and efficacy of the drug with the intention and specific desire that the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, would rely on such in selecting Celebrex (Celecoxib) as a pain reliever.

135.    Defendants made these misrepresentations and/or actively concealed information concerning the safety and efficacy of Celebrex (Celecoxib) in its labeling, advertising, product inserts, promotional materials or other marketing efforts.

136.    Defendants made these misrepresentations and actively concealed adverse information at a time when Defendants knew or should have known that its drug product had defects, dangers and characteristics that were other than what Defendants had represented to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug,

29

including Plaintiff. Specifically, Defendants misrepresented to and/or actively concealed from the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, that:

        a.     There had been insufficient studies regarding the safety and efficacy of the drug;

        b.     The drug was fully and adequately tested, despite knowing that there had been insufficient or inadequate testing of the drug;

        c.     Prior studies, research, reports and/or testing had been conducted linking the use of the drug to serious prothrombotic and allergic and/or skin reactions, including, but not limited to, adverse cardiovascular events and/or Stevens-Johnson Syndrome/toxic epidermal necrolysis;

        d.     Defendants knew or should have known of reports of increased heart attacks, allergic and/or skin reactions and/or strokes;

        e.     Defendants knew or should have known of the greatly increased risk of developing heart attacks, allergic and/or skin reactions and/or strokes associated with use of Celebrex (Celecoxib); yet, despite this they were downplaying the risk of the drug.

137. The misrepresentations of and/or active concealment by Defendants were perpetuated directly and/or indirectly by Defendants, its sales representatives, employees, distributors, agents and/or detail persons.

138. The misrepresentations of and/or active concealment by Defendants constitute a continuing tort. Indeed, through Defendants' product inserts, Defendants continued to misrepresent the potential risks and serious side effects associated with the use of Celebrex (Celecoxib). Moreover, Defendants had a post-sale duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, about the potential risks and serious side effects associated with the use of Celebrex (Celecoxib) in a timely manner, yet they failed to provide such warning.

139.   RAMOND BEAVER justifiably relied on and/or was induced by the misrepresentations and/or active concealment of Defendants to purchase and ingest Celebrex (Celecoxib) to his detriment.

140.   As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER sustained substantial injuries including, among other things, a heart attack. These injuries caused extensive pain and suffering and severe emotional distress for Plaintiff, and substantially reduced RAMOND BEAVER'S ability to enjoy life. In addition, the misrepresentations of Defendants caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

141.   As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER has been injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries caused RAMOND BEAVER intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injury and damages.

142.   As a result of Defendant's fraud, Plaintiff has suffered and will continue to suffer.

143.   As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER required reasonable and necessary health care treatment and service and had incurred expenses therefore.

144.   By reason of the foregoing, RAMOND BEAVER has been damaged by the wanton and willful recklessness of the Defendants who will be liable to Plaintiff. The amount sought herein exceeds the jurisdicuonal limits of all lower courts which would otherwise have jurisdiction over this matter.

## SEVENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

145.   Plaintiff repeats and realleges each of the allegations contained in the Complaint.

146.    Defendants negligently misrepresented or failed to exercise reasonable care in representing to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, the safety and efficacy of the drug and/or negligently concealed or failed to exercise reasonable care by concealing and failing to disclose to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, material, adverse information regarding the safety and efficacy of Celebrex (Celecoxib).

147.    Defendants' misrepresentations were communicated to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, with the intent that they reach users and/or consumers of the drug, including Plaintiff.

148.    Defendants made these misrepresentations and/or actively concealed information concerning the safety and efficacy of Celebrex (Celecoxib) in its labeling, advertising, product inserts, promotional materials or other marketing efforts.

149.    Defendants either knew or should have known that the representations were false.

150.    Defendants knew or should have known that the misrepresentations and/or omissions concerning the safety and efficacy of the drug would be relied upon by the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, in selecting Celebrex (Celecoxib) as a pain reliever.

151.    Defendants made these misrepresentations and actively concealed adverse information at a time when Defendants knew or should have known that its drug product had defects, dangers and characteristics that were other than what Defendants had represented to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff.  Specifically, Defendants misrepresented to and/or actively concealed from the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, that:

a.    There had been insufficient studies regarding the safety and efficacy of the

drug;

    b.    The drug was fully and adequately tested, despite the fact that there had been insufficient or inadequate testing of the drug;

    c.    Prior studies, research, reports and/or testing had been conducted linking the use of the drug to serious adverse cardiovascular events, allergic and/or skin reactions and strokes;

    d.    Defendants knew or should have known of reports of heart attacks associated with the use of the drug;

    e.    Defendants knew or should have known of the greatly increased risk of heart attacks, strokes, life threatening allergic and/or skin reactions and/or death and other serious and life threatening side effects associated with the drug; yet, despite this was downplaying the risks of the drug.

152.    The misrepresentations of and/or active concealment by Defendants were perpetuated directly and/or indirectly by Defendants, their sales representatives, employees, distributors, agents and/or detail persons, including Defendant Pollard.

153.    The misrepresentations of and/or active concealment by Defendants constitute a continuing tort.    Indeed, through Defendants' product inserts, Defendants continued to misrepresent the potential risks and complications associated with Celebrex (Celecoxib). Moreover, Defendants had a post-sale duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, about the potential risks and serious side effects associated with the use of Celebrex (Celecoxib) in a timely manner, yet it failed to provide such warning.

154.    Plaintiff justifiably relied on and/or was induced by the misrepresentations and/or active concealment of Defendants to purchase and ingest Celebrex (Celecoxib) to his detriment.

155.    As a direct, legal, proximate and producing result of the misrepresentations of Defendants, Plaintiff sustained harm, including, among other things, a heart attack.    These

injuries have caused extensive pain and suffering and severe emotional distress and substantially reduced Plaintiff's ability to enjoy life. In addition, the misrepresentations of Defendants caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

156.    As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER was injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injury and damages.

157.    As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER required reasonable and necessary health care treatment and service and had incurred expenses therefore.

158.    As a result of the misrepresentations of the Defendants, Plaintiff has suffered and will continue to suffer.

159.    By reason of the foregoing, Plaintiff has been damaged by the wanton and willful recklessness of these Defendants who will be liable to Plaintiff.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendants be cited to appear and answer herein; that upon final trial herein, Plaintiff recovers damages as set forth above from Defendants, including cost of Court, pre-judgment and post-judgment interest at the legal rates, and that Plaintiff has such other and further relief, both general and special, at law and in equity, to which she may be justly entitled under the facts and attending circumstances.

Dated: November 2 , 2007          BY:   *Navan Ward Jr.*

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
Navan Ward, Jr. (WAR062)
Andy D. Birchfield, Jr. (BIR006)
234 Commerce Street
Montgomery, Alabama 36104
Telephone: (334) 269-2343

34

Facsimile: (334) 954-7555

*ATTORNEYS FOR PLAINTIFFS*

## PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES

# Exhibit 4



JURY AWARDS IN AEMLD CASES

$950,000 — Castleberry v. Central Mach. Co., 2004 WL 3261150 (Ala. Cir. Ct., Elmore County, Sept. 2, 2004) (products liability action by a woman whose hand was injured by a chicken breast and liver harvesting machine)

$50,000,000 (Original Verdict) — Mack Trucks, Inc. v. Witherspoon, 867 So. 2d 307 (Ala. 2003) (products liability case arising out of a tractor-trailer rollover)

$12,000,000 ($8,000,000 Compensatory, $4,000,000 Punitive) — Merism v. ProTech Industries, 2003 WL 23111670 (Ala. Cir. Ct., Lamar County, Aug. 26, 2003) (wrongful death case based on products liability claim against truck manufacturer arising out of rollover and absence of cab guard on logging truck)

$7,000,000 — Daniel v. Snap Products, 2003 WL 23111813 (Ala. Cir. Ct., Baldwin County, May 28, 2003) (wrongful death case based on products liability claim against manufacture of the repair product after treated the exploded)

$4,161,500 ($1,061,500 Compensatory, $3,100,000 Punitive) — McCain, et al. v. Metabolife Intl., Inc., 259 F. Supp. 2d 1225 (N.D. Ala. 2002) (products liability action by four plaintiffs who suffered cardiac symptoms after using ephedra-based diet drug) (reversed on appeal, 401 F.3d 1233 (11th Cir. 2005), and remanded for a new trial)

$960,000 ($25,000 over and above $935,000 in pre trade settlement) — Hannah v. Grace Blend & Berry, 2002 WL 32169653 (Ala. Cir. Ct., Colbert County, Oct. 23, 2002) (wrongful death case arising out of fatal crush injury in industrial belt equipment)

$122,800,000 ($22,800,000 Compensatory, $100,000,000 Punitive) — Jernigan v. General Motors Corp., Bullock County (May 3, 2002) (products liability case arising out of collapse of Oldsmobile passenger compartment) (reversed on appeal, 883 So.2d 646 (Ala. 2003), and remanded for new trial)

$510,000 (Compensatory) $10,000,000 (Punitive) — Hobart Corporation v. Scottie W. Scarcha, 776 So.2d 36 (Ala. 2000) (products liability action by a man who was injured while using a meat saw manufactured by Hobart)

$3,000,000 ($2,500,000 Compensatory $500,000 Punitive) — Cessna Aircraft Company v. Robert Trucksell, 682 So. 2d 17 (Ala. 1996) (products liability action by a man who was injured in an airplane crash due to a defective shoulder harness)

$1,000,000 (Original verdict $325,000) — Uniroyal Goodrich Tire Company v. Melin Darryl Hall, 681 So. 2d 126 (Ala. 1996) (products liability action by a man who was injured when wheel rim exploded)

$1,225,000 — Ford Motor Company v. June Burchalow, 661 So. 2d 236 (Ala. 1995) (wrongful death case brought against truck manufacturer after decedent was killed by a truck's transmission slipping out of neutral and crushing him)

1/1228422.5

1

| | |
|---|---|
| $13,000,000 | General Motors Corporation v. Pamela L. Saint, 646 So. 2d 564 (Ala. 1994) (products liability action by a woman who was injured due to a defective seat belt) |
| $250,000 ($100,000 Compensatory, $150,000 Punitive) | Fincher Enterprises, Inc. v. Maryann Davis, 780 So. 2d 1132 (Ala. 1996) (products liability action by a woman who found human blood in styrofoam package containing bloody gravy) |
| $250,000 | Caterpillar, Inc. v. Hightower, 605 So. 2d 1193 (Ala. 1992) (product liability action brought by a man who was injured by a broken tree trunk while handling machinery during logging operation) |
| $115,000 | Bucyrus Welders, Inc. v. Kalahian, 423 So. 2d 441 (Ala. 1982) (product liability claim against manufacturer for personal injuries received on electric welder) |
| $6,500,000 | Sears, Roebuck & Co. v. Harris, 630 So. 2d 1018 (Ala. 1993) (wrongful death case based on product liability claim against manufacturer and retailer of gas water heater that caused carbon monoxide poisoning) |
| $7,500,000 | General Motors Corp. v. Johnson, 592 So. 2d 1054 (Ala. 1992) (wrongful death case based on product liability claim where child was killed in automobile accident) |
| $3,000,000 | Industrial Chem. & Fiberglass Corp. v. Chandler, 547 So. 2d 812 (Ala. 1989) (widows of two workers killed in industrial accident brought wrongful death action against distributor of cleaning substances that ignited and caused death of workers) |
| $2,300,000 | General Motors Corp. v. Edwards, 428 So. 2d 1176 (Ala. 1985) (wrongful death case based on products liability claim where two boys were killed in automobile accident) |
| $200,000 | Interstate Engineering, Inc. v. Burnett, 474 So. 2d 624 (Ala. 1985) (wrongful death case brought against manufacturer of heat detector after decedent was killed in a fire) |
| $300,000 | Piper Aircraft Corp. v. Byron, 434 So. 2d 594 (Ala. 1982) (damages in wrongful death case based on product liability claim against airplane manufacturer where decedent was killed in plane crash) |
| $500,000 | Caterpillar Tractor Co. v. Ford, 406 So. 2d 854 (Ala. 1981) (wrongful death case based on product liability claim where decedent was killed in an accident on a tractor manufactured by defendant) |

FILED

2007 Dec-10  PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 7

## AFFIDAVIT OF WINWOOD UMPHLETT

STATE OF MISSISSIPPI        }
                            }
COUNTY OF _Lauderdale_      }

I Winwood Umphlett, under penalty of perjury, state as follows:

1.    I am over the age of eighteen years and am otherwise competent to make this affidavit. This affidavit is based upon my personal knowledge.

2.    I currently reside in Mississippi. I am not a resident of Alabama.

3.    I have been employed by Pfizer since 1966 as a pharmaceutical sales representative (also known as a "detailer").

4.    As a detailer, I visit physicians and healthcare providers' offices and provide them FDA-approved package inserts and other FDA-approved information about Pfizer's products, which is referred to as "detailing." My job is to make the physician aware of certain of Pfizer's products, so that he or she could consider whether to prescribe them for particular patients.

5.    I am not a physician or pharmacist. The information and material I use to detail Pfizer's drugs is derived exclusively from education provided to me by Pfizer. Pfizer provides me with the FDA-approved package inserts and other FDA-approved information for the medications I detail. I have no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

6.    I have never detailed Celebrex® in Alabama. Thus, if plaintiff's prescribing physician is located in Alabama, I have never visited with or provided any information about Celebrex® to plaintiff's prescribing physician.

7.    At no time did I have any involvement with the design, manufacture,

development or testing of the prescription medication of Celebrex®, nor did I have any

involvement in the FDA-approved package insert for Celebrex®.

8.    At no time did I sell, offer to sell, or take orders for the sale of Celebrex®

to healthcare providers, physicians, or patients.

9.    I have never made any representations to the general public concerning

Celebrex®.

10.    I have never met with or spoken with the plaintiff, Ramond Beaver, and I

have never sold or given Celebrex® to Ramond Beaver.

FURTHER AFFIANT SAITH NOT.

    This **24th** day of November, 2007.

_____
Winwood Umphlett

STATE OF MISSISSIPPI

COUNTY OF Lauderdale

    PERSONALLY APPEARED BEFORE ME the undersigned authority in and for
the state and county above, WINWOOD UMPHLETT, who after being duly sworn,
stated on oath that the above statements are true and correct to the best of his knowledge.

    SWORN TO AND SUBSCRIBED BEFORE ME, this **24** day of November,
2007.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

Feb 26, 2008



JILL **GAVIN**
Notary Public **State of MS**
My Comm. Expires **Feb. 26, 2008**

## AFFIDAVIT OF DIANN LOPER

STATE OF _Mississippi_ }

COUNTY OF _Lamar_ }

I Diann Loper, under penalty of perjury, state as follows:

1.    I am over the age of eighteen years and am otherwise competent to make this affidavit. This affidavit is based upon my personal knowledge.

2.    I currently reside in Mississippi. I am not a resident of Alabama.

3.    I was formerly employed by Pfizer and legacy companies (hereinafter collectively "Pfizer") until May of 2005 as a pharmaceutical sales representative (also known as a "detailer").

4.    As a detailer, I visit physicians and healthcare providers' offices and provide them FDA-approved package inserts and other FDA-approved information about Pfizer's products, which is referred to as "detailing." My job is to make the physician aware of certain of Pfizer's products, so that he or she could consider whether to prescribe them for particular patients.

5.    I am not a physician or pharmacist. The information and material I use to detail Pfizer's drugs is derived exclusively from education provided to me by Pfizer. Pfizer provides me with the FDA-approved package inserts and other FDA-approved information for the medications I detail. I have no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

6.      I have never detailed Celebrex® in Alabama. Thus, if plaintiff's prescribing physician is located in Alabama, I have never visited with or provided any information about Celebrex® to plaintiff's prescribing physician.

7.      At no time did I have any involvement with the design, manufacture, development or testing of the prescription medication of Celebrex®, nor did I have any involvement in the FDA-approved package insert for Celebrex®.

8.      At no time did I sell, offer to sell, or take orders for the sale of Celebrex® to healthcare providers, physicians, or patients.

9.      I have never made any representations to the general public concerning Celebrex®.

10.     I have never met with or spoken with the plaintiff, Ramond Beaver, and I have never sold or given Celebrex® to Ramond Beaver.

FURTHER AFFIANT SAITH NOT.

This _____ day of November, 2007.

_____
Diann Loper

2

STATE OF _MS_

COUNTY OF _LAMAR_

PERSONALLY APPEARED BEFORE ME the undersigned authority in and for the state and county above, DIANN LOPER, who after being duly sworn, stated on oath that the above statements are true and correct to the best of his knowledge.

SWORN TO AND SUBSCRIBED BEFORE ME, this _28_ day of November, 2007.

Terri K. Riles
NOTARY PUBLIC

MY COMMISSION EXPIRES:

NOTARY PUBLIC STATE OF MISSISSIPPI AT LARGE
MY COMMISSION EXPIRES: June 26, 2011
BONDED THRU NOTARY PUBLIC UNDERWRITERS



3

## AFFIDAVIT OF LESLIE HOOPER

STATE OF Alabama }
COUNTY OF Montgomery }

I Leslie Hooper, under penalty of perjury, state as follows:

1.     I am over the age of eighteen years and am otherwise competent to make this affidavit. This affidavit is based upon my personal knowledge.

2.     I currently reside in Alabama.

3.     I was formerly employed by Pharmacia and legacy company G. D. Searle, LLC (hereinafter collectively "Pharmacia") until October of 2002 as a pharmaceutical sales representative (also known as a "detailer").

4.     As a detailer, I visited physicians and healthcare providers' offices and provided them FDA-approved package inserts and other FDA-approved information about Pharmacia's products, which is referred to as "detailing." My job was to make the physician aware of certain of Pharmacia's products, so that he or she could consider whether to prescribe them for particular patients.

5.     I am not a physician or pharmacist. The information and material I used to detail Pharmacia's drugs was derived exclusively from education provided to me by Pharmacia. Pharmacia provided me with the FDA-approved package inserts and other FDA-approved information for the medications I detailed. I had no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

6.    I have never detailed Celebrex® in Alabama. Thus, if plaintiff's prescribing physician is located in Alabama, I have never visited with or provided any information about Celebrex® to plaintiff's prescribing physician.

7.    At no time did I have any involvement with the design, manufacture, development or testing of the prescription medication Celebrex®, nor did I have any involvement in the FDA-approved package insert for Celebrex®.

8.    At no time did I sell, offer to sell, or take orders for the sale of Celebrex® to healthcare providers, physicians, or patients.

9.    I have never made any representations to the general public concerning Celebrex®.

10.    I have never met with or spoken with the plaintiff, Ramond Beaver, and I have never sold or given Celebrex® to Ramond Beaver.

FURTHER AFFIANT SAITH NOT.

This  4th  day of December, 2007.

Leslie Hooper

Leslie Hooper

2

STATE OF Alabama

COUNTY OF Montgomery

PERSONALLY APPEARED BEFORE ME the undersigned authority in and for the state and county above, LESLIE HOOPER, who after being duly sworn, stated on oath that the above statements are true and correct to the best of her knowledge.

SWORN TO AND SUBSCRIBED BEFORE ME, this _____ day of December, 2007.

NOTARY PUBLIC

MY COMMISSION EXPIRES:

MY COMMISSION EXPIRES AUGUST 18, 2009

3

## AFFIDAVIT OF KRISTIE GENOVA

STATE OF ___Arkansas___    }
                            }
COUNTY OF ___Benton___      }

I Kristie Genova, under penalty of perjury, state as follows:

1.      I am over the age of eighteen years and am otherwise competent to make this affidavit. This affidavit is based upon my personal knowledge.

2.      I currently reside in Arkansas. I am not a resident of Alabama.

3.      I have been employed by Pfizer and legacy companies (hereinafter collectively "Pfizer") since 1994 as a pharmaceutical sales representative (also known as a "detailer").

4.      As a detailer, I visit physicians and healthcare providers' offices and provide them FDA-approved package inserts and other FDA-approved information about Pfizer's products, which is referred to as "detailing." My job is to make the physician aware of certain of Pfizer's products, so that he or she could consider whether to prescribe them for particular patients.

5.      I am not a physician or pharmacist. The information and material I use to detail Pfizer's drugs is derived exclusively from education provided to me by Pfizer. Pfizer provides me with the FDA-approved package inserts and other FDA-approved information for the medications I detail. I have no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

6.      I have never detailed Celebrex® in Alabama.  Thus, if plaintiff's

prescribing physician is located in Alabama, I have never visited with or provided any

information about Celebrex® to plaintiff's prescribing physician.

7.      At no time did I have any involvement with the design, manufacture,

development or testing of the prescription medication of Celebrex®, nor did I have any

involvement in the FDA-approved package insert for Celebrex®.

8.      At no time did I sell, offer to sell, or take orders for the sale of Celebrex®

to healthcare providers, physicians, or patients.

9.      I have never made any representations to the general public concerning

Celebrex®.

10.     I have never met with or spoken with the plaintiff, Ramond Beaver, and I

have never sold or given Celebrex® to Ramond Beaver.

FURTHER AFFIANT SAITH NOT.

        This __27__ day of November, 2007.

                                                _Kristie Genova_
                                                Kristie Genova

STATE OF _ARKANSAS_

COUNTY OF _BENTON_

        PERSONALLY APPEARED BEFORE ME the undersigned authority in and for
the state and county above, KRISTIE GENOVA, who after being duly sworn, stated on
oath that the above statements are true and correct to the best of his knowledge.

        SWORN TO AND SUBSCRIBED BEFORE ME, this __27__ day of November,
2007.

┌─────────────────────────────────┐
│        OFFICIAL SEAL            │
│        KEVIN HOWARD             │
│        BENTON COUNTY           │
│   NOTARY PUBLIC - ARKANSAS     │
│  COMMISSION EXP. JULY 10, 2015 │
└─────────────────────────────────┘

                                        _Kevin Howard_
                                        NOTARY PUBLIC

2

MY COMMISSION EXPIRES:

10 2015

OFFICIAL SEAL
KEVIN HOWARD
BENTON COUNTY
NOTARY PUBLIC - ARKANSAS
MY COMMISSION EXP. JULY 10, 2015

## AFFIDAVIT OF TERRI ALLEN

**STATE OF _Mississippi_____**    }
**COUNTY OF  Lamar_____ }**

I Terri Allen, under penalty of perjury, state as follows:

1.      I am over the age of eighteen years and am otherwise competent to make this affidavit.  This affidavit is based upon my personal knowledge.

2.      I currently reside in Mississippi.  I am not a resident of Alabama.

3.      I was formerly employed by Pfizer and legacy companies (hereinafter collectively "Pfizer") until June of 2005 as a pharmaceutical sales representative (also known as a "detailer").

4.      As a detailer, I visited physicians and healthcare providers' offices and provided them FDA-approved package inserts and other FDA-approved information about Pfizer's products, which is referred to as "detailing."  My job was to make the physician aware of certain of Pfizer's products, so that he or she could consider whether to prescribe them for particular patients.

5.      I am not a physician or pharmacist.  The information and material I used to detail Pfizer's drugs was derived exclusively from education provided to me by Pfizer.  Pfizer provided me with the FDA-approved package inserts and other FDA-approved information for the medications I detailed.  I had no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

6.      I have never detailed Celebrex® in Alabama.  Thus, if plaintiff's prescribing physician is located in Alabama, I have never visited with or provided any information about Celebrex® to plaintiff's prescribing physician.

7.     At no time did I have any involvement with the design, manufacture, development or testing of the prescription medication of Celebrex®, nor did I have any involvement in the FDA-approved package insert for Celebrex®.

8.     At no time did I sell, offer to sell, or take orders for the sale of Celebrex® to healthcare providers, physicians, or patients.

9.     I have never made any representations to the general public concerning Celebrex®.

10.    I have never met with or spoken with the plaintiff, Ramond Beaver, and I have never sold or given Celebrex® to Ramond Beaver.

FURTHER AFFIANT SAITH NOT.

This 30th day of November, 2007.

Terri Allen

2

STATE OF _Mississippi_

COUNTY OF _Lamar_

PERSONALLY APPEARED BEFORE ME the undersigned authority in and for the state and county above, TERRI ALLEN, who after being duly sworn, stated on oath that the above statements are true and correct to the best of his knowledge.

SWORN TO AND SUBSCRIBED BEFORE ME, this 30th day of November, 2007.

Judy Pearson
NOTARY PUBLIC

MY COMMISSION EXPIRES:



3

# Exhibit 8


ELECTRONICALLY FILED
11/7/2007 10:54 AM
CV-2007-900105.00
CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA
NANCY L. HEARN, CLERK

IN THE CIRCUIT COURT OF
COLBERT COUNTY, ALABAMA

RAMOND BEAVER                                    §
                                                 §
          PLAINTIFF,                             §
                                                 §
VS.                                              §          CIVIL ACTION NO. CV-07-900105
                                                 §
PFIZER, INC.; G. D. SEARLE, LLC.                 §
(hereinafter "Searle") a subsidiary of           §
PHARMACIA CORPORATION,                           §
(hereinafter "Pharmacia"), a Foreign             §
Corporation; MONSANTO COMPANY;                   §
TERRI R. ALLEN, (hereinafter "Allen"),           §
an Individual, KRISTIE GENOVA,                   §
(hereinafter "Genova"), an Individual,           §
LESLIE HOOPER, (hereinafter "Hooper"), §
and Individual, DIANN LOPER,                     §
(hereinafter "Loper"), an Individual and         §
WINWOOD UMPHLETT, (hereinafter                   §
"Umphlett") an Individual, and fictitious        §
Defendants A, B, C and D being those             §
persons, firms or corporations whose             §
actions, inactions, fraudulent suppression,      §
fraud, scheme to defraud and/or other            §
wrongful conduct caused or contributed to        §
the Plaintiff's injuries and damages, and        §
whose true names and identities are              §
presently unknown to the Plaintiff but will      §
be substituted by amendment when                 §
ascertained,                                     §
                                                 §
          DEFENDANTS.                            §

## COMPLAINT

### TRIAL BY JURY IS REQUESTED

1.    This is a civil action brought by Plaintiff, RAMOND BEAVER, for injuries

resulting in a heart attack. Plaintiff was prescribed and used the prescription medication

CELEBREX (Celecoxib). This action seeks monetary damages for personal injuries pursuant to

AL Code Ann. Sec. 11-7-13, damages caused by the drugs named herein and ingested by

1

Plaintiff.

2.      Plaintiff, RAMOND BEAVER is an adult resident of Colbert County, Alabama.

3.      Plaintiff, RAMOND BEAVER, was an adult resident of Colbert County, Alabama at the time of his injury.

4.      Defendant Pfizer Inc. (hereinafter "Pfizer") is a Delaware corporation, and at all times relevant hereto Pfizer was in the business of marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib). Defendant Pfizer is licensed and registered to do business in Alabama and may be served through its registered agent: The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109. 5.    Defendant Pharmacia Corporation is a Delaware Corporation licensed and registered to do business in Alabama and can be served through its registered agent: The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109.

6.      Defendant Monsanto Company (hereinafter "Monsanto") is the parent of Pharmacia and is a Delaware Corporation. At all times relevant hereto Monsanto through its subsidiary companies was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib). Defendant Monsanto is licensed and registered to do business in Alabama, and may be served through its agent: CSC Lawyers Incorporating Service, Inc.; 150 South Perry Street; Montgomery, Alabama 36104.

7.      Defendant G. D. Searle LLC. (hereinafter "Searle") is a subsidiary of Pharmacia Corporation, and is upon information, knowledge and belief an Illinois Corporation, and is registered to do business in Alabama. As such, Defendant Searle can be served through its registered agent: The Corporation Company; 2000 Interstate Park Drive, Suite 204; Montgomery, Alabama 36109. At all times relevant hereto, Searle as a subsidiary of Pharmacia Corporation and Pharmacia Corporation (hereinafter "Pharmacia"); at all times relevant to this

2

action was in the business of manufacturing, marketing, selling and distributing the pharmaceutical product Celebrex (Celecoxib).

8.    Defendant Terri R. Allen (hereinafter "Allen") is, upon information and belief, over the age of nineteen years and a resident of Forrest County, Mississippi. At all times relevant hereto Defendant Allen was a sales representative employed by Defendant Pfizer, Inc. to call upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Allen may be served at her home address: 17 Belletower Turn, Hattiesburg, Mississippi 39406.

9.    Defendant Kristie Genova (hereinafter "Genova") is, upon information and belief, over the age of nineteen years and a resident of Benton County, Arkansas. At all times relevant hereto Defendant Genova was a sales representative employed by Defendant Pfizer, Inc. to call upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Genova may be served at her home address: 4105 NE Cadbury Avenue, Bentonville, Arkansas 73712.

10.    Defendant Leslie Hooper (hereinafter "Hooper") is, upon information and belief, over the age of nineteen years and a resident of Montgomery County, Alabama. At all times relevant hereto Defendant Hooper was a sales representative employed by Defendant Pfizer, Inc. to call upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Hooper may be served at her home address: 2525 Aimee Drive, Montgomery, Alabama 36106.

11.    Defendant Diann Loper (hereinafter "Loper") is, upon information and belief, over the age of nineteen years and a resident of Forrest County, Mississippi. At all times relevant hereto Defendant Loper was a sales representative employed by Defendant Pfizer, Inc. to call

3

upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Loper may be served at her home address: 89 Brewer Road, Hattiesburg, Mississippi 39406.

12.     Defendant Winwood Umphlett (hereinafter "Umphlett") is, upon information and belief, over the age of nineteen years and a resident of Lauderdale County, Mississippi. At all times relevant hereto Defendant Umphlett was a sales representative employed by Defendant Pfizer, Inc. to call upon physicians in Alabama, including Plaintiff's prescribing physician, for the express purpose of marketing Celebrex. Defendant Umphlett may be served at his home address: 1705 Hunters Run, Meridian, Mississippi 39305.

13.     Personal jurisdiction and subject matter jurisdiction are appropriate in this court as to all Defendants, as all Defendants have done business in Colbert County, Alabama, either directly or by agent, and have thus availed themselves of this jurisdiction.

14.     The Plaintiff's claims accrued in whole or in part in this judicial district and the Plaintiff resided in this judicial circuit at the time of his injury. Some of these Defendants are foreign corporations, which have been and are currently engaged in business, directly or by authorized agent, in this judicial district. Venue and jurisdiction are therefore proper. The claims of Plaintiff herein satisfy the jurisdictional amount of this court.

15.     Celebrex is a pharmaceutical treatment for musculoskeletal joint pain associated with osteoarthritis, among other maladies. Defendants Searle, Pharmacia, Monsanto, Pfizer and Pollard did manufacture, design, package, market and/or distribute this drug. Defendants Searle, Pharmacia, Pfizer, Allen, Genova, Hooper, Loper, and Umphlett (hereinafter "Defendants") encouraged the use of this drug in improper customers, misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects. These

4

Defendants aggressively marketed this drug directly to the consuming public, although only available through prescription, through the use of various marketing mediums, including, but not limited to, print and television advertisements. These Defendants did this to increase sales and profits.

16.    At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and/or sell their product so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by this product. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to the Plaintiff's individual rights, and hence punitive damages are appropriate.

**BACKGROUND**

17.    Celebrex is a pharmaceutical treatment for musculoskeletal joint pain associated with osteoarthritis, among other maladies.  Defendants Searle, Pharmacia, Monsanto, Pfizer, Allen, Genova, Hooper, Loper, and Umphlett did manufacture, design, package, market, sell and/or distribute this drug.    Defendants Searle, Pharmacia, Pfizer, Allen, Genova, Hooper, Loper, and Umphlett (hereinafter "Defendants") encouraged the use of this drug in improper customers, misrepresented the safety and effectiveness of this drug and concealed or understated its dangerous side effects.  These Defendants aggressively marketed this drug directly to the consuming public, although only available through prescription, through the use of various marketing mediums, including, but not limited to, sales representatives and print and television advertisements.  These Defendants did this to increase sales and profits.

18.    At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and

5

sell their product so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by this product. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to the Plaintiff's individual rights, and hence punitive damages are appropriate.

19.    This Complaint seeks redress for damages sustained by RAMOND BEAVER, resulting from his use of Celebrex (Celecoxib), manufactured and sold by Pharmacia, G.D. Searle, Monsanto and Pfizer, the Defendants herein.

20.    RAMOND BEAVER was 58 years old on or about December 29, 2005, when he suffered a heart attack due to his use of Celebrex (Celecoxib).

21.    The damages sought herein are the direct and proximate result of Defendants' wrongful conduct in connection with designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the prescription drug Celebrex (Celecoxib).

22.    At all times relevant hereto, Defendants were engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the pharmaceutical drug Celebrex (Celecoxib) throughout the United States.

23.    Had Defendant properly disclosed the risks associated with using Celebrex (Celecoxib), RAMOND BEAVER would not have taken it for treatment of pain associated with injury.

24.    This action is being brought in the Circuit Court of Colbert County, because the amount of recovery sought exceeds the jurisdictional levels of all lower courts.

6

A.    **Facts Regarding Celebrex: Science and other Cox-2 Inhibitors**

25.    Celebrex is one of a class of pain medications called non-steroidal anti-inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade name Advil) are examples of well-known NSAIDs.

26.    NSAIDs reduce pain by blocking the body's production of pain transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes.

27.    In addition to decreasing inflammation, the prostaglandins that are supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric tissue is hampered and as a result, can cause harmful gastrointestinal side effects, including stomach ulceration and bleeding.

28.    Prostaglandin I2 is the predominant cyclooxygenase product in endothelium, inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and preventing the proliferation of vascular smooth muscle. Whereas older NSAIDS inhibit Thromboxane A2 and Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane A2 is a potent platelet aggregator and vasoconstrictor which is synthesized by platelets. Therefore, while the older NSAIDS suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors support it.

29.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be expected, traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause blood clots, rather they actually reduce the risk of clots and help protect heart function.

30.    Defendants and other pharmaceutical companies set out to remedy these ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors that

7

would block only COX-2 production, thus (supposedly) allowing the proper maintenance of gastric tissue while still reducing inflammation.

31.    In making this decision, Defendants and their predecessors in interest either intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2 inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke, unstable angina. The vasoconstriction and fluid retention cause the hypertension.

32.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs, in January 1999 and initiated a massive marketing campaign to convince doctors and consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs.  In May, 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

33.    Seeking increased market share in this extremely lucrative market, Defendants, and their predecessors in interest, also sought approval of a "second generation" selective COX-2 inhibitor and filed for FDA approval of Valdecoxib (Bextra) on January 16, 2001 for the (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

## B.    Facts Regarding Celebrex's Safety and Defendants' Knowledge Thereof

34.    The potential for cardiovascular risk of selective COX-2 inhibitors was known to Defendants long before the market launch.  By 1997, and prior to the submission of the New Drug Application (the "NDA") for Celebrex, Defendants was aware that, by inhibiting COX-2, Celebrex altered the homeostatic balance between prostacylcin synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing blood clots to form in those who ingested it.  *See* Topol, E.J., *et al.*, *Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954.

35.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as Celebrex, suppressed

8

the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

36.    Based on the studies performed on Celebrex, other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendants knew when Celebrex was being developed and tested that selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors. Studies show that selective COX-2 inhibitors, including Celebrex, decrease blood levels of a prostacyclin. When those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart attack, and stroke.

37.    Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of Celebrex, Defendants failed to take any action to protect the health and welfare of patients, but instead, continued to promote the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

### 1.    Celebrex and Cox-2 Studies Did Not Show Celebrex to be Safe

38.    The defendants touted the Celebrex Long-Term Arthritis Safety Study ("CLASS") as the primary evidence to support its theory that Celebrex was safer for consumers that could not tolerate traditional NSAIDs in their gastrointestinal system. (CLASS data is found in NDA 20-998/S-009 submitted to the FDA by G.D. Searle on June 12, 2000. CLASS was submitted to the FDA on June 12, 2000 and reviewed by James Witter, M.D., Ph.D. (FDA Medical Officer) on September 20, 2000.)

### 2.    CLASS

39.    The FDA Medical Officer Review of the CLASS data proves Celebrex is no more efficacious than other traditional NSAIDS and is harmful to consumers. See generally, FDA Medical Officer Review, NDA 20-998/S-009 submitted to the FDA by G.D. Searle on June 12,

9

2000 ("FDA CLASS Review"). On April 7, 2005, the FDA issued an *Alert* noting only minimal information is available regarding Celebrex: "The only available data from a long term comparison of Celebrex to other NSAIDs came from the CLASS study...."

40.    Pfizer misrepresented the data in CLASS by using biased authors. According to the *Washington Post* the CLASS authors were either employees of Pharmacia, Celebrex's manufacturer, or paid consultants of the company. Pfizer needed a study to demonstrate that its Cox-2 inhibitor was safer for the stomach than older cheaper medications: CLASS was designed to be that study. Unfortunately, the results of the completed study revealed the truth – Celebrex offered no gastrointestinal (GI) benefit. Instead of releasing the complete –12-month – results from CLASS, Pfizer had only the first six months of data published in the Journal of American Medicine. JAMA 2000,48:1455-1460

41.    "After reviewing the full study, the FDA's arthritis advisory committee concluded that Celebrex offers no proven safety advantage over the two older drugs in reducing the risk of ulcer complications, said FDA spokesman Susan Cruzan." *Washington Post,* August 5, 2001. According to the FDA's review of the CLASS data: "Celecoxib did not demonstrate any statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of CSUGIE (Clinically Significant Upper Gastrointestinal Adverse Events) at any point in the trial although there were trends that favored celecoxib" (FDA CLASS Review)

42.    According to an August 5, 2001 article in the *Washington Post*, editors of the Journal of the American Medical Association (JAMA) and other medical experts, "were flabbergasted" when they realized they had been duped by only being provided with the first six months of CLASS data. The Washington Post reported JAMA editors as saying: "When all of the data were considered, most of Celebrex's apparent safety advantage disappeared."

43.    The "scientific double-cross" boosted sales. "[T]he JAMA article and editorial have likely contributed to Celebrex's huge sales. 'When the JAMA article comes out and

10

confirms the hype, that probably has more impact than our labeling does,' said Robert J. Temple, director of medical policy at the FDA's Center for Drug Evaluation and Research." *Washington Post*, August 5, 2001.

44.    "A total of 36 deaths occurred during the [CLASS] study or during post study follow-up: 19 in the celecoxib group, 9 in the diclofenac group and 8 in the ibuprofen group . . . . Most deaths were cardiovascular in nature." FDA CLASS Review, at 54. The increased number of adverse cardiovascular events in the Celebrex group were not surprising as they were also revealed in the original New Drug Application (NDA) submitted for Celebrex. "In the original NDA, myocardial infarction was noted to occur at a higher rate in celecoxib-treated as compared to placebo treated patients. In the long term trial (Trial 024) that was included in the NDA submission, the predominate (>90%) cause of death for patients taking celecoxib at any does was cardiovascular." FDA CLASS Review at 78.

45.    Public Citizen, a public watchdog organization, reviewed the CLASS data in its entirety. A complete review reveals the combined anginal adverse events was 1.4% in celecoxib (Celebrex) group versus 1.0% in either NSAID group. Specifically, the rate of heart attack in the Celebrex was double that of the other two NSAIDs, 0.2% vs. 0.1%, respectively.

46.    The CLASS data proves that Pfizer knew that its first generation Cox-2 inhibitor, Celebrex, caused a disproportionately and statistically significantly high number of adverse cardiovascular events before it was introduced to the market in January 1999. According to Public Citizen, after CLASS, the FDA recommended a trial to specifically assess the CV risk of COX-2 inhibitors. The Adenoma Prevention with Celecoxib (APC) trial was intended to be this placebo-controlled trial of Celebrex.

### 3.    APC Trial

47.    The Adenoma Prevention with Celecoxib (APC) trial compared the efficacy and safety of celecoxib with placebo. N.Eng. J. Med. 352;11 at 1072. According to the APC trial, the number of deaths from cardiovascular causes was significantly higher in the Celebrex group

11

when compared to placebo. (0.1% placebo; 0.4% Celebrex 200mg; and 0.9% Celebrex 400mg).
Id. at 1075.

48.     The FDA Reported the APC data as follows[1]:

> In the National Cancer Institute's Adenoma Prevention with
> Celecoxib (APC) trial in patients at risk for recurrent colon polyps,
> a 2-3 fold increased risk of serious adverse CV events was seen for
> Celebrex compared to placebo after a mean duration of treatment
> of 33 months. There appeared to be a dose response relationship,
> with a hazard ratio of 2.5 for Celebrex 200 mg twice daily and 3.4
> Celebrex 400 mg twice daily for the composite endpoint of death
> from CV causes, myocardial infarction (MI), or stroke.

49.     The dosage noted in the study is important for two reasons: first, there appears to
be an association between dosage and the increase in adverse cardiovascular events. See
generally, at 1077. Second, most patients increase dosage. Pfizer knew patients were increasing
their dosages as noted in CLASS: "Interestingly ... up to 70% of patients increased their dose for
celecoxib." FDA CLASS Review at 7. Thus, Pfizer was aware of the dosage creep.

### 4.     Other Celebrex Trials

50.     Several other Celebrex trials also gave Defendants insight into the cardiovascular
risks presented by Celebrex. The Prevention of Spontaneous Adenomatous Polyps (PreSAP)
trial identified the death rate from cardiovascular causes (heart attack, stroke, heart failure,
angina, or need for CV procedure) as 3.6% with Celebrex as compared to 2.7% for placebo.

51.     Public Citizen also reviewed the results of Study IQ IQ5-97-02-001 which
reflected "the combined rate of all serious cardiovascular adverse events in patients getting a
placebo was 2.1% but was greatly increased in those getting celecoxib to 7.7%, a 3.6 fold
increase in CV risk in those people taking celecoxib. (p=0.03)"[2]. According to Dr. Sidney
Wolfe, "The study revealed a significantly increased rate (3.6-fold) of serious CV adverse events

---

[1] April 7, 2005 FDA Alert: www.fda.gov/cder/drug/infopage/celebrex/celebrex-hcp.htm.

[2] *Public Citizen,* January 26, 2005, Dr. Sidney M. Wolfe.

12

and more than a doubling in the rate of CV deaths in people using celecoxib compared to those using placebo."[3]

### 5.    Cox-2 Studies: VIGOR and APPROVe

52.    Pfizer also had access to other data which indicated a cardiovascular risk with its drugs. Specifically, Pfizer had knowledge of two studies conducted by Merck related to its Cox-2 inhibitor Vioxx – Vioxx Gastrointestinal Outcomes Research (VIGOR) and Adenomatous Polyp Prevention (APPROVe).

### a.    VIGOR

53.    In 2000, The FDA Medical Officer Review of CLASS specifically noted the VIGOR trial and the concern over serious adverse cardiovascular events. FDA CLASS Review at 78.

54.    According to VIGOR (near acronym for Vioxx Gastrointestinal Outcomes Research) Vioxx patients experienced 20% more serious clinical adverse events (statistically significant); they experienced 4.6 times more hypertension events serious enough to warrant discontinuation, 1.7 times more edema events, and 1.85 times as many congestive heart failure adverse events. By two measures of cardiovascular events related to blood clots, Vioxx had twice the risk of naproxen and the results were considered statistically significant.

55.    The VIGOR study comprised the most definitive scientific evidence ever obtained about pharmaceutical products. It was a large, randomized clinical trial, the gold standard of medical research. It was a safety study with endpoints set in advance. As Merck stated many times, it was designed to provide definite proof of safety, convincing enough to silence the most skeptical critics. In medical terms, the VIGOR results raised the question of whether selective inhibition of Cox-2 was a monumental mistake from the start. While the NSAID risks to the GI system were real and sometimes fatal, they were dwarfed by the cardiovascular risks of the

---

[3] Id.

13

arthritis population that needed these drugs on a daily basis. All makers of NSAIDs, including Defendants, were aware of these results.

### b.    APPROVe

56.    Anxious to put safety questions surrounding Vioxx to rest, Merck designed another large scale trial, Adenomatous Polyp Prevention (APPROVe), which was intended to test the drug's ability to prevent or shrink colon polyps, but would also compare the cardiovascular safety of Vioxx to a placebo control. According to the analysis conducted by Public Citizen of the APPROVe data: Vioxx "doubled the risk of any thrombotic cardiovascular event" and "doubled the risk of MI (myocardial infarction a/k/a heart attack)[4]. *Public Citizen*, January 24, 2005, at 15. Despite the available Celebrex data and other information related to Vioxx, Pfizer never paused to re-evaluating the Celebrex data and studies.

57.    The scientific data available during and after Celebrex's approval process made clear to Defendants that their formulation of Celebrex would cause a higher risk of blood clots, stroke and/or myocardial infarctions among Celebrex consumers, alerting them to the need to do additional and adequate safety studies.

58.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and have the highest risk of further cardiovascular events."

59.    Dr. Topol was also the author on the study published in August 2001 in JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who used COX-2 inhibitors.

---

[4] Although Merck claims that the two-fold risk of heart attacks and strokes seen in the APPROVe trial did not emerge until after patients had been taking the drug for 18 months, closer analysis indicates that significant increase in risk of heart attack was evident in as little as 4 months time.

60.     Based upon readily available scientific data, Defendants knew, or should have known, that their pre-approval testing of Celebrex did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take Celebrex. Therefore, Defendants' testing and studies were grossly inadequate.

61.     Had Defendants done adequate testing prior to approval and "market launch," rather than the extremely short duration studies done on the small size patient base that was actually done the defendants' scientific data would have revealed significant increases in incidence of strokes and myocardial infarctions among the intended and targeted population of Celebrex consumers. Adequate testing would have shown that Celebrex possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

62.     In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued Celebrex sales.

63.     Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

64.     At the time Defendants manufactured, advertising, and distributed Celebrex to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase Celebrex, but instead would purchase other cheaper and safer NSAIDs.

C.    **Facts Regarding Defendants' Marketing and Sale of Celebrex**

65.     Such an ineffective and unreasonably dangerous drug could only be widely prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the

15

Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and misleading advertising, consumers, including the Plaintiff, would not have purchased Celebrex, a more costly prescriptive drug, ineffective for its intended purposes.

66.    On January 10, 2005 the FDA issued Pfizer a written reprimand for its promotional activities. The reprimand reads: "These five promotional pieces [3 Celebrex and 2 Bextra] variously: omit material facts ... and make misleading safety, unsubstantiated superiority, and unsubstantiated effectiveness claims." This was not the Defendants first offense related to its Cox-2 inhibitors. The FDA also reprimanded Pfizer on October 6, 1999 noting: "DDMAC has reviewed these promotional pieces and has determined that they are false or misleading because they contain unsubstantiated comparative claims, misrepresentations of Celebrex's safety profile, and are lacking in fair balance." Ultimately, on April 8, 2005, the New York Times reported the results of an FDA advisory panel: "The February advisory panel voted overwhelmingly that the company should never again advertise the drug [Celebrex]."

67.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive Celebrex as a safer and better drug than its other NSAIDs and, therefore, purchase Celebrex.

68.    Defendants widely and successfully marketed Celebrex throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of Celebrex in order to induce a widespread use and consumption. Celebrex was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff's prescribing physicians.

69.    Despite knowledge of the dangers presented by Celebrex, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for

16

the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of Defendants' product, Celebrex, and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product, Celebrex. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product, Celebrex, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiff.

70.    In an elaborate and sophisticated manner, Defendants aggressively marketed Celebrex directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payors, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include Celebrex on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payors were compelled to add Celebrex to their formularies. Defendants' marketing campaign specifically targeted third party payors, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of Celebrex.

71.    Defendants represented that Celebrex was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance, NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-term use. Defendants promoted Celebrex as a safe and effective alternative that would not have the

17

same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

72.     Celebrex possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, Celebrex was no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Defendants chose not to warn about these risks and dangers.

73.     Defendants knew of these risks before the U.S. Food and Drug Administration (the "FDA") approved Celebrex for sale, but Defendants ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of Celebrex.     Defendants' omission, suppression, and concealment of this important information enabled Celebrex to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

74.     Consequently, Celebrex captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2004 alone, sales of Celebrex exceeded $2 billion, despite the significantly higher cost of Celebrex as compared to other pain relievers in the same family of drugs.

75.     Because Defendants engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted Celebrex as a safer drug than other drugs in its class, while uniformly failing to disclose the health risks of Celebrex, Defendants were able to justify pricing Celebrex significantly higher than the cost of generic aspirin. In reality, that price inflation was not justified. Had Defendants disclosed the truth

about Celebrex, Defendants would now and could not have reaped the billions of dollars in Celebrex sales that were achieved as a direct result of the concealment, omission, suppression, and obfuscation of the truth.

76.    The Defendants intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed, and obfuscated important and material information regarding the risks, dangers, defects, and disadvantages of Celebrex from Plaintiff, the public, the medical community, and the regulators. This concealment and omission was deliberate, knowing, active, and uniform, was intended to induce and maximize sales and purchases of Celebrex, and prevented Plaintiff from obtaining all the material information that would be important to their decisions as reasonable persons to purchase, pay for, and/or use Celebrex.

77.    Defendants' systematic, active, knowing, deliberate, and uniform concealment, omissions, suppression, and conduct caused Plaintiff to purchase, pay for, and/or use Celebrex; and caused Plaintiff's losses and damages as asserted herein.

78.    Had Defendants done adequate testing prior to approval and "market launch," the defendants' scientific data would have revealed significant increases in stroke and myocardial infarction amongst the intended population of Celebrex consumers. Adequate testing would have shown that Celebrex possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

79.    In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued Celebrex sales.

80.    Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

81.    At the time Defendants manufactured, advertising, and distributed Celebrex to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase Celebrex, but instead would purchase other cheaper and safer NSAID drugs.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

82.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

83.    Defendants, directly or indirectly, negligently and/or defectively designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed the drug Celebrex (Celecoxib).

84.    At all times material hereto, Defendants had a duty to users and/or consumers of Celebrex (Celecoxib), including Plaintiff, RAMOND BEAVER, to exercise reasonable care in the design, testing, inspection, manufacture, assembly, development, labeling, sterilization, licensing, marketing, advertising, promotion, sale, packaging, supply and/or distribution of Celebrex (Celecoxib).

85.    Defendants breached that duty and were negligent in the design, testing, inspection, manufacture, assembly, development, labeling, sterilization, licensing, marketing, advertising, promotion, sale, packaging, supply and/or distribution of Celebrex (Celecoxib) in that: Celebrex (Celecoxib) was defective when put on the market by Defendants; that with such defect, Celebrex (Celecoxib) was reasonably certain to be dangerous when put to normal use;

20

and that Defendants failed to use reasonable care in designing or making Celebrex (Celecoxib) or in inspecting it for defects. Specifically, Defendants breached their duty by, among other things:

a.    Failing to include adequate warnings that would alert the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, to the potential risks and serious side effects of the drug;

b.    Failing to adequately and properly test and inspect the drug before placing the drug on the market;

c.    Failing to conduct sufficient testing and inspection of the drug which, if properly performed, would have shown that the drug had serious side effects, including, but not limited to, heart attack, stroke, life threatening allergic and/or skin reactions and/or death.

d.    Failing to adequately warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, of the potential risks and other serious side effects associated with the drug, including, among other things, heart attack, stroke, life threatening allergic and/or skin reactions and/or death;

e.    Failing to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risks associated with the use of the drug;

f.    Failing to recall and/or remove the drug from the stream of commerce despite the fact that Defendants knew or should have known of the defective and unreasonably dangerous nature of the drug, including the significant health risks associated with the use of the drug;

g.    Encouraging misuse and overuse while failing to disclose the side effects of the drug to the medical, pharmaceutical and/or scientific communities, and users and/or consumers, including RAMOND BEAVER, in order to make a profit from sales.

21

86.    Defendants knew or should have known that Celebrex (Celecoxib) caused unreasonably dangerous risks and serious side effects of which users and/or consumers of the drug, including Plaintiff, were not aware.    Defendants nevertheless advertised, promoted, marketed, sold, distributed and/or supplied Celebrex (Celecoxib) knowing that there were safer methods for pain relief.

87.    As a direct, legal, proximate and producing result of the negligence of Defendants, RAMOND BEAVER sustained substantial injuries including, among other things, a heart attack. This injury caused extensive pain and suffering and severe emotional distress and substantially reduced RAMOND BEAVER'S ability to enjoy life.    In addition, Defendants' negligence caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

88.    As a direct, legal, proximate and producing result of the negligence of Defendants, RAMOND BEAVER was injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to physical injury and damages.

89.    As a direct, legal, proximate and producing result of the negligence of Defendants, RAMOND BEAVER required reasonable and necessary health care treatment and services and had incurred expenses therefore. Defendants' negligence was a contributing cause of Plaintiff's injuries and Plaintiff's economic and non economic loss. As a result of Defendant's negligence, Plaintiff has suffered and will continue to suffer.

90.    By reason of the foregoing, Plaintiff was damaged by the negligence and wanton and willful recklessness of the Defendants. The amount sought herein exceeds the jurisdictional limits of all lower courts that would otherwise have jurisdiction over this matter.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY
## DEFECTIVE DESIGN

91.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

22

92.    At all times material hereto, Defendants have engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the drug Celebrex (Celecoxib), which is defective and unreasonably dangerous to users and/or consumers of the drug, including Plaintiff.

93.    At all times material hereto, Celebrex (Celecoxib) was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed by Defendants in a defective and unreasonably dangerous condition in ways which include, but are not limited to, one or more of the following:

a.    When placed in the stream of commerce, the drug contained unreasonably dangerous design defects and was not reasonably safe and fit for its intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the drug, including Plaintiff, to risks which exceeded the benefits of the drug;

b.    The drug was insufficiently tested;

c.    The drug caused harmful side effects that outweighed any potential utility;

d.    The drug was not accompanied by adequate labeling or instructions for use to fully apprise the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, of the potential risks and serious side effects associated with its use;

e.    In light of the potential and actual risk of harm associated with the drug's use, a reasonable person who had actual knowledge of this potential and actual risk of harm would have concluded that Celebrex (Celecoxib) should not have been marketed in that condition.

23

94.    At all times the drug Celebrex (Celecoxib) was designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed, it was expected to reach, and did reach, users and/or consumers of the drug across the United States, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold.

95.    At all times, RAMOND BEAVER used Celebrex (Celecoxib) for its intended or reasonably foreseeable purpose.

96.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff sustained substantial injuries including, among other things, a heart attack. These injuries caused extensive pain and suffering and severe emotional distress and substantially reduced Plaintiff's ability to enjoy life. In addition, the defective and unreasonably dangerous condition of Celebrex (Celecoxib) caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

97.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff was injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries, caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to physical injury and damages.

98.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Celebrex (Celecoxib), Plaintiff, RAMOND BEAVER, required reasonable and necessary health care treatment and service and had incurred expenses therefore.

99.    By reason of the foregoing, RAMOND BEAVER was damaged by the wanton and willful recklessness of the Defendants, who will be liable to Plaintiff. The amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

24

### THIRD CAUSE OF ACTION
### STRICT PRODUCTS LIABILITY
### FAILURE TO WARN

100.    Plaintiff repeats and realleges each of the allegations contained in this Complaint.

101.    Celebrex (Celecoxib) was defective and unreasonably dangerous when it left the possession of Defendants in that it contained warnings insufficient to alert the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, to the dangerous risks and reactions associated with Celebrex (Celecoxib) when used for its intended or reasonably foreseeable purpose. Those dangerous risks and reactions included, but were not limited to, heart attack, stroke, life threatening allergic and/or skin reactions and/or death.

102.    At all times, RAMOND BEAVER used the drug for its intended or reasonably foreseeable purpose.

103.    RAMOND BEAVER could not have discovered any defect in the drug through the exercise of care.

104.    Defendants, as manufacturers of a prescription drug, are held to the level of knowledge of an expert in the field.

105.    The warnings that were given by Defendants were not accurate or clear and/or were ambiguous.

106.    Defendants had a continuing duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, of the potential risks and serious side effects associated with the use of Celebrex (Celecoxib).

107.    As a direct, legal, proximate and producing result of Defendant's failure to warn, RAMOND BEAVER sustained harm, including, among other things, a heart attack. These injuries caused extensive pain and suffering and severe emotional distress and substantially reduced RAMOND BEAVER'S ability to enjoy life. In addition, Defendants' failure to warn caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

25

108.    As a direct, legal, proximate and producing result of Defendants' failure to warn, RAMOND BEAVER was injured in health, strength and activity and suffered physical injuries as well as mental anguish.   All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injuries and damages.

109.    As a direct, legal, proximate and producing result of Defendants' failure to warn, RAMOND BEAVER required reasonable and necessary health care treatment and services and had incurred expenses therefore.

110.    By reason of the foregoing, RAMOND BEAVER was damaged by the wanton and willful recklessness of the Defendants who will be liable to Plaintiff.  The amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

### FOURTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY OF MERCHANTABILITY

111.    Plaintiff realleges all prior paragraphs of this complaint as if fully set out herein.

112.    Defendants Searle, Pharmacia, Monsanto, Pfizer and Pollard (hereinafter "Defendants") made express representations to the consuming public at large through their aggressive marketing and advertising campaigns relative to their product, Celebrex.

113.    Defendants Searle, Pharmacia, Monsanto and Pfizer through their detail sales representatives, including Defendant Pollard, made representations of the safety and efficacy of their product, Celebrex.

114.    Celebrex does not conform to the express representations made through the Defendants' advertising and marketing efforts

115.    Celebrex does not conform to the express representations made by Defendants' agents/sales representatives, including ïₑₓfendant Pollard.

116.    Defendants' conduct in this matter was a contributing cause of injuries and

damages suffered by Plaintiff.

117.    Wherefore, this Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus cost.

## FIFTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

118.    Plaintiff repeats and realleges each of the allegations contained in the Complaint.

119.    Defendant is a "merchant" as defined in *Alabama Code Annotated* § 7-2-104.

120.    Celebrex (Celecoxib) is a "good" as defined *Alabama Code Annotated* § 7-2-105.

121.    At the time that Defendants designed, tested, inspected, manufactured, assembled, developed, labeled, sterilized, licensed, marketed, advertised, promoted, sold, packaged, supplied and/or distributed the drug Celebrex (Celecoxib), Defendants knew of the intended, reasonably foreseeable and/or ordinary use of Celebrex (Celecoxib) and impliedly warranted the drug to be of merchantable quality and safe and fit for such use.

122.    RAMOND BEAVER, in ingesting Celebrex (Celecoxib), reasonably relied upon the skill and judgment of Defendants as to whether Celebrex (Celecoxib) was of merchantable quality and safe and fit for its intended, reasonably foreseeable and/or ordinary use.

123.    In breach of the implied warranty given by Defendants, Celebrex (Celecoxib) was not of merchantable quality or safe or fit for its intended, reasonably foreseeable and/or ordinary use because the product was and is unmerchantable, in a defective condition and unreasonably dangerous and unfit for the intended, reasonably foreseeable and/or ordinary purpose for which it was intended as described above.

124.    In breach of the implied warranty given by Defendants, Celebrex (Celecoxib) was not of merchantable quality or safe or fit for its intended, reasonably foreseeable and/or ordinary use because, among other things:

a.    Use of Celebrex (Celecoxib) carried a risk of, among other things, heart attack, stroke, life threatening allergic and/or skin reactions and/or death;

27

b.     Defendants failed to include adequate warnings with the drug that would alert the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, of the potential risks and serious side effects of the drug;

c.     Defendants failed to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the potential risks and serious side effects associated with the use of the drug.

125.    As a direct, legal, proximate and producing result of Defendants' breach of warranty, RAMOND BEAVER sustained substantial injuries including, among other things, a heart attack. These injuries caused extensive pain and suffering and severe emotional distress and substantially reduced RAMOND BEAVER'S ability to enjoy life. In addition, Defendants' failure to warn caused Plaintiff to expend substantial sums of money for medical, hospital and related care.

126.    As a direct, legal, proximate and producing result of Defendants' breach of warranty, RAMOND BEAVER has been injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injuries and damages.

127.    As a direct, legal, proximate and producing result of Defendants' breach of warranty, RAMOND BEAVER required reasonable and necessary health care treatment and services and had incurred expenses therefore.

128.    As a result of Defendant's breach of warranty, Plaintiff has suffered and will continue to suffer.

129.    By reason of the foregoing, RAMOND BEAVER has been damaged by the wanton and willful recklessness of the Defendants who will be liable to Plaintiff. The amount sought herein exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

28

## SIXTH CAUSE OF ACTION
## FRAUD

130.   Plaintiff repeats and realleges each of the allegations contained in the Complaint.

131.   Defendants recklessly, knowingly, intentionally, and fraudulently misrepresented to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, the safety and efficacy of the drug and/or recklessly, knowingly, intentionally and fraudulently concealed from the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, material, adverse information regarding the safety and efficacy of Celebrex (Celecoxib).

132.   Defendants' misrepresentations were communicated to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, with the intent that they reach users and/or consumers of the drug, including RAMOND BEAVER.

133.   Defendants either knew or should have known that the representations were false.

134.   Defendants made the misrepresentations and/or actively concealed information concerning the safety and efficacy of the drug with the intention and specific desire that the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, would rely on such in selecting Celebrex (Celecoxib) as a pain reliever.

135.   Defendants made these misrepresentations and/or actively concealed information concerning the safety and efficacy of Celebrex (Celecoxib) in its labeling, advertising, product inserts, promotional materials or other marketing efforts.

136.   Defendants made these misrepresentations and actively concealed adverse information at a time when Defendants knew or should have known that its drug product had defects, dangers and characteristics that were other than what Defendants had represented to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug,

29

including Plaintiff. Specifically, Defendants misrepresented to and/or actively concealed from the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, that:

    a.    There had been insufficient studies regarding the safety and efficacy of the drug;

    b.    The drug was fully and adequately tested, despite knowing that there had been insufficient or inadequate testing of the drug;

    c.    Prior studies, research, reports and/or testing had been conducted linking the use of the drug to serious prothrombotic and allergic and/or skin reactions, including, but not limited to, adverse cardiovascular events and/or Stevens-Johnson Syndrome/toxic epidermal necrolysis;

    d.    Defendants knew or should have known of reports of increased heart attacks, allergic and/or skin reactions and/or strokes;

    e.    Defendants knew or should have known of the greatly increased risk of developing heart attacks, allergic and/or skin reactions and/or strokes associated with use of Celebrex (Celecoxib); yet, despite this they were downplaying the risk of the drug.

137. The misrepresentations of and/or active concealment by Defendants were perpetuated directly and/or indirectly by Defendants, its sales representatives, employees, distributors, agents and/or detail persons.

138. The misrepresentations of and/or active concealment by Defendants constitute a continuing tort. Indeed, through Defendants' product inserts, Defendants continued to misrepresent the potential risks and serious side effects associated with the use of Celebrex (Celecoxib). Moreover, Defendants had a post-sale duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, about the potential risks and serious side effects associated with the use of Celebrex (Celecoxib) in a timely manner, yet they failed to provide such warning.

139.   RAMOND BEAVER justifiably relied on and/or was induced by the misrepresentations and/or active concealment of Defendants to purchase and ingest Celebrex (Celecoxib) to his detriment.

140.   As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER sustained substantial injuries including, among other things, a heart attack. These injuries caused extensive pain and suffering and severe emotional distress for Plaintiff, and substantially reduced RAMOND BEAVER'S ability to enjoy life. In addition, the misrepresentations of Defendants caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

141.   As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER has been injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries caused RAMOND BEAVER intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injury and damages.

142.   As a result of Defendant's fraud, Plaintiff has suffered and will continue to suffer.

143.   As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER required reasonable and necessary health care treatment and service and had incurred expenses therefore.

144.   By reason of the foregoing, RAMOND BEAVER has been damaged by the wanton and willful recklessness of the Defendants who will be liable to Plaintiff. The amount sought herein exceeds the jurisdicuonal limits of all lower courts which would otherwise have jurisdiction over this matter.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

145.   Plaintiff repeats and realleges each of the allegations contained in the Complaint.

31

146.    Defendants negligently misrepresented or failed to exercise reasonable care in representing to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, the safety and efficacy of the drug and/or negligently concealed or failed to exercise reasonable care by concealing and failing to disclose to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including RAMOND BEAVER, material, adverse information regarding the safety and efficacy of Celebrex (Celecoxib).

147.    Defendants' misrepresentations were communicated to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, with the intent that they reach users and/or consumers of the drug, including Plaintiff.

148.    Defendants made these misrepresentations and/or actively concealed information concerning the safety and efficacy of Celebrex (Celecoxib) in its labeling, advertising, product inserts, promotional materials or other marketing efforts.

149.    Defendants either knew or should have known that the representations were false.

150.    Defendants knew or should have known that the misrepresentations and/or omissions concerning the safety and efficacy of the drug would be relied upon by the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, in selecting Celebrex (Celecoxib) as a pain reliever.

151.    Defendants made these misrepresentations and actively concealed adverse information at a time when Defendants knew or should have known that its drug product had defects, dangers and characteristics that were other than what Defendants had represented to the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff. Specifically, Defendants misrepresented to and/or actively concealed from the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, that:

                    a.    There had been insufficient studies regarding the safety and efficacy of the

drug;

      b.     *The drug was fully and adequately tested, despite the fact that there had been insufficient or inadequate testing of the drug;*

      c.     Prior studies, research, reports and/or testing had been conducted linking *the use of the drug to serious adverse cardiovascular events, allergic and/or skin reactions and strokes;*

      d.     Defendants knew or should have known of reports of heart attacks associated with the use of the drug;

      e.     Defendants knew or should have known of the greatly increased risk of heart attacks, strokes, life threatening allergic and/or skin reactions and/or death and other serious and life threatening side effects associated with the drug; yet, despite this was downplaying the risks of the drug.

152.    The misrepresentations of and/or active concealment by Defendants were perpetuated directly and/or indirectly by Defendants, their sales representatives, employees, distributors, agents and/or detail persons, including Defendant Pollard.

153.    The misrepresentations of and/or active concealment by Defendants constitute a continuing tort.   Indeed, through Defendants' product inserts, Defendants continued to misrepresent the potential risks and complications associated with Celebrex (Celecoxib). Moreover, Defendants had a post-sale duty to warn the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiff, about the potential risks and serious side effects associated with the use of Celebrex (Celecoxib) in a timely manner, yet it failed to provide such warning.

154.    Plaintiff justifiably relied on and/or was induced by the misrepresentations and/or active concealment of Defendants to purchase and ingest Celebrex (Celecoxib) to his detriment.

155.    As a direct, legal, proximate and producing result of the misrepresentations of Defendants, Plaintiff sustained harm, including, among other things, a heart attack.   These

33

injuries have caused extensive pain and suffering and severe emotional distress and substantially reduced Plaintiff's ability to enjoy life. In addition, the misrepresentations of Defendants caused Plaintiff to expend substantial sums of money for medical, hospital, and related care.

156.    As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER was injured in health, strength and activity and suffered physical injuries as well as mental anguish. All of said injuries caused Plaintiff intense anxiety, distress, fear, pain, suffering and distress secondary to the physical injury and damages.

157.    As a direct, legal, proximate and producing result of the misrepresentations of Defendants, RAMOND BEAVER required reasonable and necessary health care treatment and service and had incurred expenses therefore.

158.    As a result of the misrepresentations of the Defendants, Plaintiff has suffered and will continue to suffer.

159.    By reason of the foregoing, Plaintiff has been damaged by the wanton and willful recklessness of these Defendants who will be liable to Plaintiff.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Defendants be cited to appear and answer herein; that upon final trial herein, Plaintiff recovers damages as set forth above from Defendants, including cost of Court, pre-judgment and post-judgment interest at the legal rates, and that Plaintiff has such other and further relief, both general and special, at law and in equity, to which she may be justly entitled under the facts and attending circumstances.

Dated: November 2 , 2007        BY:    Navan Ward Jr.

BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
Navan Ward, Jr. (WAR062)
Andy D. Birchfield, Jr. (BIR006)
234 Commerce Street
Montgomery, Alabama 36104
Telephone: (334) 269-2343

34

Facsimile: (334) 954-7555

*ATTORNEYS FOR PLAINTIFFS*

<u>**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES**</u>

35

FILED
2007 Dec-10 PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

RAMOND BEAVER

Plaintiff,

v.

PFIZER INC., G.D. SEARLE, LLC.,     CASE NO: _____
PHARMACIA CORPORATION,
MONSANTO COMPANY, et al.

Defendants.

## **CERTIFICATE OF FILING OF NOTICE OF REMOVAL**

The undersigned attorneys for Defendants, hereby certify that on December 7, 2007,

pursuant to 28 U.S.C. § 1446(d), Defendants caused to be filed with the Clerk of Court for the

Circuit Court of Colbert County, Alabama, a copy of the Notice of Removal to the United States

District Court for the Northern District of Alabama, Northern Division, a copy of said state court

Certificate of Filing Notice of Removal is attached hereto.

_____
Lawrence B. Clark  (CLA012)
*Attorneys for Defendants*

OF COUNSEL:
BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, PC
Wachovia Tower, Suite 1600
420 Twentieth Street North
Birmingham, Alabama 35203
Telephone:  (205) 328-0480
Facsimile:   (205) 322-8007

B LBC1 766198 v1
2902026-000072 12/6/2007

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have served a copy of the above and foregoing on the below named by placing a copy of the same in the U.S. Mail on December 7, 2007:

Navan Ward, Jr., Esq.
Andy D. Birchfield, Jr., Esq.
BEASLEY, ALLEN, CROW, METHVIN,
   PORTIS & MILES, P.C.
PO Box 4160
Montgomery, AL 36103-4160

OF COUNSEL

2

## IN THE CIRCUIT COURT OF COLBERT COUNTY, ALABAMA

RAMOND BEAVER

Plaintiff,

v.

PFIZER INC., G.D. SEARLE, LLC.,          CASE NO:  CV-07-900105
PHARMACIA CORPORATION,
MONSANTO COMPANY, et al.

Defendants.

## <u>CERTIFICATE OF FILING NOTICE OF REMOVAL</u>

The undersigned attorneys for Defendants hereby certify that on December 7,

2007, Defendants caused to be filed with the Clerk of the Court for the Court of

Colbert County, Alabama, a Notice of Removal to the United States District Court

for the Northern District of Alabama, Northern Division.

_____
Lawrence B. Clark  (CLA012)
*Attorney for Defendants*

OF COUNSEL:
BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, PC
Wachovia Tower, Suite 1600
420 Twentieth Street North
Birmingham, Alabama 35203
Telephone:  (205) 328-0480
Facsimile:   (205) 322-8007

B LBC1 766195 v1
2902026-000072 12/6/2007

## CERTIFICATE OF SERVICE

I do hereby certify that I have served a copy of the above and foregoing on the below named by placing a copy of the same in the U.S. Mail on December 7, 2007:

Navan Ward, Jr., Esq.
Andy D. Birchfield, Jr., Esq.
BEASLEY, ALLEN, CROW, METHVIN,
   PORTIS & MILES, P.C.
PO Box 4160
Montgomery, AL 36103-4160

_____
OF COUNSEL

2

FILED

2007 Dec-10  PM 02:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **RAYMOND BEAVER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.:**_____ |
| **v.** ) | |
| ) | |
| **PFIZER, INC., G.D. SEARLE LLC,** ) | |
| **PHARMACIA CORPORATION,** ) | |
| **MONSANTO COMPANY, TERRI R.** ) | **Jury Trial Demanded** |
| **ALLEN, KRISTIE GENOVA, LESLIE** ) | |
| **HOOPER, DIANN LOPER, WINWOOD** ) | |
| **UMPHLETT, and Fictitious Defendants A,** ) | |
| **B, C, and D,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| ) | |

## DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFF'S COMPLAINT

NOW COME Defendants Pfizer Inc. (improperly captioned in Plaintiff's Complaint as "Pfizer, Inc.") ("Pfizer"), Pharmacia Corporation (f/k/a Monsanto Company[1]) ("Pharmacia"), G.D. Searle LLC ("Searle"), Diann Loper, Kristie Genvoa, Terri Allen, Leslie Hooper, and Winwood Umphlett (collectively "Defendants") and file this Answer to Plaintiff's Complaint ("Complaint"), and would respectfully show the Court as follows:

---

[1] Plaintiff's Complaint names "Monsanto Company" as a Defendant. Defendants state that in 1933, an entity known as Monsanto Company ("1933 Monsanto") was incorporated under the laws of Delaware. On March 31, 2000, 1933 Monsanto changed its name to Pharmacia Corporation. On February 9, 2000, a separate company, Monsanto Ag Company, was incorporated under the laws of Delaware. On March 31, 2000, Monsanto Ag Company changed its name to Monsanto Company ("2000 Monsanto"). The 2000 Monsanto is engaged in the agricultural business and does not and has not ever designed, produced, manufactured, sold, resold or distributed Celebrex®. Given that Plaintiff alleges in his Complaint that Monsanto Company was involved in distributing Celebrex®, *see* PLAINTIFF'S COMPLAINT at ¶ 6, Defendants assume Plaintiff means to refer to 1933 Monsanto. As a result, Pharmacia will respond to the allegations directed at Monsanto Company.

-1-

## I.
## PRELIMINARY STATEMENT

The Complaint does not state in sufficient detail when Plaintiff was prescribed or used Celebrex®. Accordingly, this Answer can only be drafted generally. Defendants may seek leave to amend this Answer when discovery reveals the specific time periods in which Plaintiff was prescribed and used Celebrex®.

## II.
## ORIGINAL ANSWER

1.      Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required. To the extent that a response is deemed required, Defendants admit that Plaintiff brought this civil action seeking monetary damages, but deny that Plaintiff is entitled to any relief or damages. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding Plaintiff's medical condition and whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants deny that Celebrex® caused Plaintiff injury or damage and deny the remaining allegations in this paragraph of the Complaint.

2.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding Plaintiff's age and citizenship, and, therefore, deny the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

3.      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding Plaintiff's age and citizenship, and, therefore, deny the same. Defendants deny that Celebrex® caused Plaintiff injury or damage and deny the remaining allegations in this paragraph of the Complaint.

4.      Defendants admit that Pfizer and Pharmacia are Delaware corporations. Defendants admit that Pfizer and Pharmacia are registered to do business in Alabama. Defendants admit that Pfizer and Pharmacia may be served through their registered agents. Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in

-2-

the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants deny the remaining allegations in this paragraph of the Complaint.

5.    Plaintiff's Complaint omits Paragraph 5.

6.    Defendants admit that in 1933 an entity known as Monsanto Company ("1933 Monsanto") was incorporated under the laws of Delaware. On March 31, 2000, a subsidiary of 1933 Monsanto merged with Pharmacia & Upjohn, Inc, and 1933 Monsanto changed its name to Pharmacia Corporation. On February 9, 2000, a separate company, Monsanto Ag Company, was incorporated under the laws of Delaware. On March 31, 2000, Monsanto Ag Company changed its name to Monsanto Company ("2000 Monsanto"). The 2000 Monsanto is engaged in the agricultural business and does not and has not ever manufactured, marketed, sold, or distributed Celebrex®. The 2000 Monsanto is not and has never been the parent of either Searle or Pharmacia. As the 2000 Monsanto does not and has not ever manufactured, marketed, sold, or distributed Celebrex®, Defendants therefore state that the 2000 Monsanto is not a proper party in this matter. Defendants deny the remaining allegations in this paragraph of the Complaint. Defendants state that the response to this paragraph of the Complaint regarding Monsanto is incorporated by reference into Defendants' responses to each and every paragraph of the Complaint referring to Monsanto and/or Defendants.

7.    Defendants admit that Searle is a Delaware limited liability company with its principal place of business in Illinois. Defendants admit that Searle is registered to do business in Alabama. Defendants admit that Searle may be served through its registered agent. Defendants admit that Pharmacia acquired Searle in 2000. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants deny the remaining allegations in this paragraph of the Complaint. Defendants deny the remaining allegations in this paragraph of the Complaint.

B LBC1 766330 v1
2902026-000072 12/7/2007

8.      Defendants admit that Terri Allen was employed by Pfizer as a pharmaceutical sales representative and, at times, called on certain healthcare providers regarding Pfizer's products. Defendants admit that Terri Allen is a resident of the State of Mississippi.  Defendants admit that Terri Allen may be served at her place of residence.  Defendants deny the remaining allegations in this paragraph of the Complaint.

9.      Defendants admit that Kristie Genova is employed by Pfizer as a pharmaceutical sales representative and, at times, calls on certain healthcare providers regarding Pfizer's products. Defendants admit that Kristie Genova is a resident of the State of Arkansas.  Defendants admit that Kristie Genova may be served at her place of residence.  Defendants deny the remaining allegations in this paragraph of the Complaint.

10.     Defendants admit that Leslie Hooper was employed by Pfizer as a pharmaceutical sales representative and, at times, called on certain healthcare providers regarding Pfizer's products. Defendants admit that Leslie Hooper is a resident of the State of Alabama.  Defendants admit that Leslie Hooper may be served at her place of residence.  Defendants deny the remaining allegations in this paragraph of the Complaint.

11.     Defendants admit that Diann Loper was employed by Pfizer as a pharmaceutical sales representative and, at times, called on certain healthcare providers regarding Pfizer's products. Defendants admit that Diann Loper is a resident of the State of Mississippi.  Defendants admit that Diann Loper may be served at her place of residence.  Defendants deny the remaining allegations in this paragraph of the Complaint.

12.     Defendants admit that Winwood Umphlett is employed by Pfizer as a pharmaceutical sales representative and, at times, calls on certain healthcare providers regarding Pfizer's products.  Defendants admit that Winwood Umphlett is a resident of the State of Mississippi. Defendants admit that Winwood Umphlett may be served at his place of residence.  Defendants deny the remaining allegations in this paragraph of the Complaint.

13.     Defendants admit that Pfizer, Pharmacia, and Searle do business in the State of Alabama. Defendants deny the remaining allegations in this paragraph of the Complaint.

-4-

14.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding Plaintiff's citizenship and the judicial district in which the asserted claims allegedly arose, and, therefore, deny the same. Defendants admit that Pfizer, Pharmacia, and Searle do business in the State of Alabama. Defendants admit that Plaintiff claims that the amount in controversy satisfies jurisdictional limits. Defendants deny any wrongful conduct, deny committing a tort in the State of Alabama, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

15.    Defendants state that Celebrex® is a prescription medication which is approved by the FDA for the following indications: (1) for relief of the signs and symptoms of osteoarthritis; (2) for relief of the signs and symptoms of rheumatoid arthritis in adults; (3) for the management of acute pain in adults; (4) for the treatment of primary dysmenorrhea; (5) to reduce the number of adenomatous colorectal polyps in familial adenomatous polyposis (FAP) as an adjunct to usual care (e.g., endoscopic surveillance surgery); (6) for relief of signs and symptoms of ankylosing spondylitis; and (7) for relief of the signs and symptoms of juvenile rheumatoid arthritis in patients two years of age and older. Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

-5-

16.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

**Response to Background Allegations**

17.    Defendants state that Celebrex® is a prescription medication which is approved by the FDA for the following indications: (1) for relief of the signs and symptoms of osteoarthritis; (2) for relief of the signs and symptoms of rheumatoid arthritis in adults; (3) for the management of acute pain in adults; (4) for the treatment of primary dysmenorrhea; (5) to reduce the number of adenomatous colorectal polyps in familial adenomatous polyposis (FAP) as an adjunct to usual care (e.g., endoscopic surveillance surgery); (6) for relief of signs and symptoms of ankylosing spondylitis; and (7) for relief of the signs and symptoms of juvenile rheumatoid arthritis in patients two years of age and older.  Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.  Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

-6-

18.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

19.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

20.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding Plaintiff's age, medical condition, and whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants deny that Celebrex® caused Plaintiff injury or damage and deny the remaining allegations in this paragraph of the Complaint.

21.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

22.    Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by

-7-

law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants deny the remaining allegations in this paragraph of the Complaint.

23.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding Plaintiff's medical condition and whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

24.    Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required. To the extent that a response is deemed required, Defendants admit that Plaintiff claims that the amount in controversy meets jurisdictional limits. Defendants deny the remaining allegations in this paragraph of the Complaint.

25.    Defendants state that the allegations in this paragraph of the Complaint regarding aspirin, naproxen, and ibuprofen are not directed toward Defendants, and, therefore, no response is required. Defendants admit that Celebrex® is in a class of drugs that are, at times, referred to as being non-steroidal anti-inflammatory drugs ("NSAIDs"). Defendants deny the remaining allegations in this paragraph of the Complaint.

26.    Defendants state that the allegations in this paragraph of the Complaint are not directed towards Defendants, and, therefore, no response is required. To the extent that a response is deemed required, Defendants state that Plaintiff fails to provide the proper context for the allegations in this paragraph of the Complaint. Defendants therefore lack knowledge or

-8-

information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.

27.    Defendants state that the allegations in this paragraph of the Complaint are not directed towards Defendants, and, therefore, no response is required.  To the extent that a response is deemed required, Defendants state that Plaintiff fails to provide the proper context for the allegations in this paragraph of the Complaint.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.

28.    Defendants state that the allegations in this paragraph of the Complaint are not directed towards Defendants, and, therefore, no response is required.  To the extent that a response is deemed required, Defendants state that Plaintiff fails to provide the proper context for the allegations in this paragraph of the Complaint.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.

29.    Defendants state that the allegations in this paragraph of the Complaint are not directed towards Defendants, and, therefore, no response is required.  To the extent that a response is deemed required, Defendants state that Plaintiff fails to provide the proper context for the allegations in this paragraph of the Complaint.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.

30.    Defendants state that the allegations in this paragraph of the Complaint regarding "other pharmaceutical companies" are not directed towards Defendants, and, therefore, no response is required.  To the extent a response is deemed required, Defendants state that, as stated in the FDA-approved labeling for Celebrex®, "[t]he mechanism of action of Celebrex is believed to be due to inhibition of prostaglandin synthesis, primarily via inhibition of cyclooxygenase-2 (COX-2), and at therapeutic concentrations in humans, Celebrex does not inhibit the cyclooxygenase-1 (COX-1) isoenzyme."  Plaintiff fails to provide the proper context for the remaining allegations

-9-

in this paragraph.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of the allegations, and, therefore, deny the remaining allegations in this paragraph of the Complaint.

31.    Defendants state that the allegations in this paragraph of the Complaint regarding "predecessors in interest" are vague and ambiguous.  Defendants are without knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.  Defendants state that, as stated in the FDA-approved labeling for Celebrex®, "[t]he mechanism of action of Celebrex is believed to be due to inhibition of prostaglandin synthesis, primarily via inhibition of cyclooxygenase-2 (COX-2), and at therapeutic concentrations in humans, Celebrex does not inhibit the cyclooxygenase-1 (COX-1) isoenzyme."  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.  Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

32.    Defendants state that the allegations in this paragraph of the Complaint regarding Merck and Vioxx® are not directed toward Defendants, and, therefore, no response is required. Defendants admit that Celebrex® was launched in February 1999.  Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved

prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

33.    Plaintiff does not allege having used Bextra® in this Complaint. Nevertheless, Defendants admit that the New Drug Application for Bextra® was filed with the FDA on January 15, 2001. Defendants admit, as indicated in the package insert approved by the FDA, that Bextra® is indicated for use in the relief of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis, as well as for the treatment of primary dysmenorrhea. Defendants state that Plaintiff's allegations regarding "predecessors in interest" are vague and ambiguous. Defendants are without knowledge or information to form a belief as to the truth of such allegations, and, therefore, deny the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

34.    Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text. Any attempt to characterize the article is denied. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants deny the remaining allegations in this paragraph of the Complaint.

35.    Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text. Any attempt to characterize the article is denied. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants deny the remaining allegations in this paragraph of the Complaint.

36.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants deny the allegations in this paragraph of the Complaint.

37.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of

-11-

Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

38.    Defendants admit that a supplemental NDA for Celebrex® was submitted to the FDA on June 12, 2000.  Defendants assert that the submission speaks for itself and any attempt to characterize it is denied.  Defendants admit that a Medical Officer Review dated September 20, 2000, was completed by the FDA.  Defendants state that the referenced study speaks for itself and respectfully refer the Court to the study for its actual language and text.  Any attempt to characterize the study is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

39.    Defendants state that the referenced Medical Officer Review speaks for itself and respectfully refer the Court to the Medical Officer Review for its actual language and text.  Any attempt to characterize the Medical Officer Review is denied.  Defendants state that the referenced Alert for Healthcare Professionals speaks for itself and respectfully refer the Court to the Alert for Healthcare Professionals for its actual language and text.  Any attempt to characterize the Alert for Healthcare Professionals is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

40.    Defendants state that the referenced study speaks for itself and respectfully refer the Court to the study for its actual language and text.  Any attempt to characterize the study is denied.  Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text.  Any attempt to characterize the article is denied.  Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

41.    Defendants state that the referenced Medical Officer Review speaks for itself and respectfully refer the Court to the Medical Officer Review for its actual language and text.  Any attempt to characterize the Medical Officer Review is denied.  Defendants state that the

-12-

referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text. Any attempt to characterize the article is denied. Defendants deny the remaining allegations in this paragraph of the Complaint.

42.    Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text. Any attempt to characterize the article is denied. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

43.    Defendants state that the referenced articles speak for themselves and respectfully refer the Court to the articles for their actual language and text. Any attempt to characterize the articles is denied. Defendants state that the referenced study speaks for itself and respectfully refer the Court to the study for its actual language and text. Any attempt to characterize the study is denied. Defendants deny the remaining allegations in this paragraph of the Complaint.

44.    Defendants state that the referenced Medical Officer Review speaks for itself and respectfully refer the Court to the Medical Officer Review for its actual language and text. Any attempt to characterize the Medical Officer Review is denied. Defendants deny the remaining allegations in this paragraph of the Complaint.

45.    Plaintiff fails to provide the proper context for the allegations concerning "Public Citizen" in this paragraph of the Complaint. Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

46.    Defendants state that the referenced study speaks for itself and respectfully refer the Court to the study for its actual language and text. Any attempt to characterize the study is denied. Plaintiff fails to provide the proper context for the allegations concerning "Public Citizen" in this paragraph of the Complaint. Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

-13-

47.    Defendants admit that there was a clinical trial called APC.  Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text.  Any attempt to characterize the article is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

48.    Defendants state that the referenced Alert for Healthcare Professionals speaks for itself and respectfully refer the Court to the Alert for Healthcare Professionals for its actual language and text.  Any attempt to characterize the Alert for Healthcare Professionals is denied. Defendants deny the remaining allegations in this paragraph of the Complaint.

49.    Defendants state that the referenced Medical Officer Review speaks for itself and respectfully refer the Court to the Medical Officer Review for its actual language and text.  Any attempt to characterize the Medical Officer Review is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

50.    Defendants admit that there was a clinical trial called PreSAP.  Plaintiff fails to provide the proper context for the allegations concerning "other Celebrex trials" contained in this paragraph of the Complaint.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.  As for the allegations in this paragraph of the Complaint regarding the PreSAP study, Defendants state that the referenced study speaks for itself and respectfully refer the Court to the study for its actual language and text.  Any attempt to characterize the study is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

51.    Plaintiff fails to provide the proper context for the allegations concerning "Public Citizen" in this paragraph of the Complaint.   Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.  Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text.  Any attempt to characterize the article is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

B LBC1 766330 v1
2902026-000072 12/7/2007

52.     Plaintiff fails to provide the proper context for the allegations in this paragraph of the Complaint regarding Merck and Vioxx®.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.  Defendants state that the referenced studies speak for themselves and respectfully refer the Court to the studies for their actual language and text.  Any attempt to characterize the studies is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

53.     Defendants state that the referenced Medical Officer Review speaks for itself and respectfully refer the Court to the Medical Officer Review for its actual language and text.  Any attempt to characterize the Medical Officer Review is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

54.     Defendants state that allegations in this paragraph of the Complaint regarding Vioxx® are not directed toward Defendants, and, therefore no response is required.  To the extent that a response is deemed required, Plaintiff fails to provide the proper context for the allegations in this paragraph of the Complaint regarding Vioxx®.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.  Defendants state that the referenced study speaks for itself and respectfully refer the Court to the study for its actual language and text.  Any attempt to characterize the study is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

55.     Defendants state that allegations in this paragraph of the Complaint regarding Merck and Vioxx® are not directed toward Defendants, and, therefore, no response is required.  To the extent that a response is deemed required, Plaintiff fails to provide the proper context for the allegations in this paragraph of the Complaint regarding Merck and Vioxx®.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.  Defendants state that the referenced study speaks for itself and respectfully refer the Court to the study for its actual language and text.  Any attempt to characterize the study is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

B LBC1 766330 v1
2902026-000072 12/7/2007

56.     Defendants state that allegations in this paragraph of the Complaint regarding Merck and Vioxx® are not directed toward Defendants, and, therefore, no response is required.  To the extent that a response is deemed required, Plaintiff fails to provide the proper context for the allegations in this paragraph of the Complaint regarding Merck and Vioxx®.  Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.  Defendants state that the referenced study speaks for itself and respectfully refer the Court to the study for its actual language and text.  Any attempt to characterize the study is denied.  Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text.  Any attempt to characterize the article is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

57.     Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.   Defendants deny the allegations in this paragraph of the Complaint.

58.     Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text.  Any attempt to characterize the article is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

59.     Defendants state that allegations in this paragraph of the Complaint are not directed toward Defendants, and, therefore, no response is required.  To the extent that a response is deemed required, Defendants state that the referenced article speaks for itself and respectfully refer the Court to the article for its actual language and text.  Any attempt to characterize the article is denied.  Defendants deny the remaining allegations in this paragraph of the Complaint.

60.     Defendants deny the allegations in this paragraph of the Complaint.

61.     Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.

-16-

Defendants deny any wrongful conduct, deny that Celebrex® is defective, and deny the remaining allegations contained in this paragraph of the Complaint.

62.     Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants deny any wrongful conduct and deny the allegations contained in this paragraph of the Complaint.

63.     Defendants deny any wrongful conduct and deny the allegations contained in this paragraph of the Complaint.

64.     Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations contained in this paragraph of the Complaint.

65.     Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.  Defendants deny any wrongful conduct, deny that Celebrex® is unreasonably dangerous, and deny the remaining allegations in this paragraph of the Complaint.

66.     Defendants admit that the FDA Division of Drug Marketing, Advertising, and Communications ("DDMAC") sent a letter to Pfizer dated January 10, 2005.  Defendants state that the referenced letter speaks for itself and respectfully refer the Court to the letter for its actual language and text.  Any attempt to characterize the letter is denied.  Defendants admit that the DDMAC sent a letter to Searle dated October 6, 1999.  Defendants state that the referenced

-17-

letter speaks for itself and respectfully refer the Court to the letter for its actual language and text. Any attempt to characterize the letter is denied. Defendants state that the transcripts of the FDA Arthritis Drugs Advisory Committee hearings speak for themselves and respectfully refer the Court to the transcripts for their actual language and text. Any attempt to characterize the transcripts is denied. Defendants state that the referenced study speaks for itself and respectfully refer the Court to the article for its actual language and text. Any attempt to characterize the article is denied. Defendants deny the remaining allegations in this paragraph of the Complaint.

67. Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny the remaining allegations in this paragraph of the Complaint.

68. Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants state that Celebrex® is a prescription medication which is approved by the FDA for the following indications: (1) for relief of the signs

-18-

and symptoms of osteoarthritis; (2) for relief of the signs and symptoms of rheumatoid arthritis in adults; (3) for the management of acute pain in adults; (4) for the treatment of primary dysmenorrhea; (5) to reduce the number of adenomatous colorectal polyps in familial adenomatous polyposis (FAP) as an adjunct to usual care (e.g., endoscopic surveillance surgery); (6) for relief of signs and symptoms of ankylosing spondylitis; and (7) for relief of the signs and symptoms of juvenile rheumatoid arthritis in patients two years of age and older.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.  Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

69.     Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which at all times was adequate and comported with applicable standards of care and law. Defendants state that Plaintiff's allegations in this paragraph of the Complaint regarding "predecessors in interest" are vague and ambiguous.  Defendants are without knowledge or information to form a belief as to the truth of such allegations, and, therefore, deny the same. Defendants deny any wrongful conduct, deny that Celebrex® is defective, and deny the allegations in this paragraph of the Complaint.

70.     Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants state that Celebrex® was and is safe

-19-

and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny the remaining allegations in this paragraph of the Complaint.

71.    Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which at all times was adequate and comported with applicable standards of care and law. Defendants deny the remaining allegations in this paragraph of the Complaint.

72.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

73.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.

-20-

Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

74.    Defendants deny the allegations in this paragraph of the Complaint.

75.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

76.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

77.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph of the Complaint regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

78.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective, and deny the remaining allegations in this paragraph of the Complaint.

-21-

79.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® are and were adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

80.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® are and were adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

81.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® are and were adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

### Response to First Cause of Action: Negligence

82.    Defendants incorporate by reference their responses to each paragraph of Plaintiff's Complaint as if fully set forth herein.

83.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective, and deny the remaining allegations in this paragraph of the Complaint.

-22-

84.    Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required.  To the extent that a response is deemed required, Defendants admit that they had duties as are imposed by law but denies having breached such duties.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants deny the remaining allegations in this paragraph of the Compliant.

85.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective, and deny the remaining allegations in this paragraph of the Complaint, including all subparts.

86.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is unreasonably dangerous, and deny the remaining allegations in this paragraph of the Complaint.

87.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

88.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

B LBC1 766330 v1
2902026-000072 12/7/2007

89.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

90.    Defendants admit that Plaintiff claims that the amount in controversy satisfies jurisdictional limits.   Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

### Response to Second Cause of Action: Strict Products Liability Defective Design

91.    Defendants incorporate by reference their responses to each paragraph of Plaintiff's Complaint as if fully set forth herein.

92.    Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants deny any wrongful conduct, deny that Celebrex® is defective or unreasonably dangerous, and deny the remaining allegations in this paragraph of the Complaint.

93.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective or unreasonably dangerous, and deny the remaining allegations in this paragraph of the Complaint, including all subparts.

-24-

94.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants state that, in the ordinary case, Celebrex® was expected to reach users and consumers without substantial change from the time of sale. Defendants deny any wrongful conduct, deny that Celebrex® is unreasonably dangerous, and deny the remaining allegations in this paragraph of the Complaint.

95.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

96.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective or unreasonably dangerous, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

97.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective or unreasonably dangerous, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

-25-

98.     Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective or unreasonably dangerous, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

99.     Defendants admit that Plaintiff claims that the amount in controversy satisfies jurisdictional limits.  Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

### Response to Third Cause of Action: Strict Products Liability Failure to Warn

100.    Defendants incorporate by reference their responses to each paragraph of Plaintiff's Complaint as if fully set forth herein.

101.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective or unreasonably dangerous, and deny the remaining allegations in this paragraph of the Complaint.

102.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants deny the remaining allegations in this paragraph of the Complaint.

103.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the

-26-

same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective, and deny the remaining allegations in this paragraph of the Complaint.

104.   Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required.  To the extent that a response is deemed required, Defendants deny the allegations in this paragraph of the Complaint.

105.   Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

106.   Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required.  To the extent that a response is deemed required, Defendants Pfizer, Pharmacia, and Searle admit that they had duties as are imposed by law but denies having breached such duties.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.  Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

-27-

107.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

108.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

109.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

110.    Defendants admit that Plaintiff claims that the amount in controversy satisfies jurisdictional limits.  Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

### Response to Fourth Cause of Action: Breach of Express Warranty of Merchantability

111.    Defendants incorporate by reference their responses to each paragraph of Plaintiff's Complaint as if fully set forth herein.

112.    Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA.  Defendants deny the remaining allegations in this paragraph of the Complaint.

113.    Defendants state that the allegations in this paragraph of the Complaint regarding "Pollard" are not directed toward Defendants, and, therefore, no response is required.  To the extent that a response is deemed required, Defendants state that Plaintiff fails to provide the proper context for the allegations regarding "Pollard" in this paragraph of the Complaint. Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same.  Defendants admit that, during certain periods of

-28-

time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny the remaining allegations in this paragraph of the Complaint.

114.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

115.    Defendants state that the allegations in this paragraph of the Complaint regarding "Pollard" are not directed toward Defendants, and, therefore, no response is required. To the extent that a response is deemed required, Defendants state that Plaintiff fails to provide the proper context for the allegations regarding "Pollard" in this paragraph of the Complaint. Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with

-29-

applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

116.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

117.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

### Response to Fifth Cause of Action: Breach of Implied Warranty of Merchantability

118.    Defendants incorporate by reference their responses to each paragraph of Plaintiff's Complaint as if fully set forth herein.

119.    Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations in this paragraph of the Complaint.

120.    Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required. To the extent that a response is deemed required, Defendants deny the allegations in this paragraph of the Complaint.

121.    Defendants admit that, during certain periods of time, Pfizer and Pharmacia marketed and co-promoted Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants admit that, during certain periods of time, Celebrex® was manufactured and packaged for Searle, which developed, tested, marketed, co-promoted and distributed Celebrex® in the United States to be prescribed by healthcare providers who are by law authorized to prescribe drugs in accordance with their approval by the FDA. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants Pfizer, Pharmacia, and Searle admit that they

-30-

provided FDA-approved prescribing information regarding Celebrex®. Defendants deny the remaining allegations in this paragraph of the Complaint.

122.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny the remaining allegations in this paragraph of the Complaint.

123.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® is defective or unreasonably dangerous, and deny the remaining allegations in this paragraph of the Complaint.

124.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint, including all subparts.

125.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

126.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

B LBC1 766330 v1
2902026-000072 12/7/2007

127.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

128.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

129.    Defendants admit that Plaintiff claims that the amount in controversy satisfies jurisdictional limits.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

## Response to Sixth Cause of Action: Fraud

130.    Defendants incorporate by reference their responses to each paragraph of Plaintiff's Complaint as if fully set forth herein.

131.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

132.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

-32-

133.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

134.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

135.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

136.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.

B LBC1 766330 v1
2902026-000072 12/7/2007

Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint, including all subparts.

137.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

138.    Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required.  To the extent that a response is deemed required, Defendants Pfizer, Pharmacia, and Searle admit that they had duties as are imposed by law but denies having breached such duties.  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.  Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

139.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

-34-

140.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

141.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

142.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

143.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

144.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

### Response to Seventh Cause of Action: Negligent Misrepresentation

145.    Defendants incorporate by reference their responses to each paragraph of Plaintiff's Complaint as if fully set forth herein.

146.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

147.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law.

-35-

Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

148.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

149.    Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

150.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

151.    Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same.  Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information.  Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information,

-36-

which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint, including all subparts.

152.   Defendants state that the allegations in this paragraph of the Complaint regarding "Pollard" are not directed toward Defendants, and, therefore, no response is required. To the extent that a response is deemed required, Defendants state that Plaintiff fails to provide the proper context for the allegations regarding "Pollard" in this paragraph of the Complaint. Defendants therefore lack knowledge or information sufficient to form a belief as to the truth of such allegations, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

153.   Defendants state that this paragraph of the Complaint contains legal contentions to which no response is required. To the extent that a response is deemed required, Defendants Pfizer, Pharmacia, and Searle admit that they had duties as are imposed by law but denies having breached such duties. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct and deny the remaining allegations in this paragraph of the Complaint.

154.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Plaintiff used Celebrex®, and, therefore, deny the

B LBC1 766330 v1
2902026-000072 12/7/2007

same. Defendants state that Celebrex® was and is safe and effective when used in accordance with its FDA-approved prescribing information. Defendants state that the potential effects of Celebrex® were and are adequately described in its FDA-approved prescribing information, which was at all times adequate and comported with applicable standards of care and law. Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

155.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

156.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

157.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

158.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

159.    Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

Answering the unnumbered paragraph following Paragraph 159 of the Complaint, Defendants deny any wrongful conduct, deny that Celebrex® caused Plaintiff injury or damage, and deny the remaining allegations in this paragraph of the Complaint.

### III.
### GENERAL DENIAL

Defendants deny all allegations and/or legal conclusions set forth in Plaintiff's Complaint that have not been previously admitted, denied, or explained.

### IV.
### AFFIRMATIVE DEFENSES

Defendants reserve the right to rely upon any of the following or additional defenses to claims asserted by Plaintiff to the extent that such defenses are supported by information developed through discovery or evidence at trial. Defendants affirmatively show that:

-38-

### First Defense

1.      The Complaint fails to state a claim upon which relief can be granted.

### Second Defense

2.      Celebrex® is a prescription medical product.  The federal government has preempted the field of law applicable to the labeling and warning of prescription medical products. Defendants' labeling and warning of Celebrex® was at all times in compliance with applicable federal law.  Plaintiff's causes of action against Defendants, therefore, fail to state a claim upon which relief can be granted; such claims, if allowed, would conflict with applicable federal law and violate the Supremacy Clause of the United States Constitution.

### Third Defense

3.      At all relevant times, Defendants provided proper warnings, information and instructions for the drug in accordance with generally recognized and prevailing standards in existence at the time.

### Fourth Defense

4.      At all relevant times, Defendants' warnings and instructions with respect to the use of Celebrex® conformed to the generally recognized, reasonably available, and reliable state of knowledge at the time the drug was manufactured, marketed and distributed.

### Fifth Defense

5.      Plaintiff's action is time-barred as it is filed outside of the time permitted by the applicable Statute of Limitations, and same is pled in full bar of any liability as to Defendants.

### Sixth Defense

6.      Plaintiff's action is barred by the statute of repose.

### Seventh Defense

7.      Plaintiff's claims against Defendants are barred to the extent Plaintiff was contributorily negligent, actively negligent or otherwise failed to mitigate their damages, and any recovery by Plaintiff should be diminished accordingly.

-39-

## Eighth Defense

8.    The proximate cause of the loss complained of by Plaintiff is not due to any acts or omissions on the part of Defendants. Rather, said loss is due to the acts or omissions on the part of third parties unrelated to Defendants and for whose acts or omissions Defendants are not liable in any way.

## Ninth Defense

9.    The acts and/or omissions of unrelated third parties as alleged constituted independent, intervening causes for which Defendants cannot be liable.

## Tenth Defense

10.    Any injuries or expenses incurred by Plaintiff were not caused by Celebrex®, but were proximately caused, in whole or in part, by an idiosyncratic reaction, operation of nature, or act of God.

## Eleventh Defense

11.    Defendants affirmatively deny that they violated any duty owed to Plaintiff.

## Twelfth Defense

12.    A manufacturer has no duty to warn patients or the general public of any risk, contraindication, or adverse effect associated with the use of a prescription medical product. Rather, the law requires that all such warnings and appropriate information be given to the prescribing physician and the medical profession, which act as a "learned intermediary" in determining the use of the product. Celebrex® is a prescription medical product, available only on the order of a licensed physician. Celebrex® provided an adequate warning to Plaintiff's treating and prescribing physicians.

## Thirteenth Defense

13.    The product at issue was not in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.

B LBC1 766330 v1
2902026-000072 12/7/2007

### Fourteenth Defense

14.     Celebrex® was at all times material to the Complaint reasonably safe and reasonably fit for its intended use and the warnings and instructions accompanying Celebrex® at the time of the occurrence of the injuries alleged by Plaintiff were legally adequate for its approved usages.

### Fifteenth Defense

15.     Plaintiff's causes of action are barred in whole or in part by the lack of a defect as the Celebrex® allegedly ingested by Plaintiff was prepared in accordance with the applicable standard of care.

### Sixteenth Defense

16.     Plaintiff's alleged injuries/damages, if any, were the result of misuse or abnormal use of the product Celebrex® after the product left the control of Defendants and any liability of Defendants is therefore barred.

### Seventeenth Defense

17.     Plaintiff's alleged damages were not caused by any failure to warn on the part of Defendants.

### Eighteenth Defense

18.     Plaintiff's alleged injuries/damages, if any, were the result of preexisting or subsequent conditions unrelated to Celebrex®.

### Nineteenth Defense

19.     Plaintiff knew or should have known of any risk associated with Celebrex®; therefore, the doctrine of assumption of the risk bars or diminishes any recovery.

### Twentieth Defense

20.     Plaintiff is barred from recovering against Defendants because Plaintiff's claims are preempted in accordance with the Supremacy Clause of the United States Constitution and by the Federal Food, Drug and Cosmetics Act, 21 U.S.C. § 301 et. seq.

B LBC1 766330 v1
2902026-000072 12/7/2007

### Twenty-first Defense

21.    Plaintiff's claims are barred in whole or in part under the applicable state law because the subject pharmaceutical product at issue was subject to and received pre-market approval by the Food and Drug Administration under 52 Stat. 1040, 21 U.S.C. § 301.

### Twenty-second Defense

22.    The manufacture, distribution and sale of the pharmaceutical product referred to in Plaintiff's Complaint were at all times in compliance with all federal regulations and statutes, and Plaintiff's causes of action are preempted.

### Twenty-third Defense

23.    Plaintiff's claims are barred in whole or in part by the deference given to the primary jurisdiction of the Food and Drug Administration over the subject pharmaceutical product at issue under applicable federal laws, regulations, and rules.

### Twenty-fourth Defense

24.    Plaintiff's claims are barred in whole or in part because there is no private right of action concerning matters regulated by the Food and Drug Administration under applicable federal laws, regulations, and rules.

### Twenty-fifth Defense

25.    Plaintiff's claims are barred in whole or in part because Defendants provided adequate "direction or warnings" as to the use of the subject pharmaceutical product within the meaning of Comment j to Section 402A of the Restatement (Second) of Torts.

### Twenty-sixth Defense

26.    Plaintiff's claims are barred or limited to a product liability failure to warn claim because Celebrex® is a prescription pharmaceutical drug and falls within the ambit of Restatement (Second) of Torts § 402A, Comment k.

B LBC1 766330 v1
2902026-000072 12/7/2007

## Twenty-seventh Defense

27.     Plaintiff's claims are barred in whole or in part because the subject pharmaceutical product at issue "provides net benefits for a class of patients" within the meaning of Comment f to § 6 of the Restatement (Third) of Torts: Products Liability.

## Twenty-eighth Defense

28.     Plaintiff's claims are barred under § 4, et seq., of the Restatement (Third) of Torts: Products Liability.

## Twenty-ninth Defense

29.     To the extent that Plaintiff is seeking punitive damages, Plaintiff has failed to plead facts sufficient under the law to justify an award of punitive damages.

## Thirtieth Defense

30.     Defendants affirmatively aver that the imposition of punitive damages in this case would violate Defendants' rights to procedural due process under the Fourteenth Amendment of the United States Constitution and the Constitutions of the States of Alabama and California, and would additionally violate Defendants' rights to substantive due process under the Fourteenth Amendment of the United States Constitution.

## Thirty-first Defense

31.     Plaintiff's claims for punitive damages are barred, in whole or in part, by the Fifth and Fourteenth Amendments to the United States Constitution.

## Thirty-second Defense

32.     The imposition of punitive damages in this case would violate the First Amendment to the United States Constitution.

## Thirty-third Defense

33.     Plaintiff's punitive damage claims are preempted by federal law.

B LBC1 766330 v1
2902026-000072 12/7/2007

### Thirty-fourth Defense

34.    In the event that reliance was placed upon Defendants' nonconformance to an express representation, this action is barred as there was no reliance upon representations, if any, of Defendants.

### Thirty-fifth Defense

35.    Plaintiff failed to provide Defendants with timely notice of any alleged nonconformance to any express representation.

### Thirty-sixth Defense

36.    To the extent that Plaintiff's claims are based on a theory providing for liability without proof of causation, the claims violate Defendants' rights under the United States Constitution.

### Thirty-seventh Defense

37.    Plaintiff's claims are barred, in whole or in part, because the advertisements, if any, and labeling with respect to the subject pharmaceutical products were not false or misleading and, therefore, constitute protected commercial speech under the applicable provisions of the United States Constitution.

### Thirty-eighth Defense

38.    To the extent that Plaintiff seeks punitive damages for the conduct which allegedly caused injuries asserted in the Complaint, punitive damages are barred or reduced by applicable law or statute or, in the alternative, are unconstitutional insofar as they violate the due process protections afforded by the United States Constitution, the excessive fines clause of the Eighth Amendment of the United States Constitution, the Commerce Clause of the United States Constitution, and the Full Faith and Credit Clause of the United States Constitution, and applicable provisions of the Constitutions of the States of Alabama and California. Any law, statute, or other authority purporting to permit the recovery of punitive damages in this case is unconstitutional, facially and as applied, to the extent that, without limitation, it: (1) lacks constitutionally sufficient standards to guide and restrain the jury's discretion in determining whether to award punitive damages and/or the amount, if any; (2) is void for vagueness in that it

-44-

failed to provide adequate advance notice as to what conduct will result in punitive damages; (3) permits recovery of punitive damages based on out-of-state conduct, conduct that complied with applicable law, or conduct that was not directed, or did not proximately cause harm, to Plaintiff; (4) permits recovery of punitive damages in an amount that is not both reasonable and proportionate to the amount of harm, if any, to Plaintiff and to the amount of compensatory damages, if any; (5) permits jury consideration of net worth or other financial information relating to Defendants; (6) lacks constitutionally sufficient standards to be applied by the trial court in post-verdict review of any punitive damages awards; (7) lacks constitutionally sufficient standards for appellate review of punitive damages awards; and (8) otherwise fails to satisfy Supreme Court precedent, including, without limitation, *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 (1991), *TXO Production Corp. v. Alliance Resources, Inc.*, 509 U.S. 443 (1993); *BMW of North America, Inc. v. Gore*, 519 U.S. 559 (1996); and *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

### Thirty-ninth Defense

39.    The methods, standards, and techniques utilized with respect to the manufacture, design, and marketing of Celebrex®, if any, used in this case, included adequate warnings and instructions with respect to the product's use in the package insert and other literature, and conformed to the generally recognized, reasonably available, and reliable state of the knowledge at the time the product was marketed.

### Fortieth Defense

40.    The claims asserted in the Complaint are barred because Celebrex® was designed, tested, manufactured and labeled in accordance with the state-of-the-art industry standards existing at the time of the sale.

### Forty-first Defense

41.    If Plaintiff has sustained injuries or losses as alleged in the Complaint, upon information and belief, such injuries and losses were caused by the actions of persons not having real or apparent authority to take said actions on behalf of Defendants and over whom Defendants had

-45-

no control and for whom Defendants may not be held accountable.

### Forty-second Defense

42.    The claims asserted in the Complaint are barred, in whole or in part, because Celebrex® was not unreasonably dangerous or defective, was suitable for the purpose for which it was intended, and was distributed with adequate and sufficient warnings.

### Forty-third Defense

43.    Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of laches, waiver, and/or estoppel.

### Forty-fourth Defense

44.    Plaintiff's claims are barred because Plaintiff's injuries, if any, were the result of the pre-existing and/or unrelated medical, genetic and/or environmental conditions, diseases or illnesses, subsequent medical conditions or natural courses of conditions of Plaintiff, and were independent of or far removed from Defendants' conduct.

### Forty-fifth Defense

45.    The claims asserted in the Complaint are barred, in whole or in part, because Celebrex® did not proximately cause injuries or damages to Plaintiff.

### Forty-sixth Defense

46.    The claims asserted in the Complaint are barred, in whole or in part, because Plaintiff did not incur any ascertainable loss as a result of Defendants' conduct.

### Forty-seventh Defense

47.    The claims asserted in the Complaint are barred, in whole or in part, because the manufacturing, labeling, packaging, and any advertising of the product complied with the applicable codes, standards and regulations established, adopted, promulgated or approved by any applicable regulatory body, including but not limited to the United States, any state, and any agency thereof.

B LBC1 766330 v1
2902026-000072 12/7/2007

### Forty-eighth Defense

48.    The claims must be dismissed because Plaintiff would have taken Celebrex® even if the product labeling contained the information that Plaintiff contends should have been provided.

### Forty-ninth Defense

49.    The claims asserted in the Complaint are barred because the utility of Celebrex® outweighed its risks.

### Fiftieth Defense

50.    Plaintiff's damages, if any, are barred or limited by the payments received from collateral sources.

### Fifty-first Defense

51.    Defendants' liability, if any, can only be determined after the percentages of responsibility of all persons who caused or contributed toward Plaintiff's alleged damages, if any, are determined.  Defendants seek an adjudication of the percentage of fault of the claimants and each and every other person whose fault could have contributed to the alleged injuries and damages, if any, of Plaintiff.

### Fifty-second Defense

52.    Plaintiff's claims are barred, in whole or in part, by the doctrine of abstention in that the common law gives deference to discretionary actions by the United States Food and Drug Administration under the Federal Food, Drug, and Cosmetic Act.

### Fifty-third Defense

53.    The claims asserted in the Complaint are barred, in whole or in part, because Celebrex® is comprehensively regulated by the FDA pursuant to the Federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, and regulations promulgated there under, and Plaintiff's claims conflict with the FDCA, with the regulations promulgated by FDA to implement the FDCA, with the purposes and objectives of the FDCA and FDA's implementing regulations, and with the specific determinations by FDA specifying the language that should be used in the labeling accompanying Celebrex®.    Accordingly, Plaintiff's claims are preempted by the

-47-

Supremacy Clause of the United States Constitution, Article VI, clause 2, and the laws of the United States.

### Fifty-fourth Defense

54.     Plaintiff's misrepresentation allegations are not stated with the degree of particularity required by Federal Rule of Civil Procedure 9(b) and should be dismissed.

### Fifty-fifth Defense

55.     Defendants reserve the right to supplement their assertion of defenses as they continue with their factual investigation of Plaintiff's claims.

### V.
### JURY DEMAND

Defendants hereby demand a trial by jury.

### VI.
### PRAYER

WHEREFORE, Defendants pray that Plaintiff take nothing by this suit; that Defendants be discharged with their costs expended in this matter, and for such other and further relief to which it may be justly entitled.

Dated:  December 7, 2007.

Lawrence B. Clark
Attorney for Defendants

OF COUNSEL:
BARKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
Wachovia Tower, Suite 1600
420 Twentieth Street North
Birmingham, Alabama 35203
Telephone: (205) 328-0480
Facsimile: (205) 322-8007

-48-

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2007 I placed a copy properly addressed, postage prepaid, in the United States mail, to the following counsel of record:

Navan Ward, Jr.
Andy Birchfield, Jr.
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
234 Commerce Street
Montgomery, Alabama 36104

_____
Of Counsel

-49-

FILED

2008 Jan-31 PM 02:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

RECEIVED

OFFICE OF THE CLERK
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

08 JAN 31  AM 11: 47

J.S. DISTRICT COURT
N.D. OF ALABAMA

Richard W. Wieking
Clerk

450 Golden Gate Avenue
San Francisco, CA 94102
415.522.2000

January 28th, 2008

Alabama Northern District Court
1729 Fifth Avenue North
Birmingham, AL 35203-2000

Re:  MDL 05-1699 In re Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation

Title of Case(s)
Raymond Beaver v. Pfizer Inc.

Your Case Number(s)
C.A. No. 3:07-2219

Dear Clerk:

Enclosed is a certified copy of the order from the Judicial panel on Multidistrict Litigation transferring the above entitled action to the Northern District of California, San Francisco Division. The case has been assigned to the Honorable Charles R. Breyer for coordinated or consolidated pretrial processing pursuant to 28 USC §1407.

Please forward the **original record** and **a certified copy of the docket entries** in the case listed above along with the enclosed copy of this transmittal letter to:

United States District Court
Northern District of California
450 Golden Gate Avenue, P.O. Box 36060
San Francisco, CA 94102
Attn: Simone Voltz

If the case is an electronic case filing please do one of the following: 1) e-mail the PDF documents, as separate PDF files, including a PDF copy of the docket sheet to **SFmdl_clerk@cand.uscourts.gov**, 2) provide us with a temporary log in and a password to directly access your database and to expedite the downloading of the PDF files we need and/or require, or, 3) if you prefer, on a disc. We appreciate your prompt attention to this matter.

Sincerely yours,
Richard W. Wieking, Clerk

By: Simone Voltz
Deputy Clerk

Encl.



FILED

# UNITED STATES JUDICIAL PANEL
## on
# MULTIDISTRICT LITIGATION

**CHAIRMAN:**
Judge John G. Heyburn II
United States District Court
Western District of Kentucky
N.D. OF ALABAMA

**MEMBERS:**
Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

Judge Anthony J. Scirica
United States Court of Appeals
Third Circuit

**DIRECT REPLY TO:**

Jeffery N. Lüthi
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:          [202] 502-2888
http://www.jpml.uscourts.gov

January 22, 2008

Richard W. Wieking, Clerk
Phillip Burton U.S. Courthouse
Box 36060
450 Golden Gate Avenue
San Francisco, CA 94102-3489

Re: MDL No. 1699-- IN RE: Bextra and Celebrex Marketing, Sales Practices and Products Liability Litigation

(See Attached CTO-92)

Dear Mr. Wieking:

I am enclosing a certified copy and one additional copy of a conditional transfer order filed by the Panel in the above-captioned matter on January 3, 2008. As stipulated in Rule 7.4(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), transmittal of the order has been stayed 15 days to give any party an opportunity to oppose the transfer. The 15-day period has now elapsed, no opposition was received, and the order is directed to you for filing.

The Panel's governing statute, 28 U.S.C. §1407, requires that the transferee clerk "...transmit a certified copy of the Panel's order to transfer to the clerk of the district court from which the action is being transferred."

A list of involved counsel is attached.

Very truly,

Jeffery N. Lüthi
Clerk of the Panel

By _Dana L. Stewart_
Deputy Clerk

I hereby certify that the annexed instrument is a true ......... y of the original on file in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California

By _____
                                        Deputy Clerk
Date _____

Attachment

cc: Transferee Judge:      Judge Charles R. Breyer
    Transferor Judges:     (See Attached List of Judges)
    Transferor Clerks:     (See Attached List of Clerks)

JPML Form 36

A CERTIFIED TRUE COPY

JAN 2 2 2008

ATTEST
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

JAN - 3 2008

FILED
CLERK'S OFFICE

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

**IN RE: BEXTRA AND CELEBREX MARKETING, SALES**
**PRACTICES AND PRODUCTS LIABILITY LITIGATION**          MDL No. 1699

(SEE ATTACHED SCHEDULE)

**CONDITIONAL TRANSFER ORDER (CTO-92)**

On September 6, 2005, the Panel transferred 30 civil actions to the United States District Court for the Northern District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 391 F.Supp.2d 1377 (J.P.M.L. 2005). Since that time, 1,167 additional actions have been transferred to the Northern District of California. With the consent of that court, all such actions have been assigned to the Honorable Charles R. Breyer.

It appears that the actions on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Northern District of California and assigned to Judge Breyer.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425, 435-36 (2001), these actions are transferred under 28 U.S.C. § 1407 to the Northern District of California for the reasons stated in the order of September 6, 2005, and, with the consent of that court, assigned to the Honorable Charles R. Breyer.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Northern District of California. The transmittal of this order to said Clerk shall be stayed 15 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 15-day period, the stay will be continued until further order of the Panel.

Inasmuch as no objection is
pending at this time, the
stay is lifted.

JAN 2 2 2008

CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By
Deputy Clerk
Date

IN RE: BEXTRA AND CELEBREX MARKETING, SALES
PRACTICES AND PRODUCTS LIABILITY LITIGATION           MDL No. 1699

## SCHEDULE CTO-92 - TAG-ALONG ACTIONS

**DIST. DIV. C.A. #**          **CASE CAPTION**

ALABAMA NORTHERN
   ALN 3  07-2219          Raymond Beaver v. Pfizer Inc., et al.

MARYLAND
   MD 1  07-3205          Ronald N. Price, Sr., etc. v. Pfizer Inc.
   MD 1  07-3206          Martin Fisher, etc. v. Pfizer Inc.

MINNESOTA
   MN 0  07-4791          Robert Colman v. Pfizer Inc., et al.
   MN 0  07-4801          Harriet Bratcher v. Pfizer Inc., et al.

MISSISSIPPI SOUTHERN
   MSS 3  07-450          Bobbie H. Overton, et al. v. Pfizer Inc., et al.

IN RE: BEXTRA AND CELEBREX MARKETING, SALES
PRACTICES AND PRODUCTS LIABILITY LITIGATION                    MDL No. 1699

## INVOLVED COUNSEL LIST (CTO-92)

Andy D. Birchfield, Jr.
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES PC
P.O. Box 4160
Montgomery, AL 36103-4160

Levi Boone, III
BOONE LAW FIRM
401 West Sunflower Road
P.O. Box 1772
Cleveland, MS 38732-1772

Elizabeth J. Cabraser
LIEFF CABRASER HEIMANN
& BERNSTEIN LLP
Embarcadero Center West, 30th Floor
275 Battery Street
San Francisco, CA 94111-3339

Lawrence B. Clark
BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ PC
1600 Wachovia Tower
420 North 20th Street
Birmingham, AL 35203-5202

Walter T. Johnson
WATKINS & EAGER
P.O. Box 650
Jackson, MS 39205-0650

Gregory A. Markel
CADWALADER WICKERSHAM
& TAFT LLP
One World Financial Center
New York, NY 10281

Ted G. Meadows
BEASLEY ALLEN CROW METHVIN
PORTIS & MILES PC
P.O. Box 4160
Montgomery, AL 36103-4160

Amy W. Schulman
DLA PIPER US LLP
1251 Avenues of the Americas
27th Floor
New York, NY 10020-1104

Paul A. Weykamp
LAW OFFICES OF PAUL A WEYKAMP
16 Stenersen Lane
Suite 2
Hunt Valley, MD 21030

IN RE: BEXTRA AND CELEBREX MARKETING, SALES
PRACTICES AND PRODUCTS LIABILITY LITIGATION          MDL No. 1699

## INVOLVED JUDGES LIST (CTO-92)

Hon. Sharon Lovelace Blackburn
Chief Judge, U.S. District Court
730 Hugo L. Black U.S. Courthouse
1729 5th Avenue North
Birmingham, AL 35203

Hon. J. Frederick Motz
U.S. District Judge
101 West Lombard Street
510 Edward A. Garmatz Federal Building & U.S. Courthouse
Baltimore, MD 21201-2690

Hon. William D. Quarles, Jr.
United States District Judge
3A Edward A. Garmatz Fed. Bldg. & U.S. Courthouse
101 West Lombard Street
Baltimore, MD 21201-2605

Hon. Joan N. Ericksen
U.S. District Judge
12W U.S. Courthouse
300 South 4th Street
Minneapolis, MN 55415

Hon. Ann D. Montgomery
U.S. District Judge
13W U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Hon. Tom S. Lee
Senior U.S. District Judge
222 James O. Eastland U.S. Courthouse
245 East Capitol Street
Jackson, MS 39201

## IN RE: BEXTRA AND CELEBREX MARKETING, SALES
## PRACTICES AND PRODUCTS LIABILITY LITIGATION

MDL No. 1699

### INVOLVED CLERKS LIST (CTO-92)

Perry D. Mathis, Clerk
140 Hugo L. Black U.S. Courthouse
1729 5th Avenue North
Birmingham, AL 35203

Richard W. Wieking, Clerk
Phillip Burton U.S. Courthouse
Box 36060
450 Golden Gate Avenue
San Francisco, CA 94102-3489

Felicia C. Cannon, Clerk
Edward A. Garmatz Federal
Building & U.S. Courthouse
101 W. Lombard Street
Baltimore, MD 21201-2690

Richard Sletten, Clerk
202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

J.T. Noblin, Clerk
P.O. Box 23552
Jackson, MS 39225-3552

TRANSFERRED MDL

# U.S. District Court
## Northern District of Alabama (Northwestern)
## CIVIL DOCKET FOR CASE #: 3:07-cv-02219-SLB
### Internal Use Only

Beaver v. Pfizer, Inc
Assigned to: Chief Judge Sharon Lovelace
Blackburn
Case in other court: Colbert County, 07-900105
Cause: 28:1441 Petition for Removal- Product
Liability

Date Filed: 12/07/2007
Date Terminated: 01/31/2008
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj.
Prod. Liability
Jurisdiction: Diversity

**Plaintiff**

**Raymond Beaver**                     represented by   **Andy D Birchfield, Jr**
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES
PC
PO Box 4160
Montgomery, AL 36103-4160
1-334-269-2343
Email:
andy.birchfield@beasleyallen.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Navan Ward, Jr**
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES
PC
234 Commerce Street
PO Box 4160
Montgomery, AL 36103-4160
334-269-2343
Fax: 334-954-7555
Email:
navan.ward@beasleyallen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.
**Defendant**
**Pfizer, Inc**                          represented by  **Lawrence B Clark**
                                                         BAKER, DONELSON,
                                                         BEARMAN, CALDWELL &
                                                         BERKOWITZ
                                                         Suite 1600 Wachovia Tower
                                                         420 20th Street North
                                                         Birmingham, AL 35203
                                                         205-328-0480
                                                         Fax: 205-322-8007
                                                         Email: lclark@bakerdonelson.com

                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**
**Monsanto Company**                     represented by  **Lawrence B Clark**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**
**Terri R Allen**                        represented by  **Lawrence B Clark**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**
**Kristie Genova**                       represented by  **Lawrence B Clark**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**
**Leslie Hooper**                        represented by  **Lawrence B Clark**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Diann Loper**                          represented by **Lawrence B Clark**
                                         (See above for address)
                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Winwood Umphlett**                     represented by **Lawrence B Clark**
                                         (See above for address)
                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**G. D. Searle, LLC**                    represented by **Lawrence B Clark**
                                         (See above for address)
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/07/2007 | ❶ | (Court only) ***Party Monsanto Company, and Terri R Allen rep by, and Kristie Genova, and Leslie Hooper and Diann Loper, and Winwood Umphlett added. (KAM, ) (Entered: 12/10/2007) |
| 12/07/2007 | ❶1 | NOTICE OF REMOVAL by all defendants from Colbert County, case number 07-900105. ( Filing fee $ 350 rec # 200 242251), filed by all defendants. (Attachments: # 1 Exh 1 & 2# 2 Exh 3 & 4# 3 Exh 5 & 6# 4 Exh 7 & 8# 5 Cert of filing) (KAM, ) (Entered: 12/10/2007) |
| 12/07/2007 | ❶2 | NOTICE of Corporate Disclosure by Monsanto Company, G. D. Searle, LLC, Pfizer, Inc (KAM, ) (Entered: 12/10/2007) |
| 12/07/2007 | ❶3 | ANSWER to Complaint by Monsanto Company, Terri R Allen, Kristie Genova, Leslie Hooper, Diann Loper, Winwood Umphlett, G. D. Searle, LLC, Pfizer, Inc.(KAM, ) (Entered: 12/10/2007) |
| 12/12/2007 | ❶4 | MOTION to Stay *Pending Transfer to MDL* by Monsanto Company, Terri R Allen, Kristie Genova, Leslie Hooper, Diann Loper, Winwood Umphlett, G. D. Searle, LLC, Pfizer, Inc. (Clark, Lawrence) (Entered: 12/12/2007) |
| 12/20/2007 | ❶5 | Opposition to *Defendants Motion to Stay* filed by Raymond Beaver. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4)(Ward, Navan) (Entered: 12/20/2007) |

| 01/31/2008 | ●6 | ORDER Transferring Case to MDL: ORDER of Judicial Panel on Multidistrict Litigation transferring this case to the District of Northern California for inclusion in MDL 05-1699; certified copy of docket entries and documents requested by transferee clerk e-mailed to Clerk of Court in District of Northern California.. (KAM, ) (Entered: 01/31/2008) |

FILED
2007 Dec-10  PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 5

Westlaw.

999 F.2d 1430                                                                                          Page 1
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
**(Cite as: 999 F.2d 1430)**

▷United States Court of Appeals,
Eleventh Circuit.
Brenda Griffin TOOLE and J. Michael Toole,
Plaintiffs-Appellees, Cross-
Appellants,
v.
Richmond C. McCLINTOCK, Jr., M.D.; Richmond
C. McClintock, Jr., a Professional
Association; Heyer-Schulte, an unincorporated
wholly owned subsidiary of
American Hospital Supply Corporation, a
Corporation; American Hospital Supply
Corporation, a Corporation; Baxter Travenol
Laboratories, Inc., a
Corporation; Travenol Laboratories, Inc., a
Corporation, Defendants,
Baxter Healthcare Corporation, a Corporation,
Defendant-Appellant, Cross-
Appellee.
**No. 91-7997.**

Sept. 2, 1993.

Patient and spouse brought action against successor
silicone gel breast implant manufacturer to recover
for injuries caused by rupture of implants. The
United States District Court for the Middle District of
Alabama, No. 90- H-195-S, Truman M. Hobbs, J.,
778 F.Supp.  1543, entered judgment, after ordering
remittitur of jury verdict, and successor appealed.
The Court of Appeals, Edmondson, Circuit Judge,
held that: (1) federal agency report should have been
excluded, and (2) evidence did not support award of
punitive damages.

Vacated and remanded.

West Headnotes

**[1] Products Liability** ⬦**87.1**
313Ak87.1Most Cited Cases
Under Alabama law, existence of duty to warn and
adequacy of warning are questions of fact for jury.

**[2] Products Liability** ⬦**83**
313Ak83Most Cited Cases
Finding that silicone gel breast implant
manufacturer's warnings were insufficient, thereby
rendering it liable to patient whose implants ruptured,

was supported by evidence; jury could reasonably
have found that warning given doctor understated
risks of implant rupture from closed capsulotomies.

**[3] Products Liability** ⬦**46.1**
313Ak46.1Most Cited Cases
   (Formerly 313Ak46)
Under "learned intermediary doctrine," adequacy of
silicone gel breast implant manufacturer's warning
was measured by its effect on physicians, to whom it
owed duty to warn, and not by its effect on patient.

**[4] Products Liability** ⬦**81.1**
313Ak81.1Most Cited Cases
Federal agency's document, containing proposal to
require premarket approval for silicone gel-filled
breast prostheses, as well as proposed findings on
risks posed by devices, was not admissible in
patient's action to recover against manufacturer for
injuries suffered when implants ruptured; document,
containing findings proposed years after dates of
patient's implants or rupture, were irrelevant and
inadmissible as to what manufacturer knew or should
have known about risks.

**[5] Evidence** ⬦**366(1)**
157k366(1)Most Cited Cases
Federal agency's document, containing proposal to
require premarket approval for silicone gel-filled
breast prostheses, as well as proposed findings on
risk posed by devices, was not admissible in patient's
action to recover against manufacturer for injuries
suffered when implants ruptured; document, which
contained only "proposed" findings inferred from
articles in medical journals, lacked "trustworthiness"
necessary to come within exception to hearsay rule
for government investigative reports. Fed.Rules
Evid.Rule 803(8)(C), 28 U.S.C.A.

**[6] Damages** ⬦**91.5(4)**
115k91.5(4)Most Cited Cases
   (Formerly 115k91(1))
Manufacturer of silicone gel breast implants could
not be held liable for punitive damages to patient
whose implants ruptured absent showing, as required
under Alabama law, that its conduct made injury
"likely" or probable; actual incidence of implant
ruptures from closed capsulotomies, as occurred in
instant case, was slightly less than one percent.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

999 F.2d 1430
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
**(Cite as: 999 F.2d 1430)**

**[7] Damages** 208(8)

115k208(8)Most Cited Cases

Under Alabama law, issue of punitive damages should not go to jury when manufacturer took steps to warn products liability plaintiff of potential danger that injured him; those facts bar finding that defendant was "consciously indifferent."

**\*1431** Patrick J. Lamb,Amy E. Smith, Katten Muchin & Zavis, Chicago, IL, C.C. Torbert, Jr., Maibeth J. Porter, Maynard, Cooper, Frierson & Gale, P.C., Montgomery, AL, Hall R. Marston, Dickson, Carlson & Campillo, Santa Monica, CA, for defendant-appellant.

Ralph I. Knowles, Jr., Everette L. Doffermyre, K. Christine Harrelson, Doffermyre, Shields, Canfield & Knowles, Atlanta, GA, Rufus R. Smith, Jr., Ernest H. Hornsby, Farmer, Price, Smith, Hornsby & Weatherford, Dothan, AL, K. Christine Harrelson, Federal, Goetz & Cronkright, Atlanta, GA, for plaintiffs-appellees.

Appeals from the United States District Court for the Middle District of Alabama.

Before ANDERSON and EDMONDSON, Circuit Judges, and YOUNG [FN*], Senior District Judge.

> FN* Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

EDMONDSON, Circuit Judge:

In this products liability case, the jury returned a general verdict against appellant Baxter Healthcare Corporation and awarded compensatory and punitive damages to plaintiffs Brenda and Michael Toole. On the condition that the Tooles agreed to remit part of the jury award, the district court denied Baxter's motions for JNOV and a new trial and entered final judgment for plaintiffs. 778 F.Supp. 1543. Looking at the law of Alabama, we reverse and remand the case for a new trial.

1. *Background*

Brenda Toole had breast augmentation surgery in 1981. In that operation, Dr. Richmond McClintock, an Alabama surgeon implanted two silicone

elastomer gel-filled mammary prostheses manufactured by Heyer-Schulte Corporation [FN1]. In 1987, Ms. Toole suffered from "capsular contracture," a condition in which a capsule of scar tissue forms around the implant and gradually contracts, deforming or hardening the breast. Toole returned to Dr. McClintock in February 1988 for treatment of this condition.

> FN1. Baxter Healthcare Corporation acquired the assets and liabilities of American Hospital Supply Corporation, the parent of the implant manufacturer, Heyer-Schulte Corporation, in November 1985.

Dr. McClintock treated Toole's capsular contracture by performing a "closed capsulotomy." In this technique, physicians compress the affected breast to rupture the scar tissue, which ideally restores suppleness. [FN2] When Dr. McClintock did this to Ms. Toole, the procedure ruptured her implants, causing silicone gel to escape into the surrounding tissue. Brenda Toole has since had several operations to replace her implants and to remove granulomas, which are basically lumps that form in response to a foreign particle in the body. Toole may require more treatment for granulomas in the future.

> FN2. Each of the five surgeons who testified at trial (Drs. McClintock, Robinson, Hamner, Windham and Zaworski), including Ms. Toole's expert witness and treating physician, Dr. Zaworski, testified that the closed capsulotomy is often the best way to treat capsular contracture and that they perform the procedure on their patients many times each year.

When Ms. Toole first got her implants, Heyer-Schulte provided in its product literature written warnings, including these: (1) **\*1432** that "Heyer-Schulte Corporation cannot guarantee the structural integrity of its implant should the surgeon elect to treat capsule firmness by forceful external stress;" (2) that "the patient should be made aware that any abnormal stress or trauma to the breasts could result in rupture of the prosthesis;" and (3) that "should the silicone envelope be ruptured, Heyer-Schulte Corporation cannot guarantee reliable gel containment and the prosthesis should be replaced." [FN3]

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

999 F.2d 1430
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
**(Cite as: 999 F.2d 1430)**

Page 3

FN3. The warnings in Heyer-Schulte's product insert read in full as follows:
Warnings

The silicone elastomer envelope of these products has a low tear strength and is thin to achieve desired prosthesis softness and mobility. For these reasons, the envelope may be easily cut by a scalpel or ruptured by excessive stresses, manipulation with blunt instruments or penetration by a needle.

Gel prostheses may be easily ruptured when still hot from the autoclave. Care must be exercised during handling to prevent such damage.

Each prosthesis should be checked for patency prior to implantation. A prosthesis which has been damaged, or on which repairs have been attempted, should not be implanted. A standby prosthesis should be available at the time of operation.

After autoclaving, it is recommended that the implant be completely cooled prior to insertion to avoid possible tissue damage from residual heat release.

Sepsis, hemorrhage or thrombosis may result from the placement of any foreign object in the body.

Dacron velour, when used as an internal fixation patch, will eventually deteriorate and may result in separation and/or migration of fragments into the surrounding tissues.

Heyer-Schulte Corporation cannot guarantee the structural integrity of its implant should the surgeon elect to treat capsule firmness by forceful external stress.

The patient should be made aware that any abnormal stress or trauma to the breasts could result in rupture of the prostheses.

The gel interior of these products is vulcanized to retard the migration of gel should a rupture occur in the silicone envelope. However, should the silicone envelope be ruptured, Heyer-Schulte Corporation cannot guarantee reliable gel containment and the prosthesis should be replaced.

Breast implants may interfere with postoperative xeromammography. It has been reported that silicone implants can interfere with ECG measurements.

The tab on the posterior side of the oval prostheses (Styles 6000 and 8000) is for orientation only and cannot be relied upon to provide permanent fixation.

Lint, fingerprints, talc and other surface contaminants can cause foreign body reactions. Utmost caution should be taken to avoid contaminants.
Pl. Exhibit 50.

Ms. Toole testified that she recalled Dr. McClintock warning her during their initial appointment in 1981 of certain risks, including implant rupture. [FN4]

The testimony at trial was conflicting about what Dr. McClintock said to Ms. Toole before performing the closed capsulotomy in 1988. Ms. Toole testified that Dr. McClintock did not warn her that performing the closed capsulotomy risked rupturing her implants. Dr. McClintock testified that he warned Ms. Toole of certain risks of closed capsulotomies, including bleeding, rupture of the implant, and distortion of the breast. The evidence was plain that Brenda Toole's implants ruptured during the closed capsulotomy and that she has suffered from the consequences.

> FN4. Ms. Toole recalled that Dr. McClintock had told her that "it would take like the force of an automobile accident" to rupture the implants. R.Vol. 7 at 70. Dr. McClintock testified that, in 1981, he told Ms. Toole of "the complications that were generally accepted by the medical profession" and that his records showed he gave her an information sheet about implants. R.Vol. 7 at 150-51.

Brenda Toole and her husband brought this products liability action against appellant Baxter Healthcare Corporation ("Baxter") and a malpractice claim against Dr. McClintock. Two of the Tooles' claims against Baxter were tried to the jury: a claim that the implants were unreasonably dangerous and a claim that Heyer-Schulte failed adequately to warn doctors of risks associated with the product.

The jury found Baxter liable and awarded $350,000 in compensatory damages to Brenda Toole and $50,000 to her husband. The jury also awarded plaintiffs $5,000,000 in punitive damages. Baxter moved for JNOV or a new trial. The district court found the award excessive in the light of the evidence and conditionally granted Baxter's motion for a new trial unless the Tooles agreed to a remittitur reducing the award of compensatory **\*1433** damages to

$275,000 and the award of punitive damages to $2 million, for a total award of $2,275,000. The Tooles agreed to the remittitur "under protest."

The district court denied Baxter's motions for JNOV and for a new trial, and entered final judgment for the Tooles. In this appeal Baxter attacks the district court's denials of Baxter's motions for a directed verdict, for JNOV and for a new trial. Baxter also asserts error in the admission of certain evidence and the award of punitive damages. The Tooles' cross-appeal challenges the district court's order of remittitur.

2. *Issues & Analysis* [FN5]

> FN5. The Tooles' cross-appeal challenging the remittitur does not persuade us. A federal plaintiff may not appeal a remittitur to which she has agreed, even if plaintiff agreed to it "under protest" to try to preserve appeal rights. *Donovan v. Penn Shipping,* 429 U.S. 648, 649, 97 S.Ct. 835, 836, 51 L.Ed.2d 112 (1977) (remittitur in lieu of new trial). Baxter's motion to dismiss the cross-appeal is granted.

A. *Denial of Directed Verdict/JNOV: Adequacy-of-Warning Issues*

Baxter contends that the district court erred in denying its motions for directed verdict and JNOV for three reasons. Baxter argues that its warning was clear that a closed capsulotomy could rupture the implant, that Ms. Toole admitted that, had the manufacturer's warnings been conveyed to *her,* she would not have consented to implant surgery, and that there is no evidence that a different warning from Baxter would have caused Dr. McClintock to behave differently. These arguments have insufficient merit.

[1][2] The jury in this case was instructed that it could find Baxter liable either because the Heyer-Schulte implant was an "unreasonably dangerous" product *or* for a negligent warning, and the jury returned a general verdict. Even assuming that the sole basis for the verdict was the warning, under Alabama law, "the existence of a duty to warn and the adequacy of a warning are questions of fact for the jury." *State Farm Fire & Casualty Co. v. J.B. Plastics,* 505 So.2d 1223, 1227 (Ala.1987). The jury could reasonably have thought that Baxter's warning,

as it was worded, understated the risks of implant rupture from closed capsulotomies.

[3] Under the "learned intermediary doctrine," the adequacy of Baxter's warning is measured by its effect on the *physician,* Dr. McClintock, to whom it owed a duty to warn, and not by its effect on Ms. Toole. *See Stone v. Smith, Kline & French Lab.,* 447 So.2d 1301, 1304-05 (Ala.1984), *adopting Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.1974). The jury heard evidence from which it could reasonably conclude that a different warning would have caused Dr. McClintock to warn Ms. Toole before her augmentation surgery. [FN6] There was no error in denying Baxter's motions for directed verdict and JNOV on these grounds.

> FN6. Dr. McClintock's testified that "If I had known in 1981 that there was a--even a slightly significant instance of rupture of the implants, then I would have serial [sic] warned my patient. I'm not saying that I didn't know implants couldn't rupture. But in 1981 I think that was considered a very very unusual event." R.Vol. 7 at 150-51.

B. *Evidentiary Error* [FN7]

> FN7. Other evidentiary issues raised by Baxter lack merit.

Baxter contends that the district court abused its discretion when it admitted into evidence a document about implants prepared by the Food and Drug Administration. Baxter also contends that remittitur is insufficient to cure the error in admitting the FDA paper and that Baxter is entitled to a new trial. We agree.

Over Baxter's objection, the district court admitted into evidence, under Fed.R.Evid. 803(8)(C), a document published by the FDA in May 1990 about breast implants. The admitted document contained the agency's proposal to require pre-market approval for silicone-gel filled breast prostheses. The document also stated the agency's "proposed findings" on risks posed by the devices. *See* **\*1434**General and Plastic Surgery Devices; Effective Date of Requirement for Premarket Approval of Silicone Gel-filled Breast Prosthesis; Proposed Rule, 55 Fed.Reg. 20,568 (1990) (to be codified at 21 C.F.R. § 878) (proposed May 17, 1990) ("the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

999 F.2d 1430                                                                                           Page 5
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
**(Cite as: 999 F.2d 1430)**

report"). [FN8]

> FN8. The FDA's proposed findings were
> based on a survey of 128 pieces of medical
> literature. The rule proposal said that "FDA
> now believes that the following are
> significant risks associated with the use of
> the silicone gel-filled breast prosthesis," and
> then described nine specific risks, including
> fibrous capsular contracture, silicone gel
> leakage and migration, infection,
> interference with early tumor detection,
> human carcinogenicity, and autoimmune
> disease. The FDA invited public comment
> on these proposed findings before issuance
> of a final rule. See 55 Fed.Reg. at 20,568-
> 71. The district court ruled that the report
> was admissible under Fed.R.Evid. 803(8)(C)
> "because it was the product of a factual
> investigation conducted by the FDA
> pursuant to its statutory authority" and was
> "sufficiently reliable to be deemed
> admissible under Fed.R.Evid. 803(8)(c)."

The report said that FDA thought human
carcinogenicity and autoimmune disease to be among
the "significant risks" of implants. The Tooles relied
on the report to corroborate testimony by their expert
witness, Dr. Shanklin. On direct examination,
plaintiff's counsel asked Dr. Shanklin to review the
admitted FDA report. Shanklin testified that he
agreed with the FDA report's assertions that implant
recipients faced risks including cancer and
autoimmune disease. [FN9] The Tooles argued to the
jury that the report established what Baxter should
have known about risks posed by its implants and
also showed Ms. Toole's chances of suffering
ailments, such as autoimmune disease, in the future.

> FN9. We note that the district court, in
> granting Baxter's post-trial motion for
> remittitur, said that
> "[T]he only evidence that Brenda Toole is at
> increased risk for cancer and immune
> system diseases is the testimony of Dr.
> Shanklin. Baxter, on the other hand,
> produced evidence which tended to show
> that the overwhelming majority of the
> medical establishment disagrees with Dr.
> Shanklin. It is clear that today, in 1991, the
> scientific basis for Dr. Shanklin's views is
> not generally accepted; in 1981, there was
> even less basis for a belief that a ruptured

implant could cause cancer.
R.Vol. 5-135 at 16. That Dr. Shanklin's
views were not the "only evidence" that
purported to show risks of cancer and
autoimmune disease is plain to us. The
Tooles urged the jury to view the FDA
report as independent evidence of cancer
and autoimmune risks, corroborative of Dr.
Shanklin's testimony. R.Vol. 12 at 15, 75
("When Doctor Shanklin testified about
what he believed Brenda was at risk for, he
wasn't pulling this out of thin air ... You are
going to have back there with you the
Federal Register and the report of the FDA,
Federal Food and Drug Administration [sic]
of the United States government. Nobody
can challenge this as being a biased
report....").

Rule of Evidence 803(8)(C) excepts certain kinds of
government investigative reports from the hearsay
rule in civil actions. Under the rule, courts may
admit reports containing "factual findings resulting
from an investigation made pursuant to authority
granted by law, unless the sources of information or
other circumstances indicate lack of trustworthiness."
Fed.R.Evid. 803(8)(C). We conclude that it was an
abuse of discretion to admit the FDA report in this
case because the report was irrelevant and failed to
qualify for admission under Rule 803(8)(C).

[4] The FDA report contains no findings specifically
about the Heyer-Schulte implants at issue in this case,
but rather proposes findings about implants
generally. The report contained findings proposed
by the FDA in 1990, years *after* the dates of Ms.
Toole's initial implant surgery or her later
capsulotomy. As a simple matter of timeliness,
those statements are irrelevant and inadmissible on
what Heyer-Schulte knew or should have known
about risks before 1988. See Fed.R.Evid. 401, 402.
[FN10]

> FN10. The Tooles' counsel urged the jury to
> look at the references listed in the FDA
> report's bibliography--the original sources
> from which the FDA inferred its proposed
> findings--and to compare the references'
> publication dates with the dates of Ms.
> Tooles' treatment. That some of those
> *references* pre-date Ms. Toole's treatment,
> however, makes none of the *FDA findings*
> relevant. Rule 803 makes admissible only

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Case 3:08-cv-01015-CRB    Document 1-10    Filed 02/20/2008    Page 7 of 47

999 F.2d 1430                                                                                    Page 6
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
**(Cite as: 999 F.2d 1430)**

the hearsay statements "of public offices or agencies," not the findings of others which the government investigator may have considered or cited. To view the rule otherwise is simply to let in the source material in addition to the agency's findings. No exception in Rule 803 exists for an agency's reference material.

[5] In addition, the FDA report is not the kind of trustworthy report described in Rule 803. By its own terms, the FDA report contained only "proposed" findings. The report invited public comment and forecasted the issuance of a "final" document after more study. Rule 803 makes no exception for **\*1435** tentative or interim reports subject to revision and review. See City of New York v. Pullman Inc., 662 F.2d 910, 914 (2nd Cir.1981); United Air Lines v. Austin Travel Corp., 867 F.2d 737, 742-43 & n. 3 (2nd Cir.1989).

The FDA's proposed findings are inferred from articles in medical journals (documenting investigations made by others). The assumption "that a government agency's findings may be assumed to be trustworthy ... has substantially diminished force when extended to the sources outside the investigative agency from which the agency culls the information for its report." Brown v. Sierra Nevada Mem. Miners Hosp., 849 F.2d 1186, 1189-90 (9th Cir.1988). We doubt that the kind of academic exercise behind the FDA report produced findings deserving special presumptions about trustworthiness in a court of law. [FN11] The tentative and second-hand nature of the findings in the FDA report should have kept it out of evidence.

> FN11. We note that, after the trial in this case, the FDA released its final rule mandating premarket approval of breast implants. 56 Fed.Reg. 14620 (1991) (to be codified at 21 C.F.R. § 878). The differences between the final rule report and the proposed rule report points out the tentative nature of the earlier report. The final rule says that 29 of the references it cited in its proposed rule in support of its proposed findings were miscited, and the rule abandoned its earlier finding that human adjuvant disease was among the autoimmune diseases risked by implants. Unlike its proposed findings, which described cancer, autoimmune disease, and

other conditions as "significant risks," the final rule is substantially more equivocal about these risks. The final report says that, "carcinogenesis is a putative risk secondary to implantation of any material" and that "carcinogenicity is a *potential* risk" that *must be assessed* in a premarket approval filing. As to autoimmune disease, the final report says that "it is not clear whether the incidence of these diseases in implanted women is the same as or greater than the incidence in the general population ... the uncertainty surrounding this risk *requires that it be investigated.*" Id. at 14,624. The final rule notes that, of 2,670 public comments received, over 2600 of the comments described the benefits of breast prostheses.

For these reasons, we think that the FDA report was inadmissible hearsay. Admitting the report, which contained highly and unfairly prejudicial assertions about the risks of cancer and autoimmune disease, was an abuse of discretion. Counsel was permitted to argue to the jury that the FDA evidence showed both Baxter's liability and the Tooles' damages, improperly influencing both issues. In these circumstances, remittitur alone is no cure for the error; a new trial is mandatory. See Edwards v. Sears, Roebuck & Co., 512 F.2d 276, 283 (5th Cir.1975).

## C. *Punitive Damages*

[6] Baxter also argues that insufficient evidence supports the award of punitive damages in this case. [FN12] Under Alabama law, to award punitive damages, the jury must have found, by clear and convincing evidence, that Baxter "consciously or deliberately engaged in ... wantonness ... with regard to the plaintiff." Ala.Code § 6-11-20 (Supp.1990). "Wantonness" means "reckless or conscious disregard" of the plaintiffs' rights. Id. The district court ruled that the evidence in this case showed that "the company had knowledge that the implants were *likely* to rupture when closed capsulotomies were performed" and so justified an award of punitive damages. R.Vol. 5-136 at 14. We cannot agree.

> FN12. We need not reach Baxter's argument that Alabama's statutory punitive damages cap, Ala.Code § 6-11-30 (Supp.1990), should have been applied in this case.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

999 F.2d 1430                                                                                           Page 7
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
**(Cite as: 999 F.2d 1430)**

In a case about "wantonness" under Alabama law, we have stressed that "wantonness" must be distinguished from negligence. *Salter v. Westra*, 904 F.2d 1517, 1525-27 (11th Cir.1990). Wantonness means knowledge that an act or failure to act does not merely increase risk of injury, but that the act makes injury "likely" or "probable." *See id.; see also Coca-Cola Bottling Co. United, Inc. v. Stripling*, 622 So.2d 882 (Ala.1993). The evidence in this case showed that the *actual* incidence of implant ruptures from closed capsulotomies is probably slightly less than one percent. [FN13] Although the evidence showed that implant rupture can be serious when it occurs, rupture is no "likely" event, even for patients undergoing closed capsulotomies.

> FN13. At oral argument, counsel for Baxter stressed the evidence showing that less than one percent of closed capsulotomy patients suffer implant rupture. Counsel for the Tooles stressed the evidence showing that implants have an overall complication rate, encompassing ruptures and other problems, of about 10%.

*1436[7] And, we have held that the issue of punitive damages should not go to the jury when a manufacturer took steps to warn plaintiff of the potential danger that injured him; those facts bar a finding that defendant was "consciously indifferent." *See Kritser v. Beech Aircraft Corp.*, 479 F.2d 1089, 1096-97 (5th Cir.1973) (applying Texas law similar to Alabama law). The Heyer-Schulte warning describes the main harms that Ms. Toole has actually suffered--capsular contracture, rupture, and granuloma--and the warning forecasted the way she came to suffer these harms--"treat[ment of] capsule firmness by forceful external stress." More could have been done or said, but Heyer-Schulte did not exhibit indifference toward safety. Baxter's conduct shows regard for recipients of its implants and cannot be viewed as "wanton." We conclude that there was insufficient evidence of wantonness in this case to permit the jury to award punitive damages.

3. *Conclusion*

The judgment below is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

•BAXTER HEALTHCARE CORPORATION, Appellant, v. Brenda Griffin TOOLE, et al., Appellees., 1991 WL 11011170 (Appellate Brief) (C.A.11 1991), Reply Brief of Appellant/Cross Appellee Baxter Healthcare Corporation

•BAXTER HEALTHCARE CORPORATION, Appellant, v. Brenda Griffin TOOLE, et al., Appellees., 1992 WL 12019803 (Appellate Brief) (C.A.11 August 19, 1992), Brief of Appellant Baxter Healthcare Corporation

•BAXTER HEALTHCARE CORPORATION, Appellant, v. Brenda Griffin TOOLE, et al., Appellees., 1992 WL 12135105 (Appellate Brief) (C.A.11 August 20, 1992), Brief of Appellant Baxter Healthcare Corporation

•BAXTER HEALTHCARE CORPORATION, Appellant/Cross-Appellee, v. Brenda Griffin TOOLE and J. Michael Toole, Appellees/Cross-Appellants., 1992 WL 12019802 (Appellate Brief) (C.A.11 October 6, 1992), Reply Brief of Appellees/Cross-Appellants Brenda Griffin Toole and J. Michael Toole

•BAXTER HEALTHCARE CORPORATION, Appellant/Cross-Appellee, v. Brenda Griffin TOOLE and J. Michael Toole, Appellees/Cross-Appellants., 1992 WL 12135102 (Appellate Brief) (C.A.11 October 6, 1992), Brief of Appellees/Cross-Appellants Brenda Griffin Toole and J. Michael Toole

•BAXTER HEALTHCARE CORPORATION, Appellant, v. Brenda Griffin TOOLE, et al., Appellees., 1992 WL 12135104 (Appellate Brief) (C.A.11 November 27, 1992), Reply Brief of Appellant/Cross Appellee Baxter Healthcare Corporation

•BAXTER HEALTHCARE CORPORATION, Appellant/Cross-Appellee, v. Brenda Griffin TOOLE and J. Michael Toole, Appellees/Cross-Appellants., 1992 WL 12019801 (Appellate Brief) (C.A.11 December 18, 1992), Reply Brief of Appellees/Cross-Appellants Brenda Griffin Toole and J. Michael Toole

•BAXTER HEALTHCARE CORPORATION, Appellant/Cross-Appellee, v. Brenda Griffin TOOLE

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

999 F.2d 1430
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
**(Cite as: 999 F.2d 1430)**

Page 8

and J. Michael Toole, Appellees/Cross-Appellants.,
1992 WL 12135103 (Appellate Brief) (C.A.11
December 18, 1992), Reply Brief of
Appellees/Cross-Appellants Brenda Griffin Toole
and J. Michael Toole

999 F.2d 1430, 37 Fed. R. Evid. Serv. 997,
Prod.Liab.Rep. (CCH) P 13,606

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

792 F.2d 1537                                                                                    Page 1
792 F.2d 1537, 21 Fed. R. Evid. Serv. 193, Prod.Liab.Rep. (CCH) P 11,065
**(Cite as: 792 F.2d 1537)**

▷United States Court of Appeals,
Eleventh Circuit.
Alma H. BENFORD, Plaintiff-Appellee,
v.
RICHARDS MEDICAL COMPANY, Defendant-
Appellant.
**No. 85-7413.**

July 7, 1986.

Patient brought diversity action against manufacturer
of hip prosthesis alleging that femoral stem in
prosthesis was defective. The United States District
Court for the Northern District of Alabama, No. CV
83-HM-0762-M, E.B. Haltom, J., entered judgment
on jury verdict in favor of patient, and manufacturer
appealed. The Court of Appeals, Anderson, Circuit
Judge, held that: (1) evidence that manufacturer of
hip prosthesis received one recommendation not to
use cast stainless steel in femoral stem of prosthesis
was insufficient to warrant award of punitive
damages under Alabama law in light of evidence that
manufacturer's choice of metals was made only after
it conducted extensive premarket tests and
thoroughly evaluated a number of metals, but (2)
district court did not abuse its discretion in denying
manufacturer's motion for mistrial on basis of
plaintiff's counsel's violation of in limine order not to
disclose to jury or use contents of list of suits
involving hip prosthesis in question.

Affirmed in part and vacated in part.

West Headnotes

**[1] Damages** ☜═══189.5
115k189.5Most Cited Cases
    (Formerly 115k184)
Evidence that manufacturer of hip prosthesis received
one recommendation not to use cast stainless steel in
femoral stem of prosthesis was insufficient to warrant
award of punitive damages under Alabama law to
patient who suffered injuries as result of allegedly
defective femoral stem in prosthesis and subsequent
revision surgery, in light of evidence that
manufacturer's choice of metals was made only after
it conducted extensive premarket tests and
thoroughly evaluated a number of metals and that
alternative metals either were in short supply or were

not suitable.

**[2] Evidence** ☜═══363
157k363Most Cited Cases
District court did not abuse its discretion in excluding
from evidence a 1981 industry standard on use of cast
stainless steel in surgical implants, in action brought
on basis that hip prosthesis was defective due to use
of cast stainless steel; the events material to claim
occurred in the early 1970's.

**[3] Evidence** ☜═══267
157k267Most Cited Cases
Testimony of employee of company employed by
manufacturer of hip prostheses to make metallurgical
evaluations of metals being considered for use in
femoral stem component of prosthesis that he heard
former president of company advising manufacturer's
representative on telephone not to use stainless steel
in hip prosthesis was offered to show that
manufacturer was on notice of potential problems
with using cast stainless steel in prosthesis, rather
than the truth of the matter asserted, and thus was not
inadmissible as hearsay. Fed.Rules Evid.Rules
801(c), 802, 28 U.S.C.A.

**[4] Federal Civil Procedure** ☜═══1952
170Ak1952Most Cited Cases
Decision to grant mistrial lies within sound discretion
of trial judge, since
he is in best position to evaluate prejudicial effect of
statement or evidence on jury.

**[5] Federal Civil Procedure** ☜═══1970.1
170Ak1970.1Most Cited Cases
    (Formerly 170Ak1970)
District court did not abuse its discretion in denying
motion for mistrial by manufacturer of hip prosthesis
on basis of plaintiff's counsel's violation of in limine
order not to disclose to jury or use contents of list of
suits involving hip prosthesis in question, where a
jury was given precautionary instruction and
plaintiff's counsel committed only a single violation
of the order.
**\*1537** Robert F. Wagner, Lewis, Bowman, Sinclaire
& Wagner and R. Robert Stommel, Indianapolis,
Ind., for defendant-appellant.

**\*1538** Jim L. Wilson, Wilson & Day, Gadsden, Ala.,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

792 F.2d 1537
792 F.2d 1537, 21 Fed. R. Evid. Serv. 193, Prod.Liab.Rep. (CCH) P 11,065
**(Cite as: 792 F.2d 1537)**

for plaintiff-appellee.

Appeal from the United States District Court for the Northern District of Alabama.

Before TJOFLAT and ANDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

ANDERSON, Circuit Judge:

I.

Benford brought this diversity action against Richards Medical Company ("Richards") under the Alabama Manufacturer's Liability Doctrine, the Alabama Extended Manufacturer's Liability Doctrine, and the theory of implied warranty of merchantability. Richards was the manufacturer of the Bechtol Total Hip Prosthesis which was surgically implanted into Benford in an effort to alleviate problems Benford was having with her natural hip. The Bechtol Total Hip Prosthesis consists of two components: a polyethylene cup which replaces the natural hip socket and a stainless steel femoral stem which is surgically implanted into the femur after removal of the head of the femur. The femoral stem component of the Bechtol Total Hip Prosthesis which was implanted into Benford allegedly suffered a fatigue fracture after surgery and had to be replaced during a revision surgery. This lawsuit was based on injuries Benford suffered as a result of the allegedly defective femoral stem and subsequent revision surgery.

The jury returned a verdict in favor of Benford and awarded her $165,000 in compensatory damages and $100,000 in punitive damages. Richards filed a motion for judgment notwithstanding the verdict and a motion for a new trial, both of which were overruled. This appeal followed in which Richards claims that there is insufficient evidence to support the jury's punitive damage award. Richards also raises three points of error in support of its assertion that the district court's finding of liability should be reversed. Specifically, Richards contends (1) that the trial court erroneously excluded from evidence a 1981 industry standard on cast stainless steel for surgical implants; (2) that the trial court erroneously admitted into evidence alleged hearsay testimony; and (3) that the trial court erroneously denied Richards' motion for a mistrial. We reject Richards' last three enumerations of error and affirm the jury's finding of liability and award of

compensatory damages. We vacate the jury's award of punitive damages because there is insufficient evidence in the record to meet the standard for such an award under Alabama law.

II.

A. *Punitive Damages*

At the close of the evidence, the trial court refused to grant Richards' motions for a directed verdict and judgment notwithstanding the verdict on the issue of punitive damages. Richards now contends that the trial court's denial of these motions is error requiring reversal of the jury's punitive damage award. We agree.

Benford contends on appeal that because Richards had reason to know of the potential danger of using cast stainless steel in its product and did not heed that danger, the jury could properly infer the legal malice necessary for an award of punitive damages. Benford presented evidence that Richards had been advised not to use cast stainless steel in the femoral component. That advice came from Taussig Associates, Inc., a company employed by Richards to give Richards metallurgical evaluations of metals being considered for use in the femoral stem component of Richards' prosthesis. Although the negative recommendation from Taussig Associates is evidence that Richards was on notice of potential problems with using cast stainless steel, the record indicates that Richards' choice of metals was made only after Richards conducted extensive pre-market tests and thoroughly evaluated a number of metals.

Richards' choice of cast stainless steel for the Bechtol Total Hip was in part based **\*1539** upon pre-market testing done on cast stainless steel for a similar product, the Tronzo Total Hip. This testing indicated that cast stainless steel was adequate for use in the Tronzo Total Hip. Richards also conducted tests on cast stainless steel, forged stainless steel, and cobalt chromium alloys specifically for choosing the metal to be used in the femoral stem of the Bechtol Total Hip. One of Benford's expert witnesses, Dr. Robert Rose, admitted that cast stainless steel, forged stainless steel, and cobalt chromium alloys were the commonly available metals used for total hip prostheses in the mid-1970's. Most other manufacturers during that time period used forged stainless steel or cast chrome cobalt for total hips, the same metals that Richards tested and evaluated as part of its decision-making process.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

792 F.2d 1537                                                                     Page 3
792 F.2d 1537, 21 Fed. R. Evid. Serv. 193, Prod.Liab.Rep. (CCH) P 11,065
**(Cite as: 792 F.2d 1537)**

The evidence further shows that Richards' decision to use cast stainless steel was, in part, a matter of elimination. Of the three commonly used metals, Richards chose not to forge the stainless steel for most of the sizes of the Bechtol Total Hip because of supply problems. Richards chose not to use cast chrome cobalt based on recommendations by experts not to use that material, and because Richards' own tests showed the material to be unsuitable. Additionally, the evidence reflects that the state of knowledge in the industry at the time Richards decided to use cast stainless steel in its prostheses would not have put Richards on notice of potential problems with using that material.

Under Alabama law, in order to award punitive damages, the defendant's conduct must amount to one of the following: (1) "gross negligence," i.e., such entire want of care as to raise a presumption that the party at fault is conscious of the probable consequences of his carelessness, and is indifferent, or worse, to the danger of injury to the persons or property of others; (2) a "willful" act in the strongest sense, or the result of reckless indifference to the rights of others; (3) an act resulting in a "wanton, malicious, or gross" injury; or (4) "fraud, malice or oppression." _Alabama Power Co. v. Dunlap,_ 240 Ala. 568, 200 So. 617, 621 (1941).

[1] Our review of the evidence reveals only one negative opinion about cast stainless steel, i.e., the report from Taussig Associates. After Richards had conducted its own independent research and investigation of the available metals for use in total hip prostheses, it made the decision to use cast stainless steel in the Bechtol Total Hip. For a trial court to properly deny a motion for directed verdict, there must be substantial evidence opposed to the motion; that is, evidence of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach a different conclusion. _Spurlin v. General Motors Corp.,_ 528 F.2d 612, 614 (5th Cir.1976). [FN1] We cannot agree with Benford that a fair-minded jury could find that Richards' conduct reached the level of indifference or willfulness at which punitive damages are appropriate. _See Dunlap,_ 200 So. at 621. In light of Richards' diligent evaluation, we conclude that the mere fact that Richards received one recommendation not to use cast stainless steel is insufficient as a matter of law to justify an award of punitive damages.

FN1. In _Bonner v. City of Prichard,_ 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. _Id._ at 1209.

B. _Liability_

[2] 1. Besides its claim that punitive damages were improperly awarded, Richards also urges this court to reverse the jury's finding of liability. Richards raises three contentions which we address in turn. Richards claims that a new trial is required because the trial judge excluded from evidence a 1981 industry standard on the use of cast stainless steel in surgical implants. The 1981 standard was tentatively admitted into evidence subject to Richards proving its relevance later in the trial. The relevance of the 1981 standard was in issue because the events material to Benford's **\*1540** claims occurred in the early 1970's. The trial judge ultimately refused to admit the standard into evidence. Record on Appeal, vol. 7 at 4-30 to 4-31.

Determinations of admissibility of evidence rest largely within the discretion of the trial judge and will not be disturbed on appeal absent the clear showing of an abuse of discretion. _Hopkins v. Britton,_ 742 F.2d 1308, 1311 (11th Cir.1984). Such a showing has not been made on appeal; thus, we conclude that the district court did not abuse its discretion in refusing to admit the 1981 industry standard.

[3] 2. Richards' next contention on appeal is that the trial judge erred by admitting into evidence the deposition of an employee of Taussig Associates, Inc. As previously stated, Taussig Associates was hired by Richards to conduct a metallurgical evaluation of cast stainless steel for use in the Bechtol Total Hip. The employee testified that he heard Len Taussig, former president of Taussig Associates, advising a Richards representative on the telephone not to use cast stainless steel in the Bechtol Total Hip.

Richards claims that this deposition testimony is hearsay, not admissible under any hearsay exception. This assertion is without merit. The Federal Rules of Evidence define hearsay as "a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

792 F.2d 1537
792 F.2d 1537, 21 Fed. R. Evid. Serv. 193, Prod.Liab.Rep. (CCH) P 11,065
**(Cite as: 792 F.2d 1537)**

Page 4

statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). The deposition is evidence that Richards was on notice of the potential problems with using cast stainless steel in the Bechtol Total Hip. As evidence not offered to prove the truth of the matter asserted, the deposition testimony was not subject to the general bar against hearsay and was properly admitted by the trial judge. See Fed.R.Evid. 802.

3. Richards' final claim on appeal is that the trial court erroneously denied Richards' motion for a mistrial based on Benford's violation of a pretrial order not to disclose to the jury the existence of other lawsuits involving the Bechtol Total Hip. Finding that the trial judge's ruling was not an abuse of discretion, we hold that the trial judge did not err in denying Richards' motion for a mistrial.

Upon Richards' motion in limine during a pretrial hearing, the trial court ordered Benford's counsel not to disclose to the jury or use the contents of a list of lawsuits involving the Bechtol Total Hip. During Benford's examination of Dr. Charles Bechtol, however, Benford's attorney asked the following question:

All right, sir. And I'll ask you if it's not a fact, sir, that in the State of California, that there was a judgment rendered against you and Richards Medical Company, and Richards Medical Company paid all the money pursuant to that judgment?

Record on Appeal, vol. 10 at 7-34. Before the witness could answer, Richards objected to the question and the objection was sustained. The trial judge then gave the jury a lengthy precautionary instruction, advising them not to draw any inferences from that question. [FN2] Richards' motion for *1541 mistrial was overruled. Record on Appeal, vol. 10 at 7-40.

FN2. In its precautionary instruction, the trial judge stated:

All right. Ladies and gentlemen of the jury, at the outset of this trial, I advised the members of the jury that there would be occasions in which the Court would have to consult with the lawyers, outside the presence and hearing of the jury, on matters of law that concern the Court alone and not the jury. I also advised you that if I

sustained an objection to a question that goes unanswered by the witness, that you should not draw any inferences or conclusions from the question itself. And here, in connection with the last question that was asked by Mr. Wilson to Dr. Bechtol, about a matter in California, I sustain the objection of the Defendant to that question, and I specifically instruct the jury and each member of the jury that you and the jury are not to draw any inferences or conclusions from the question itself, to which I have sustained an objection. In other words, ladies and gentlemen of the jury, I have ruled and do now rule, as a matter of law, that the question asked by Mr. Wilson to Dr. Bechtol is not a legal question and does not seek to elicit testimony that would be proper for the jury to consider. Now, you are the sole and exclusive judges of the facts in this case. You are the triers of the facts, but I am the sole and exclusive judge of the law. And I told you, at the beginning of this trial, that we didn't want you on this jury if you were going to reach a verdict in this case on the basis of what you thought the law was or ought to be; that you were to follow the law as stated by the Court. So, I again instruct you that you are not to draw any inferences or conclusions from this last question, which I have sustained an objection to.

Record on Appeal, vol. 10 at 7-38 to 7-40.

[4][5] The decision to grant a mistrial lies within the sound discretion of the trial judge since he is in the best position to evaluate the prejudicial effect of a statement or evidence on the jury. United States v. Satterfield, 743 F.2d 827, 848 (11th Cir.1984), cert. denied,--- U.S. ----, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). The trial judge was well aware of the seriousness of the impropriety, stating to Benford's counsel that "you're prejudicing the rights of your client, in my judgment, by insisting upon doing it, Mr. Wilson, because you may well be placing reversible error in the record." Record on Appeal, vol. 10 at 7-37. The trial judge obviously felt that his precautionary instruction was sufficient to cure the problem.

Richards cites O'Rear v. Fruehauf Distributing Co., 554 F.2d 1304 (5th Cir.1977), in support of its contention that its motion for mistrial should have

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

792 F.2d 1537
792 F.2d 1537, 21 Fed. R. Evid. Serv. 193, Prod.Liab.Rep. (CCH) P 11,065
**(Cite as: 792 F.2d 1537)**

been granted. *O'Rear* is distinguishable from this case, however, in that it involved a much more egregious situation in which counsel made repeated violations of a pretrial order. In the instant case, Benford's attorney committed only a single violation of the trial court's order. On the record before us, we cannot conclude that the trial judge abused his discretion in denying Richards' motion for mistrial.

On the basis of the foregoing, the judgment of the district court is

AFFIRMED in part and VACATED in part.

792 F.2d 1537, 21 Fed. R. Evid. Serv. 193, Prod.Liab.Rep. (CCH) P 11,065

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

**FILED**

DEC 21, 2001

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

DAVID HESTER, et al.,           )
                                )
        Plaintiffs,             )
                                )
v.                              )     CIVIL ACTION 01-D-1301-N
                                )
BAYER CORPORATION, et al.,      )
                                )
        Defendants.             )

<u>MEMORANDUM OPINION AND ORDER</u>

Before the court is Plaintiffs' Motion To Remand, which was
filed on November 9, 2001. Defendant Bayer Corporation ("Bayer")
filed an Opposition to said Motion on November 26, the argument
of which was adopted in full by Defendant GlaxoSmithKline ("GSK")
on the following day. Plaintiffs never responded to the
arguments asserted in said Opposition. After careful
consideration of the arguments of counsel, the relevant law, and
the record as a whole, the court finds that Plaintiffs' Motion To
Remand is due to be denied.


I.  **REMAND STANDARD AND FRAUDULENT JOINDER**

It is well-settled that a defendant, as the party removing
an action to federal court, has the burden to establish federal
jurisdiction. See <u>Diaz v. Sheppard</u>, 85 F.3d 1502, 1505 (11th
Cir. 1996). A federal district court may exercise jurisdiction
over cases involving citizens of different states where the

**EOD** ___12/21/01___

27

amount in controversy, exclusive of interest and costs, exceeds
$75,000. See 28 U.S.C. § 1332(a). "Diversity jurisdiction under
28 U.S.C. § 1332 requires complete diversity-every plaintiff must
be diverse from every defendant." Tapscott v. MS Dealer Serv.
Corp., 77 F.3d 1353, 1359 (11th Cir. 1996), abrogated on other
grounds by Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir.
2000). However, as the Supreme Court has long recognized,
diversity jurisdiction "cannot be defeated by a fraudulent
joinder of a residential defendant having no real connection to
the controversy." Wilson v. Republic Iron & Steel Co., 257 U.S.
92, 97 (1921).

Defendants bear a "heavy" burden in proving that the joinder
of one of their own is fraudulent. Crowe v. Coleman, 113 F.3d
1536, 1538 (11th Cir. 1997). In examining whether a joinder is
fraudulent, the court "should resolve all questions of fact and
controlling law in favor of the plaintiff." Cabalceta v.
Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir. 1989). "The
plaintiff need not have a winning case against the allegedly
fraudulent defendant; he [or she] need only have a possibility of
stating a valid cause of action in order for the joinder to be
legitimate." Triggs v. John Crump Toyota, Inc., 154 F.3d 1284,
1287 (11th Cir. 1998) (emphasis in original).

2

## II.  FACTUAL AND PROCEDURAL BACKGROUND

The present cause of action is one of several hundred products liability suits pending nationwide against Defendants Bayer and GSK concerning the alleged health problems associated with the prescription drug Baycol.  Though the cause of action was originally brought in the Circuit Court of Montgomery, Alabama, Bayer and GSK removed the matter to the present forum pursuant to 28 U.S.C. § 1446 on the basis of diverse citizenship. In so doing, they had to allege that two of the original Defendants-CVS, Inc. ("CVS"), and Yancey Park Drug Company, Inc. ("Yancey Park")-were fraudulently joined solely because their Alabama citizenship would defeat complete diversity of the parties.

The Complaint alleges that CVS and Yancey Park are pharmacies that played a sufficiently significant role in Baycol's movement through the stream of commerce so as to subject them to liability under Alabama tort law.  However, both Defendants' Removal and their Opposition brief, the latter of which was supported with affidavits, raise the suspicion as to whether said Defendants ever played any role in the sale of Baycol.  Indeed, the president of CVS has sworn that his company is not a licensed pharmacy, but rather owns two grocery stores, neither of which sells pharmaceuticals.  (Opp. Ex. B.)  Moreover,

3

Yancey Park Drug Company, Inc., the <u>named</u> defendant, has not
filled any prescriptions since 1989, prior to Baycol's having
entered the market. (Opp. Ex. B.) Curiously, Plaintiffs' Motion
to Remand does not address these damning allegations, but merely
restates the language of the Complaint as to the Alabama
Defendants' liability. It is to be noted, however, that the
<u>served</u> pharmacy Defendant Yancey Park Drug, a division of Foster
Drugs of Alabama, Inc., has sold Baycol on occasion, allegedly to
at least one of the present patients. (<u>Id.</u>) Nonetheless, its
sole responsibility in that regard has never extended beyond
merely filling subscriptions in accordance with doctors'
instructions. (<u>Id.</u>)

### III. DISCUSSION

The first issue to address is the contention that the named
pharmacy Defendants never sold Baycol. If true, the present
discussion needs proceed no further. As noted above, nowhere do
Plaintiffs counter Defendants' assertions that CVS-at least the
CVS named and served as a Party in this action-is simply not
engaged in any business of a pharmaceutical nature. An affidavit
of the served Defendant states as much, so the court is compelled
to conclude that Plaintiffs have erred in their efforts to find a
culpable pharmacy in this regard. In short, CVS was fraudulently

4

joined.

This oversight may well be academic though, for even though Yancey Park was mistakenly served under the nomme de guerre Yancey Park Drug Company, Inc., Yancey Park itself has acknowledged that it is a pharmacy.  Rule 15 permits a liberal pleading standard, and the court is unfamiliar with any precedent which permits the dismissal of a defendant simply because it was misnamed, particularly when said misnaming pertained only to the addition of "Company, Inc."  Cf. Bryant Elec. Co. v. Joe Rainero Tile Co., 84 F.R.D. 120, 122 (W.D. Va. 1979) (observing that a "plaintiff may correct a misnomer in the complaint when it is clear that the person before the court is the person plaintiff intended to sue") (internal quotations omitted).  The court deems it immaterial that the faulty nominative happened to coincide with that of a business no longer in existence; for purposes of Rule 15 that fact should matter no less than had Yancey simply been spelled without the letter "e".  What is relevant for present purposes is that Yancey Park acknowledges having filled Baycol prescriptions and it does not deny having filled them for Plaintiffs.  At the very least, more discussion is needed to determine whether the joinder of Yancey Park was fraudulent.

Plaintiffs assert the Alabama Extended Manufacturer Liability Doctrine ("AEMLD") could possibly extend to

5

pharmacists, to the extent that "a manufacturer, supplier or seller who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, is negligent as a matter of law." Entrekin v. Atlantic Richfield Co., 519 So.2d 447, 449 (Ala. 1987). In so doing, however, Plaintiffs do not cite a single instance in which an Alabama pharmacist has been found liable under this doctrine for merely filling a prescription as written by a doctor. Certainly it is Defendants' burden to prove the existence of jurisdiction, Pacheco de Perez v. AT&T Co., 139 F.3d 1368, 1373 (11th Cir. 1998), but Plaintiffs' silence follows extensive citation in Defendants' Removal to cases in Alabama and nationwide that simply refuse to extend tort liability to pharmacists and/or pharmacies who do no more than dispense prescription drugs.[1]

_____

[1] The Alabama cases cited by Defendants that have refused to extend tort liability as such are numerous. Sanks v. Parke-Davis, No. 00-S-1122-E, slip op. at 7-10 (M.D. Ala. Nov. 2, 2000); Lansdell v. Am. Home Prods., No. 99-S-2110-NE (N.D. Ala. Oct. 26, 1999); Harrell v. Wyeth-Ayerst Lab. Co., No. 98-1194-BH-M (S.D. Ala. Feb. 1, 1999); Orr v. Wyeth-Ayerst Lab. Co., No. 98-3000-DIET (Mobile Cty. Cir. Ct. Aug. 2, 1999). This general rule has been recognized in countless other jurisdictions as well. Wimm v. Jack Eckerd Corp., 3 F.3d 137 (5th Cir. 1993) (applying Texas law); Walker v. Jack Eckerd Corp., 434 S.E.2d 63 (Ga. App. 1993); Nichols v. Cent. Merch., Inc., 817 P.2d 1131 (Kan. App. 1991); McKee v. Am. Home Prods. Corp., 782 P.2d 1045 (Wash. 1989); Adkins v. Mong, 425 N.W.2d 151 (Mich. App. 1988) (per curiam). It is to be noted that these cases provided by Defendants in turn rely upon other jurisdictions, all of which follow the same rule regarding pharmacists and pharmacies.

6

Nor do Plaintiffs provide the court with any reason to believe that liability should extend to pharmacies beyond the bald assertion that the AEMLD imputes liability to every link in the chain of commerce, leaving the jury to consider the respective responsibility of each party. This contention contradicts established policy of Alabama tort law that when intricately complex products whose dangers are immediately indiscernible, the appropriate duties should be borne by the "learned intermediary." See Stone v. Smith, Kline & French Lab., 447 So.2d 1301, 1305 (Ala. 1984). The manufacturer has a duty to pass on the information regarding potential harms to doctors who then assist the patients in making informed decisions-by the time Plaintiffs arrived at Yancey Park there was no available information they might have uncovered that would have caused hesitation. Just as courts should not hold liable the shipping companies that transport the drugs from the factory to the wholesaler, liability should not extend to a business whose purpose is to effectuate the informed decision made by an ailing person. Absent an allegation that Yancey Park, whatever its true name might be, did other than what was expected of it by all parties in the chain of events, the court must conclude that there is no possibility that Plaintiffs can state a cause of action against it. Therefore, it is not a proper party to the

7

present action.  Accordingly, complete diversity of citizenship
exists as is required under 28 U.S.C. § 1332.  <u>Triggs</u>, 184 F.3d
at 1287.[2]

Complete diversity notwithstanding, Plaintiffs also argue
that jurisdiction is inappropriate since Defendants have not
proven by a "legal certainty" that the statutory requirement of
$75,000 has been satisfied.  Plaintiffs cite the wrong legal
standard.  Insofar as the Complaint made an unspecified demand
for damages, Defendants need only establish by a preponderance of
the evidence that the amount in controversy requirement has been
met.  <u>Tapscott</u>, 77 F.3d at 1357.  Plaintiffs allege they suffered
"significant muscle problems" (Compl. ¶¶ 3-4) due to Defendants'
"conscious disregard of the foreseeable harm caused by" Baycol.
(<u>Id.</u> at 17.)  It is not uncommon in these circumstances for
Alabama juries to award compensatory damages in excess of the
jurisdictional prerequisite, even before punitive damages are
considered.  <u>See</u>, <u>e.g.</u>, <u>Toole v. McClintock</u>, 999 F.2d 1430 (11th
Cir. 1993) (addressing propriety of $400,000 compensatory award

---

[2] Obviously, the general rule that all defendants must join
in a petition for removal is inapplicable to those defendants
that are fraudulently joined.  <u>Erkins v. Am. Bankers Ins. Co.</u>,
866 F. Supp. 1373, 1375 (N.D. Ala. 1994) ("[I]t is not necessary
that a fraudulently or improperly joined defendant join with the
other defendants in a petition for removal.") (internal
quotations omitted).  Accordingly, the fact that the pharmacist
Defendants were improper parties to the action cures any alleged
defect to the removal.

8

and $5,000,000 punitive award in medical products liability

case).  The court is persuaded that Defendants have met their

burden in demonstrating that the amount in controversy "more

likely than not" exceeds $75,000.  <u>Tapscott</u>, 77 F.3d at 1357.

Accordingly, jurisdiction is appropriate in the present matter.


### IV.  ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that

Plaintiffs' Motion to Remand be and the same is hereby DENIED.

DONE this ___21st___ of December, 2001.

_____
UNITED STATES DISTRICT JUDGE

9

# Exhibit 6

Westlaw.

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
(Cite as: 154 F.3d 1284)

Page 1

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Eleventh Circuit.
David L. TRIGGS, Plaintiff-Appellant,
v.
JOHN CRUMP TOYOTA, INC.; World Omni
Financial Corporation, a.k.a. World Omni
Financial Corporation, Defendants-Appellees.
No. 97-6584.

Sept. 16, 1998.

Alabama resident who leased auto through Florida lessor brought class action against lessor and Alabama auto dealership, alleging that dealership and other dealerships sold cars in Alabama to lessor at inflated prices pursuant to scheme whereby lessor then leased cars to plaintiff class and passed excess cost on to them. Defendants removed action to federal court on grounds of diversity jurisdiction, and lessee moved to remand. The United States District Court for the Northern District of Alabama, No. CV-96-B-1723-J, Sharon Lovelace Blackburn, J., denied motion. Lessee appealed. The Court of Appeals, Anderson, Circuit Judge, held that no basis existed for finding that dealership was fraudulently joined in order to defeat diversity jurisdiction, even though 98% of plaintiff class would not have claim against dealership.

Reversed and remanded.

West Headnotes

**[1] Federal Courts** ☞776
170Bk776 Most Cited Cases
Subject matter jurisdiction is a question of law subject to de novo review.

**[2] Federal Courts** ☞286.1
170Bk286.1 Most Cited Cases
Diversity jurisdiction requires complete diversity; every plaintiff must be diverse from every defendant. 28 U.S.C.A. § 1332.

**[3] Removal of Cases** ☞36
334k36 Most Cited Cases

An action may be removable if the joinder of the non-diverse party were fraudulent. 28 U.S.C.A. § 1441(a).

**[4] Federal Courts** ☞303
170Bk303 Most Cited Cases
Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity. 28 U.S.C.A. § 1441(a).

**[5] Federal Courts** ☞303
170Bk303 Most Cited Cases
There are three instances in which a joinder of a non-diverse party is fraudulent, and does thus not defeat diversity jurisdiction: (1) where there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant; (2) where there is outright fraud in the plaintiff's pleading of jurisdictional facts; and (3) where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several, or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. 28 U.S.C.A. § 1441(a).

**[6] Removal of Cases** ☞36
334k36 Most Cited Cases
If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court. 28 U.S.C.A. § 1441(a).

**[7] Federal Courts** ☞303
170Bk303 Most Cited Cases
For the joinder of a non-diverse defendant to be legitimate, and to thus defeat diversity jurisdiction, the plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action. 28 U.S.C.A. § 1441(a).

**[8] Removal of Cases** ☞107(7)
334k107(7) Most Cited Cases
In evaluating a motion to remand, the removing party bears the burden of demonstrating federal jurisdiction.

**[9] Federal Courts** ☞303
170Bk303 Most Cited Cases
Alabama resident who leased auto from defendant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

Florida lessor stated potential cause of action against defendant Alabama auto dealership in state court class action by alleging that dealership sold cars in Alabama to lessor at inflated prices pursuant to scheme whereby lessor then leased cars to plaintiff class and passed excess cost on to them, and thus, there was no basis for finding that dealership was fraudulently joined to defeat diversity jurisdiction, even though 98% of plaintiff class would not have claim against it; joinder of dealership fit within rule for permissive joinder of parties, and court was to consider citizenship only of named parties when determining whether diversity existed. 28 U.S.C.A. § § 1332, 1441(a).

**[10] Federal Courts ⌐═══288**
170Bk288 Most Cited Cases
In class actions, a court should consider only the citizenship of the named parties to determine whether there is diversity jurisdiction. 28 U.S.C.A. § § 1332, 1441(a).

**[11] Federal Courts ⌐═══288**
170Bk288 Most Cited Cases
In determining whether diversity jurisdiction existed in class action in which named plaintiff and one defendant were both Alabama residents, court would not look beyond named plaintiff's citizenship and bifurcate plaintiff class solely on basis of whether members of class had potential claim against all defendants. 28 U.S.C.A. § § 1332, 1441(a).

**[12] Federal Courts ⌐═══303**
170Bk303 Most Cited Cases
Named plaintiff's alleged "bad faith" in joining non-diverse defendant did not warrant finding that such defendant was fraudulently joined in order to defeat diversity jurisdiction; defendants made no showing that plaintiff lacked real intention to get joint judgment against non-diverse defendant. 28 U.S.C.A. § § 1332, 1441(a).

**[13] Removal of Cases ⌐═══107(9)**
334k107(9) Most Cited Cases
Plaintiff timely perfected interlocutory appeal to Court of Appeals from trial court order denying motion to remand to state court, even though plaintiff failed to file petition for appeal with Court of Appeals within ten days of district court's initial order certifying case for interlocutory appeal; district court reconsidered and re-entered its order, and plaintiff subsequently perfected his appeal in timely manner.
***1286** Garve Ivey, Jr., Jasper, AL, Barry A. Ragsdale, King, Ivey & Warren, Birmingham, AL,

for Plaintiff-Appellant.

Jarred O. Taylor, II, Lee E. Bains, Jr., John A. Truitt, Maynard, Cooper & Gale, P.C., William A. Mudd, Hall, Conerly, Mudd & Bolvig, Birmingham, AL, for Defendants-Appellees.

Adam Sloane, Mayer, Brown & Platt, Evan Tager, Washington, DC, Amicus for ACOLI.

Brian Anderson, Washington, DC, amicus for PLAC.

Pamela Moore, Mobile, AL, amicus for IAODC and LFCJ.

Appeal from the United States District Court for the Northern District of Alabama.

Before ANDERSON and BIRCH, Circuit Judges, and PAINE [FN*], Senior District Judge.

> FN* Honorable James C. Paine, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

ANDERSON, Circuit Judge:

This appeal presents an interesting question relating to diversity of citizenship jurisdiction and fraudulent joinder in the context of a class action. Adopting a novel approach, the district court found fraudulent joinder and diversity of citizenship. The district court retained jurisdiction. We reverse.

### 1. Facts and Procedural History

Plaintiff-appellant Triggs is an Alabama resident. He filed a class action fraud suit in Alabama state court against World Omni Financial Corp ("Omni"), a Florida corporation, and John Crump Toyota ("Crump"), an Alabama corporation. Plaintiff alleges that Crump and other dealerships sold cars in Alabama to Omni at inflated prices pursuant to a scheme whereby Omni then leased the cars to the plaintiff class and passed the excess cost on to them. Plaintiff alleges that Omni and Crump and the other dealers implemented this fraudulent scheme through misrepresentations and suppressions of material fact. The named plaintiff, Triggs, dealt with Omni through Crump.

Defendants-appellees filed a Notice of Removal, alleging diversity jurisdiction. The case was removed to the Northern District of Alabama. Plaintiff filed a Motion to Remand. The district

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

court found that the putative class which Triggs seeks to represent includes over 17,000 people, all of whom had dealt with Omni, but that only 371(2%) of them had dealt through Crump. The court held that Crump had been fraudulently joined. Because there was complete diversity between Triggs and Omni, the only remaining parties if Crump is disregarded, the motion to remand was denied. The district court then asserted supplemental jurisdiction over the 371 plaintiffs who had dealt with Omni through Crump.

The district court entered its order finding that Crump had been fraudulently joined and denying the motion for remand, and later certified the order for immediate appeal pursuant to 28 U.S.C. § 1292(b). This court granted the petition for permission to appeal.

## II. Issue

The issue presented by this appeal is: has defendant Crump been fraudulently joined merely because 98% of the members of the putative plaintiff class would have no claim against Crump, notwithstanding the fact that the named plaintiff has a potential claim to *1287 impose joint and several liability on defendants Crump and Omni?

## III. Standard of Review

[1] Subject matter jurisdiction is a question of law subject to de novo review. *Tapscott v. MS Dealer Service Corp.,* 77 F.3d 1353, 1356 (11th Cir.1996).

## IV. Discussion

[2] A civil case filed in state court may be removed by the defendant to federal court if the case could have been brought originally in federal court. 28 U.S.C. § 1441(a). [FN1] Federal courts have diversity jurisdiction over all civil actions where the amount in controversy exceeds $50,000 [FN2] and the action is between the citizens of different states. 28 U.S.C. § 1332. [FN3] Diversity jurisdiction requires complete diversity; every plaintiff must be diverse from every defendant. *Tapscott v. MS Dealer Service Corp.,* 77 F.3d 1353, 1355 (11th Cir.1996).

FN1. "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

FN2. As of January 17, 1997, the

jurisdictional amount increased to $75,000. See Federal Courts Improvement Act of 1996, P.L. No. 104-317, § 205, 110 Stat. 3847, 3850 (codified as amended at 28 U.S.C. § 1332). Because the present action was filed prior to this effective date, the amount in controversy requirement for this case is $50,000.

FN3. "(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
(1) citizens of different States."
28 U.S.C. § 1332.

The named plaintiff, Triggs, is a citizen of Alabama. Defendant Omni is a citizen of Florida. Defendant Crump is a citizen of Alabama. Accordingly, on the face of the pleadings, there is a lack of complete diversity which would preclude removal of the case to federal court.

[3][4][5][6][7][8][9] However, an action may nevertheless be removable if the joinder of the non-diverse party, defendant Crump, were fraudulent. *Tapscott,* 77 F.3d at 1359. [FN4] Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity. Joinder has been deemed fraudulent in two situations. The first is when there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant. *Coker v. Amoco Oil Co.,* 709 F.2d 1433, 1440 (11th Cir.1983), *superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc.,* 991 F.2d 1533 (11th Cir.1993). The second is when there is outright fraud in the plaintiff's pleading of jurisdictional facts. *Coker,* 709 F.2d at 1440. In *Tapscott,* 77 F.3d at 1355 (11th Cir.1996), a third situation of fraudulent joinder was identified--i.e., where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. *Id.* at 1360. In the instant case, the parties do not suggest that there has been "outright fraud in the plaintiff's pleading of jurisdictional facts," so we concern ourselves only with the first and third types of fraudulent joinder. Turning to the first type, "If there is *even a possibility* that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 4

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
(Cite as: 154 F.3d 1284)

joinder was proper and remand the case to the state court." *Coker, 709 F.2d at 1440-41* (emphasis added). The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate. In the instant case, Triggs has asserted facts which clearly state a potential cause of action against Crump in state court. He has alleged that Crump and Omni, working in concert, defrauded him by misrepresenting and suppressing material facts with regard to automobile lease transactions. Therefore, Triggs's complaint states a potential cause of action against Crump in state court. With *1288 regard to Triggs, Crump is not fraudulently joined.

> FN4. In evaluating a motion to remand, the removing party bears the burden of demonstrating federal jurisdiction. *Pacheco de Perez v. AT & T Co., 139 F.3d 1368, 1373 (11th Cir.1998).*

Indeed, the joinder of Crump fits comfortably within the rule for permissive joinder of parties as provided in Rule 20 of the Federal Rules of Civil Procedure. With respect to the joinder of defendants, Rule 20 provides:

> All persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Fed.R.Civ.P. 20. In this case, the named plaintiff (and incidentally 2% of the putative class in addition) is asserting a claim for relief against Omni and Crump jointly and severally arising out of the same transaction, and giving rise to common questions of law and fact. Of course, in this case, the joinder of the members of the putative plaintiff class is pursuant to Rule 23 of the Federal Rules of Civil Procedure. We note also, however, that the permissive joinder standards of Rule 20 are satisfied. With respect to joinder of plaintiffs, Rule 20 provides:

> All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action.

Fed.R.Civ.P. 20. In the instant case, the members of the putative plaintiff class assert such rights against Omni, Crump and the other unnamed dealers

arising out of the series of automobile lease transactions allegedly orchestrated by Omni, which give rise to common questions of law and fact. Of particular importance for this case, Rule 20 specifically provides that "[a] plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities." Fed.R.Civ.P. 20. In other words, the fact that a great many of the members of the putative plaintiff class can seek no relief against one of the defendants, Crump, would be no obstacle to the permissive joinder of Crump under Rule 20. Accordingly, we readily conclude that the joinder of defendant Crump satisfies the standards of Rule 20.

[10] The contention of defendants in this case focuses upon the claims of the members of the putative plaintiff class, rather than upon the named plaintiff. Defendants argue that Crump must be deemed to have been fraudulently joined merely because 98% of the members of the putative plaintiff class would have no claim against Crump. This focus is inconsistent with the well-settled rule for class actions that a court should consider only the citizenship of the named parties to determine whether there is diversity jurisdiction. *Supreme Tribe of Ben-Hur v. Cauble, 255 U.S. 356, 41 S.Ct. 338, 65 L.Ed. 673 (1921).* Accord *Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 1059, 22 L.Ed.2d 319 (1969)* (dictum) ("Under current doctrine, if one member of a class is of diverse citizenship from the class' opponent, and no nondiverse members are named parties, the suit may be brought in federal court even though all other members of the class are citizens of the same State as the defendant and have nothing to fear from trying the lawsuit in the courts of their own State," citing *Ben-Hur* ); *In re School Asbestos Litigation, 921 F.2d 1310, 1317 (3d Cir.1990); In re Agent Orange Prod. Liability Litigation, 818 F.2d 145, 162 (2d Cir.1987); Kerney v. Fort Griffin Fandangle Ass'n, Inc., 624 F.2d 717, 720 (5th Cir.1980)* ("Given that the amended complaint properly brought a class suit, it alleged citizenship sufficient to establish diversity by alleging that the named defendants were citizens of Texas, for a class is considered to be diverse from the opposing party if the named parties are diverse," citing *Ben-Hur* ); *[FN5]* 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane § 1755 p. 63-64 ("Rule 23 would be completely unworkable in the diversity *1289 context and its value significantly compromised if the citizenship of all the class members, many of whom may be unknown, had to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 5

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
(Cite as: 154 F.3d 1284)

considered in establishing jurisdiction."). Pursuant to this well-settled rule, we look to the citizenship of the named plaintiff, Triggs, and conclude that there is not complete diversity, because, although Triggs is diverse with respect to defendant Omni, he is not diverse with respect to the properly-joined defendant, Crump. [FN6]

> FN5. In *Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981)* (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

> FN6. Amicus calls our attention to *Zahn v. International Paper Co., 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).* There, the Court held in the context of a class action that the amount in controversy for purposes of the then $10,000 requirement of *28 U.S.C. § 1332(a)* could not be satisfied by aggregating the value of the claims of the members of the plaintiff class. Although the named plaintiff did meet the $10,000 jurisdictional requirement, the Court held that any member of the putative class not meeting the jurisdictional amount would have to be dismissed. In so holding, the Court relied on its long-standing precedent interpreting the statutory phrase "matter in controversy," and the fact that "Congress, with complete understanding of how the courts had construed the statute, had not changed the governing language." *Id.* at 298-300, *94 S.Ct. at 511.* Unlike the *Zahn* case, which addressed the issue involving the interpretation of the statutory phrase "matter in controversy," the instant case presents the different issue of interpretation of the statutory language relating to diversity of citizenship and the meaning of the concept of complete diversity. The precedent controlling the issue before us, also precedent of long-standing stature, provides that courts should consider only the citizenship of the named parties in determining whether or not there is complete diversity. In evaluating the complete diversity issue in this case, we thus conclude that *Zahn* in inapposite. *See Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 1059, 22 L.Ed.2d 319 (1969)* (recognizing this distinction between the analysis of diversity of citizenship and the

analysis for the amount in controversy).

[11] Contrary to the well-settled rule that the citizenship of the named parties is controlling, defendants invite this court to look beyond the named plaintiff and bifurcate the plaintiff class solely on the basis of whether or not the members of the class have a potential claim against all defendants. Finding no persuasive precedent for this position, we reject defendants' invitation. There is precedent for bifurcating a class or severing claims where the claims are separable and have no logical connection. In *Tapscott v. M.S. Dealer Service Corp., 77 F.3d 1353 (11th Cir.1996)*, this court addressed a fraudulent joinder issue in the context of a removed class action. The case as filed in state court involved what the *Tapscott* opinion referred to as two classes. The first class consisted of named plaintiffs, citizens of Alabama, who had claims against certain defendants, also citizens of Alabama, arising out of the sale of service contracts on automobiles sold and financed in Alabama. The second class consisted of different named plaintiffs, citizens of Alabama, who had claims against a different defendant, Lowe's, a North Carolina citizen, arising out of the sale of extended service contracts in connection with the sale of retail products. The court referred to the two classes as the automobile class and the merchant class. Lowe's sought to remove the case to federal court, arguing that the claims against it should be severed from the claims against the defendants in the automobile class. The district court agreed and severed the two classes. The court remanded to state court the claims involving the automobile class as to which there was no diversity, but retained the claims against the merchant class, with respect to which there was complete diversity. This court affirmed. We concluded that there was a fraudulent misjoinder because Lowe's was improperly joined with the non-diverse defendants in the automobile class (there being no allegation of joint liability), because there was "no real connection" between the two controversies, *id.* at 1360, and because the misjoinder was "so egregious as to constitute fraudulent joinder." *Id.*

*Tapscott* is readily distinguishable from the case at bar. Unlike *Tapscott*, the instant case does not involve two distinct classes that have "no real connection" to each other. To the contrary, there is only one class in the instant case and one named plaintiff, Triggs. Triggs and all the members of the putative class have claims for relief which would impose joint liability upon Omni and the particular dealership involved. Among the dealerships

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
**(Cite as: 154 F.3d 1284)**

involved was the named defendant, Crump, the dealership through whom the named plaintiff, Triggs, dealt with Omni. Focusing on the only named plaintiff there is clearly no reason to bifurcate the class. Even if we should, as defendants suggest, compare the claims of Triggs and those *1290 members of the putative class who dealt with Omni through the Crump dealership, to the claims of other members of the putative class who dealt with Omni through other automobile dealerships, we would find that those other claims arise out of a series of transactions precisely like the Triggs-Omni transaction and give rise to common questions of law and fact. Thus, unlike *Tapscott*, there is a real connection between the claims of the named plaintiff and the claims which defendants seek to bifurcate and sever (i.e., the claims of the 98% of the putative class). Unlike the situation in *Tapscott*, the parties in the instant case have been properly joined, in full compliance with the standards set out in Rule 20. We conclude that *Tapscott* provides no support for defendants' desire to bifurcate the instant plaintiff class.

Nor do we find other persuasive support for bifurcating the instant plaintiff class. It is true that a few district courts in Alabama, in unpublished opinions, have accepted such an invitation to bifurcate a plaintiff class merely because many members of the putative class do not have claims against one of the named defendants. *See, e.g., Arnold v. Ford Motor Co.*, Civ. Action No. CV-95-PT-0073-M (N.D.Ala. May 2, 1995) (unpublished decision). Arnold, an Alabama citizen purporting to represent a class of purchasers of Ford pickup trucks in Alabama, sued a diverse defendant, Ford Motor Company, and a nondiverse defendant, Pollack Ford Company. Pollack apparently was one of the numerous Ford dealerships through whom the Alabama class dealt with Ford. Although the facts of the case are not entirely clear from the opinion, we will assume *arguendo* that the relevant facts are virtually indistinguishable from the instant facts. The court concluded that the joinder of Pollack was fraudulent merely because most members of the putative class dealt with Ford through dealerships other than Pollack, and thus had no claim against Pollack. Disregarding Pollack, the court concluded there was complete diversity. We find this precedent unpersuasive for several reasons. Defendants' reliance upon *Tapscott* to support this precedent is without merit for the reasons noted above. [FN7] Also, there is nothing to support this precedent in the standards for permissive joinder as provided in Rule 20. To the contrary, the express language of Rule 20

indicates that all plaintiffs need not seek relief against all defendants. Finally, *Arnold* and its progeny are inconsistent with the well established rule that, in a class action context, courts should look to named parties in evaluating the complete diversity requirement. For the foregoing reasons, we reject defendants' invitation to bifurcate the instant plaintiff class.

> FN7. A number of well-reasoned district court decisions have also rejected the result of *Arnold* and its progeny. *See, e.g., Atchison v. Woodmen of the World Ins. Society*, 982 F.Supp. 835 (S.D.Ala.1997).

[12] Finally, defendants contend that plaintiff's "bad faith" is enough to warrant a finding that Crump was fraudulently joined. Defendants assert that plaintiff joined defendant Crump solely for the purpose of defeating diversity jurisdiction, and they argue that this constitutes a fraudulent joinder. Defendants apparently infer this "bad faith" purpose from the fact that plaintiff joined as a named defendant only one of the numerous automobile dealerships through whom the members of the putative class dealt with Omni. Defendants apparently suggest that if the plaintiff class really wanted to pursue a judgment against the dealerships, as well as against Omni, they would have joined more than just one dealership. [FN8] We reject defendants' *1291 argument; it is inconsistent with binding precedent. Supreme Court precedent is clear that a plaintiff's motivation for joining a defendant is not important as long as the plaintiff has the intent to pursue a judgment against the defendant. In *Chicago, Rock Island & Pacific Ry. Co. v. Schwyhart*, 227 U.S. 184, 33 S.Ct. 250, 57 L.Ed. 473 (1913), the plaintiff filed an action for personal injuries against the railway company and its servant, Barrett, whose immediate negligence allegedly caused the injury. Plaintiff and defendant Barrett were citizens of Missouri, but the railway company was diverse. The railway company sought to remove the case to federal court, arguing, *inter alia*, that Barrett was joined for the sole and fraudulent purpose of preventing a removal, being a person of little or no property while the company was fully able to pay. Rejecting that argument, the Court held: "[o]n the question of removal, we have not to consider more than whether there was a real intention to get a joint judgment, and whether there was a colorable ground for it ... as the record stood when the removal was denied." *Id.* at 194, 33 S.Ct. at 251. The Court also said:

> FN8. We note that the district court did not



Page 7

154 F.3d 1284
154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83
(Cite as: 154 F.3d 1284)

suggest that the joinder of Crump was fraudulent because of plaintiff's "bad faith." To the contrary, the district court acknowledged that "[i]f the court considers only the named plaintiff, then Crump was not fraudulently joined." District Court Order at 7. Defendants' "bad faith" argument is inconsistent with precedent, *see infra*, and the argument also lacks logical force as a factual matter. There are other potential reasons that plaintiff might not have joined the other dealerships. At this early stage in the proceedings, it is not surprising that the dealership uppermost in plaintiff's mind was the dealer through whom the named plaintiff dealt with Omni. Plaintiff may need discovery in order to obtain pertinent information about other dealerships. Moreover, most of the other dealerships are probably also citizens of Alabama, since the plaintiff class is composed of persons who leased automobiles in Alabama. Defendants apparently fault plaintiff for not joining more of the potential Alabama defendants, an action that hardly suggests a fraudulent intent to avoid diversity jurisdiction.

Again, the motive of the plaintiff, taken by itself, does not affect the right to remove. If there is a joint liability, he has an absolute right to enforce it, whatever the reason that makes him wish to assert the right.... Hence, the fact that the company is rich and Barrett poor does not affect the case. *Id.* at 193, 33 S.Ct. at 251. *Accord Chicago, Rock Island & Pacific Ry. Co. v. Whiteaker*, 239 U.S. 421, 36 S.Ct. 152, 60 L.Ed. 360 (1915) ("to apply the epithet 'fraudulent' to the joinder will not suffice: the showing must be such as compels the conclusion that the joinder is without right"); *Parks v. New York Times Co.*, 308 F.2d 474 (5th Cir.1962). In the instant case, nothing suggests an absence of a "real intention to get a joint judgment" against defendant Crump. Pursuant to the foregoing precedent, we reject defendants' "bad faith" argument.

[13] For the foregoing reasons, we hold that Crump is not fraudulently joined. Because there is not complete diversity among the parties, the federal courts do not have subject matter jurisdiction to hear this case. [FN9]

FN9. Defendants make additional arguments which we readily find to be without merit. First, defendants argue that the instant case involves a defect in removal procedure and that therefore the motion to remand was untimely under 28 U.S.C. § 1447(c). We reject this argument. It is clear that plaintiff's motion to remand was based on the assertion that the district court was without subject matter jurisdiction, an assertion with which we agree for the reasons spelled out in the text. Because there is no time limit for motions to remand that challenge subject matter jurisdiction, plaintiff's motion was timely filed. Defendants also argue that plaintiff did not perfect his interlocutory appeal to this Court. Plaintiff failed to file a petition for appeal with the Eleventh Circuit within ten days of the district court's initial order certifying this case for interlocutory appeal. However, the district court reconsidered and re-entered its order, a procedure which was recognized in *Aparicio v. Swan Lake*, 643 F.2d 1109, 1112 (5th Cir., Apr.27, 1981). Plaintiff subsequently perfected his appeal in a timely manner. Consequently, we reject defendants' procedural arguments.

V. Conclusion

We reverse the district court's judgment and remand with directions that the district court remand this case to the Alabama state court.

REVERSED AND REMANDED.

154 F.3d 1284, 12 Fla. L. Weekly Fed. C 83

**Briefs and Other Related Documents (Back to top)**

• 97-6584 (Docket) (Jul. 22, 1997)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
**(Cite as: 113 F.3d 1536)**

## Briefs and Other Related Documents

United States Court of Appeals,
Eleventh Circuit.
Arthur L. CROWE, Jr., Edith Crowe Ingram, Eleanor
Ingram Kiefling, Plaintiffs-
Appellants,
v.
Daniel COLEMAN, Crown Central Petroleum
Corporation, Crown Stations, Inc.,
Defendants-Appellees.
No. 96-8116.

May 21, 1997.

Landowners sued present and former adjacent landowner, in state court, seeking recovery for damages caused by leakage on to their property of gasoline entering ground while former owner was operating gasoline station on premises. Case was removed and landowners sought remand. The United States District Court for the Northern District of Georgia, No. 1:95-CV-2669-CAM, Charles A. Moye, J., denied motion and entered summary judgment for present owner. Appeal was taken. The Court of Appeals, Edmondson, Circuit Judge, held that: (1) there was arguable cause of action against present owner for nuisance, under Georgia law, even though original pollution was caused by actions of prior owner and present owner had not contributed to pollution; (2) as result present owner was not joined to suit for purposes of defeating diversity jurisdiction and his presence in action required remand; and (3) isolated remark by suing landowners' counsel during appeal, that it could not be proved that gasoline flowed on to suing landowners' property during present owner's tenure, was too ambiguous to determine issue in present owner's favor.

Summary judgment vacated; reversed and remanded with instructions.

Roney, Senior Circuit Judge, dissented and filed opinion.

West Headnotes

**[1] Removal of Cases** 36
334k36 Most Cited Cases

**[1] Removal of Cases** 102
334k102 Most Cited Cases
If there is even a possibility that state court would

find complaint states cause of action against any resident defendant, federal court must find that joinder of same citizenship defendant was proper and remand case to state court for lack of diversity of citizenship.

**[2] Nuisance** 48
279k48 Most Cited Cases
Landowners adequately pleaded that current adjacent landowner was liable for nuisance in connection with seepage of gasoline from his property to landowner's, under Georgia law, even though complaint spoke in terms of "trespass" and it was acknowledged that landowners had no trespass claim; while "trespass" can mean specific form of tort action, it also means wrongful entry upon land of another, encroachment or intrusion, and as broadly interpreted could support nuisance claim.

**[3] Federal Civil Procedure** 654.1
170Ak654.1 Most Cited Cases
When multiple defendants are named in complaint, allegations can be and usually are to be read in such a way that each defendant is having allegation made about him individually.

**[4] Removal of Cases** 36
334k36 Most Cited Cases

**[4] Removal of Cases** 101.1
334k101.1 Most Cited Cases
Joinder to state court nuisance suit, of present owner of property from which gasoline originally entering ground during prior owner's use of land as gasoline station was alleged to be leaking on to complaining landowners' property, was not merely for purpose of defeating diversity, and citizenship of present landowner required remand to state court; complaint stated arguable nuisance cause of action against present landowner under Georgia law, as there was case holding that owner could have liability for continuing damage to property even though not responsible for original damage, and although there was also contrary precedent this was irrelevant for remand determination purposes.

**[5] Removal of Cases** 36
334k36 Most Cited Cases

**[5] Removal of Cases** 107(7)
334k107(7) Most Cited Cases
For plaintiff to present arguable claim against in-state defendant and, therefore, to require case removed to federal court to be remanded to state court, plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

need not show that he could survive in district court a motion for summary judgment filed by that in-state defendant; for remand, after drawing all reasonable inferences from record in plaintiff's favor and then resolving all contested issues of fact in favor of plaintiff, there need only be reasonable basis for predicting that state law might impose liability on facts involved.

[6] Federal Courts ☜773.1
170Bk773.1 Most Cited Cases
Waivers and concessions made in appellate oral arguments need to be unambiguous before they are allowed to change outcome of appeal from reversal to affirmance.
*1537 Roy E. Barnes, Marietta, GA, for Plaintiffs-Appellants.

Stephen E. O'Day, Mary Maclean Doolan, Smith, Gambrell & Russell, Atlanta, GA, for Defendants-Appellees.

Appeal from the United States District Court for the Northern District of Georgia.

Before EDMONDSON and BLACK, Circuit Judges, and RONEY, Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Plaintiffs-Appellants appeal from the district court's denial of their motion for remand to the Superior Court of Cobb County, Georgia and from the grant of summary judgment for Defendant Daniel Coleman. Because the district court erred in concluding that Plaintiffs could maintain no possible cause of action against Georgia-resident Defendant Coleman, we reverse the district court's denial of Plaintiff's motion for remand. Because the case must be returned to state court, we vacate the award of summary judgment.

1. Background
Plaintiffs are Arthur Crowe, Jr., Edith Crowe and Eleanor Ingram Kiefling. Together they own a parcel of land in Georgia. Plaintiffs filed suit in the Superior Court of Cobb County against Defendants Crown Stations, Inc. ("Crown"), a subsidiary of Crown Central Petroleum Corporation, and Daniel Coleman. Jurisdiction in state court was based on Coleman, who is a Georgia resident. See O.C.G.A. § 9-10-30. In their complaint, Plaintiffs alleged that Coleman, as the current owner of the land adjoining Plaintiffs' property, and Crown, as the former owner, were liable for damages caused to Plaintiffs by the

escape of gasoline from Defendants' property onto Plaintiffs' property. Defendant Coleman was served with a copy of the complaint on September 29, 1995.

On October 20, Defendants filed a notice of removal of the case to the District Court for the Northern District of Georgia; Defendants alleged that Georgia-resident Defendant Coleman had been fraudulently joined to defeat diversity jurisdiction. On November 13, Defendant Coleman submitted a motion for summary judgment, claiming that he did not cause Plaintiffs' harm. In support of this motion, Coleman submitted his own affidavit and the affidavit of a Crown engineer. *1538 These affidavits said that, although Crown formerly operated a service station on the land adjacent to Plaintiffs' property and stored petroleum in underground storage tanks (USTs), those USTs were removed from the ground before Coleman became the owner of the property. Coleman swore in his affidavit that, during his ownership, he "never caused the release of any petroleum products at the S. Atlanta Rd. property [that is, his own land]."

Also on November 13, Plaintiffs moved for remand to state court, arguing that they stated a valid claim for continuing nuisance against Coleman under Georgia law. Defendants responded by contending that Plaintiffs' complaint only alleged a cause of action for trespass and, if a nuisance had been alleged, that Plaintiffs could succeed on no nuisance claim against Coleman. On November 30, Plaintiffs moved to amend their complaint to state expressly a cause of action for nuisance. On January 11, 1996, the district court issued an order (1) denying Plaintiffs' motion to remand to state court, concluding there was no possibility Plaintiffs could establish a cause of action against Coleman; (2) denying Plaintiffs' motion to amend the complaint as futile; and (3) granting Defendant Coleman's motion for summary judgment.

II. Discussion
A. The Law of Remand

In a removal case alleging fraudulent joinder, the removing party has the burden of proving that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court. Cabalceta v. Standard Fruit Co., 883 F.2d 1553, 1561 (11th Cir.1989). The burden of the removing party is a "heavy one." B. Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. Unit A 1981).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536                                                          Page 3
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
**(Cite as: 113 F.3d 1536)**

To determine whether the case should be remanded, the district court must evaluate the factual allegations in the light most favorable to the plaintiff and must resolve any uncertainties about state substantive law in favor of the plaintiff. *Id.* at 549. The federal court makes these determinations based on the plaintiff's pleadings at the time of removal; but the court may consider affidavits and deposition transcripts submitted by the parties. *Id.*

[1] While "the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed.R.Civ.P. 56(b)," *id.* at n. 9, the jurisdictional inquiry "must not subsume substantive determination." *Id.* at 550. Over and over again, we stress that "the trial court must be certain of its jurisdiction before embarking upon a safari in search of a judgment on the merits." *Id.* at 548- 49. When considering a motion for remand, federal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law. *See Id.* "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." *Coker v. Amoco Oil Co.,* 709 F.2d 1433, 1440-41 (11th Cir.1983), *superseded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc.,* 991 F.2d 1533 (11th Cir.1993).

This consequence makes sense given the law that "absent fraudulent joinder, plaintiff has the right to select the forum, to elect whether to sue joint tortfeasors and to prosecute his own suit in his own way to a final determination." *Parks v. The New York Times Co.,* 308 F.2d 474, 478 (5th Cir.1962). The strict construction of removal statutes also prevents "exposing the plaintiff to the possibility that he will win a final judgment in federal court, only to have it determined that the court lacked jurisdiction on removal," *see Cowart Iron Works, Inc. v. Phillips Constr. Co., Inc.,* 507 F.Supp. 740, 744 (S.D.Ga.1981) (quoting 14A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3721), a result that is costly not just for the plaintiff, but for all the parties and for society when the case must be relitigated.

**\*1539 B.** *The Parties' Arguments*

Plaintiffs argue that removal of this case was improper and that remand is required, because Plaintiffs have stated a valid nuisance claim against

Defendant Coleman. [FN1] Defendants make two arguments challenging Plaintiffs' nuisance claim. First, Defendants argue that Plaintiffs' complaint at the time of removal only stated a claim for trespass and did not expressly state a claim for nuisance. Second, Defendants argue that, even if Plaintiffs' complaint otherwise stated a cause of action for nuisance, no possibility exists that Plaintiffs can establish a nuisance claim against Coleman under Georgia law.

> FN1. Although Plaintiffs' complaint alleged a trespass claim against all Defendants, including Coleman, Plaintiffs acknowledge that they have no trespass claim against Coleman under Georgia law because Coleman did not cause the petroleum to be released onto his property. So, Plaintiffs' argument for remand relies solely on the nuisance claim.

1. *Adequacy of Plaintiffs' Pleading for Nuisance Claim*

[2][3] Plaintiffs' complaint in this case was a verified one, that is, under oath in respect to the facts. The complaint says, among other things:

8.
The defendants have allowed the escape of gasoline from their property onto the property of the plaintiffs.

9.
The actions of the defendants in allowing gasoline to escape from their property and to travel onto the property of the plaintiffs is a trespass for which damages may be awarded and which should be permanently enjoined.

. . . . .
12.
The plaintiffs have made demands upon the defendants to remove from the property of the defendants the gasoline that they have allowed to trespass and contaminate the plaintiffs' property and which *continues to do so.* The defendants' failure to so remove the gasoline and accompanying contamination prevents the property of the plaintiffs from being salable. (emphasis added).

When multiple defendants are named in a complaint, the allegations can be and usually are to be read in such a way that each defendant is having the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536                                                                                    Page 4
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

allegation made about him individually.    We also
note that, under the liberal requirements of notice
pleading, "[n]o technical forms of pleading ... are
required."  See Fed.R.Civ.P. 8(a); O.C.G.A. § 9-11-
8(a)(2)(A).

The word "trespass," although it can mean a specific
form of tort action, can also mean "a wrongful entry
upon the lands of another" or an "encroachment or
intrusion."    The Random House Dictionary of the
English Language 2016 (2d ed. 1987).  So, although
Plaintiffs'    unamended    complaint--including
paragraph 12-- might be capable of more than one
meaning, the complaint can easily be read to be a
sworn statement that Coleman has allowed gasoline
from his land to intrude wrongfully (and to continue
to intrude) on Plaintiffs' property and to contaminate
Plaintiffs' land.    Once more, a plaintiff seeking to
have his case remanded to state court is to be given
the benefit of every reasonable inference in his favor.

2. Nuisance Claim Under Georgia Law

[4] We now must decide whether the facts alleged in
Plaintiffs' complaint state even an arguable cause of
action under Georgia law.  The answer is "yes."

Defendants contend that Georgia law creates no
cause of action against a landowner for the failure to
abate a continuing nuisance caused by his property
where the landowner did not create the nuisance:
again, no one claims that Coleman caused gasoline to
spill onto his land.  And, Georgia case law may be in
conflict on this issue.    But, at this point in the
procedural history of the case--that is, on a motion
for remand, our analysis (as well as the district
court's) must be limited to determining whether
Plaintiffs have even an arguable claim.    So, any
ambiguity or doubt about the substantive state law
favors remand to state court.

*1540 Section 41-1-5(a) of the Georgia Code
provides: "The alienee of a person owning property
injured may maintain an action for continuance of the
nuisance for which the alienee of the property
causing the nuisance is responsible."    The statute
provides no guidance about whether an alienee, such
as Coleman, may be held responsible for a nuisance
where he engaged in no act-- in this case, the storage
of petroleum--which initially caused the nuisance if
he, after notice, refuses to abate the continuing
nuisance:  in this case, petroleum seeping from his
land onto adjoining land.    The parties point to no
Georgia Supreme Court case that has decided the
issue. [FN2]

FN2.  In their brief, Defendants cite the
Georgia Supreme Court case of Cox v.
Cambridge Square Towne Houses Inc., 239
Ga. 127, 236 S.E.2d 73 (1977), for the
proposition that "a defendant must engage in
some act or operation which continues a
nuisance in order to be liable."   In Cox, the
plaintiff sued the owner of adjoining
property;   the defendant had installed the
storm sewer that was the subject of the
nuisance claim.  Cox did not involve a suit
against an alienee who owned property after
the creation of the nuisance;  so the court did
not decide the issue.

Each party relies on a Georgia Court of Appeals case
to support its argument.      Defendants point to
Citizens & Southern Trust Co. v. Phillips Petroleum
Co., 192 Ga.App. 499, 385 S.E.2d 426, 428 (1989),
where the court rejected the plaintiffs' nuisance claim
against the subsequent owner of adjoining property
when   that   adjoining   property   was   already
contaminated and its subsequent owner did not
contribute to the contamination.  Plaintiffs point to
Hoffman v. Atlanta Gas Light Co., 206 Ga.App. 727,
426 S.E.2d 387, 391 (1992), where the court
permitted a nuisance claim where the defendant did
not cause the initial contamination of the defendant's
land, but where the preexisting contamination of the
defendant's land continued to migrate onto the
plaintiffs' property.

On the face of these opinions, there appears to be a
conflict on this issue in the Georgia appellate
decisions.    Defendants, and Judge Roney in his
dissent, point to factors which might distinguish this
case from Hoffman. [FN3] If this case were properly
before the district court (and this court) under
original diversity jurisdiction, we would be obligated
to predict how the Georgia Supreme Court would
rule on this issue or to certify the question to the
Georgia Supreme Court.      For purposes of
determining whether this case should be remanded to
state court, however, the inquiry by federal judges
must not go so far:

FN3.   We do not reject the proposed
distinctions.    We accept that they may
possibly be appropriate;   but, more
important, we do not see them as doubtlessly
correct either.  For example, Hoffman never
seems to reply completely on some contract
concept to support the cause of action
allowed in that case:   a nuisance claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

●                                    ●                          Page 5

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
**(Cite as: 113 F.3d 1536)**

against the property owner who created no contamination, but whose property was the source of the contamination of his neighbors'--the plaintiffs'--land.

This is an *Erie* problem in part, but only part. In the usual diversity situation a Federal Court, no matter how difficult the task, must ascertain (and then apply) what the state law is.... But here the question is whether there is arguably a reasonable basis for predicting that the state law might impose liability on the facts involved. If that possibility exists, a good faith assertion of such an expectancy in a state court is not a sham, is not colorable and is not fraudulent in fact or in law.
*Bobby Jones Garden Apartments v. Suleski,* 391 F.2d 172, 176-77 (5th Cir.1968) (citations omitted). In this case, the arguable confusion in Georgia law itself supports remanding this case to state court. *See Parks,* 308 F.2d at 477 (noting in fraudulent joinder case that, "doubtful issues of law due to absence of definite pronouncements by the state supreme court are to be tried in the court having original jurisdiction of the case and are not to be determined in a removal proceeding.").

In the present case, neither the words of Plaintiffs' verified complaint nor-- as we will discuss more--the remainder of the record before the district court forecloses the possibility that petroleum, which had already leaked onto Defendants' property from the removed tanks, has continued to seep onto Plaintiffs' property during Coleman's ownership of the former service station site. Unlike the complaint, Defendant Coleman's answer *1541 is not under oath; but he denies wrongdoing. His denial, of course, does nothing to undercut the fact that plaintiffs have set out an arguable nuisance claim against him; the answer, at most, shows a controversy that needs to be resolved.

### 3. Defendants' Affidavits

Defendants also submitted affidavits which say that-- before Coleman's ownership of the former service station site--the USTs were removed from the ground, and no petroleum products have been since stored or sold at the property. In addition, Coleman specifically says in his affidavit: "I have never caused the release of any petroleum products *at* [Defendants'] property." (emphasis added).

Coleman submitted the affidavits in support of his motion for summary judgment before the district court ruled on Plaintiffs' motion for remand.

Although submitted in support of a motion for summary judgment, Defendants' affidavits were probably properly considered by the district court on the question of remand; and we too will take them into account in deciding the limited question of whether a possibility exists that Plaintiffs have stated a nuisance cause of action against Coleman. *See Cabalceta,* 883 F.2d at 1561.

Seemingly on the basis of Defendants' affidavits [FN4], the district court found and concluded it to be undisputed that: "Since at least May 14, 1991, there have been ... no petroleum releases *from* the site" (emphasis added). If "release," as used by the district court, means no seepage or leakage onto Plaintiffs' land, [FN5] we cannot see how that fact can be said to be undisputed from the paper record before the district court and us. Coleman's affidavit and Plaintiffs' sworn complaint seem to leave open--as completely disputed--whether gasoline from Coleman's land (after he became the landowner) has intruded, and continues to intrude, onto Plaintiffs' land. By the way, we note that Plaintiffs--before the district court ruled on the summary judgment motion- -filed, pursuant to the district court's local rules, a "Statement of Material Facts to Which There Remains a Genuine Issue to Be Tried," which included this statement: "Gasoline continues to leak from the contaminated property owned by Coleman onto the property of the Plaintiffs."

> FN4. Based on the docket entries, we suppose that a hearing at which the parties were allowed to argue was held on the motions in the district court. We know that, when motions are orally argued (even when the pertinent hearing is for argument only and not one for the presentation of evidence), important things sometimes happen which impact on the factual record-- for example, the judge while interrogating the lawyers obtains stipulations, concessions, and so on. But in this case, no one has said the oral argument in district court amended the paper record. And the transcript of the hearing in the district court is not part of the appellate record. So, we believe we are looking at the same factual record that was before the district court.

> FN5. The district court might have used "release" to mean no release of gasoline onto the Defendants' own land. This fact is undisputed. The district court may then have gone on to conclude that Georgia law

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

allows no cause of action against Coleman even if gasoline, which had been released into the soil at the service station site before Coleman owned it, had seeped onto Plaintiffs' land after Coleman bought the former service station site. This approach would be erroneous, because it would entail a decision about Georgia law when the state's precedents are not plainly consistent.

In the light of the ostensible dispute of fact appearing in the documents in the record--including those under oath--summary judgment for defendant Coleman was very possibly erroneous. But, as a reviewing court, we need not go so far as to say summary judgment was wrongfully entered. We can just say (and we do say with more certainty) that the motion for remand was improperly denied.

[5] In terms of this circuit's law, the main point for us is this one: For a Plaintiff to present an arguable claim against an in-state defendant and, therefore, to require a case removed to federal court to be remanded to state court, the plaintiff need not show that he could survive in the district court a motion for summary judgment filed by that in-state defendant. For a remand, the plaintiff's burden is much lighter than that: after drawing all reasonable inferences from the record in *1542 the plaintiff's favor and then resolving all contested issues of fact in favor of the plaintiff, there need only be "a reasonable basis for predicting that the state law *might* impose liability on the facts involved." *B., Inc.,* 663 F.2d at 550 (quoting *Bobby Jones Garden Apartments,* 391 F.2d at 177) (emphasis added). Because the procedures are similar while the substantive standards are very different, district courts must exercise extraordinary care to avoid jumbling up motions for remand and motions for summary judgment that come before them.

In the remand context, the district court's authority to look into the ultimate merit of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims. Although we have said that district courts may look beyond the face of the complaint, we emphasize that the district court is to stop short of adjudicating the merits of cases that do not appear readily to be frivolous or fraudulent. Applying these principals to this case, we conclude that the district court--given the record before it-- should have remanded the case to state court and should have never addressed the motion for summary judgment.

4. *Oral Argument in the Appellate Court*

This case, however, presents one more question. In dissent, Judge Roney points out a statement made at oral argument in this court by Plaintiffs' counsel; Judge Roney concludes from the statement that Plaintiffs cannot in fact dispute that no gasoline has intruded onto Plaintiffs' land from Coleman's land since Coleman was the landowner. Therefore, we must answer this question: If the district court erred on the record before it, does this error become harmless given Plaintiffs' counsel's words to the appellate court?

The pertinent statement of Plaintiff-Appellants' counsel occurred during the rebuttal in the context of the following exchange:
Judge Roney: "Is [the district court judge] correct or incorrect when he says, 'The following facts are undisputed: There have been no petroleum releases from the site since May 14, 1991.'"
Counsel: "He is correct that there has been no-- that was the day the tanks were taken out. There could have been no new releases, but it is undisputed that the gasoline remains on ..."
Judge Roney: "I'm not talking about that. I'm talking about whether any gasoline flowed from the property Mr. Coleman owned after he owned it?" [FN6]

> FN6. At this point, Judge Roney may be asking a question which is different from the one the district court addressed when the district court said, "[s]ince at least May 14, 1991 ... there have been no petroleum releases from the site." *See supra* note 5.

Counsel: "We could not prove one way or the other. So, I cannot technically say that the new flow since Coleman ran it is disputed."

[6] That concessions and admissions of counsel at oral argument in appellate courts can count against them is doubtlessly true. *See, e.g., Rozar v. Mullis,* 85 F.3d 556, 563 (11th Cir.1996); *United States v. Gerber,* 994 F.2d 1556, 1558 (11th Cir.1993). But waivers and concessions made in appellate oral arguments need to be unambiguous before they are allowed to change the outcome of an appeal from a reversal to an affirmance. *See Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972) ("[T]o be binding, judicial admissions must be unequivocal.") In the context of the entire oral argument in this case and of Plaintiffs' briefs, we are unwilling to base the outcome of this case on a few words uttered in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
(Cite as: 113 F.3d 1536)

last minute of Plaintiffs' counsel's rebuttal.

For example, earlier in the same oral argument, the following exchange occurred between Judge Roney and Appellants' counsel:

Judge Roney: "Where is the evidence that there was any continued leaking after Coleman got the property?"
Counsel: "There is evidence. It is alleged in the complaint ..."
Judge Roney: "No. It is very diffuse."
Counsel: "Here is the confusion. There is not the leakage from the tanks. The tanks are gone. But, there is gasoline on the adjoining property that, number one, continues to leak onto the ..." [counsel was interrupted]

*1543 At another point in the oral argument, Appellants' counsel spoke these words:

Counsel: "[The defendants] did not claim or deny in the summary judgment that the gasoline continues to be there. Nobody denies that, because it is."
Judge Roney: "Continues to be where?"
Counsel: "In the ground."
Judge Roney: "On your client's property?"
Counsel: "On our client's property and on [the defendants'] property."

For other representations of plaintiff-appellants on the timing of the seepage of gasoline onto their land, see Appellant's Brief at page 13 (characterizing the continuing nuisance as "the exuding gasoline") and at page 15 ("the pollutants currently obtruding Plaintiffs' property represent the continuing nuisance"). See also Appellant's Reply Brief at page 6 ("The cause of action against Coleman stems, not from any involvement with the leaky USTs, but rather, from his passive acquiescence of the continuing exudation of contamination from *his property* after failing his statutory duty to abate it upon Appellants' request.") (emphasis in original).

Taken as a whole, we cannot say that Plaintiff-Appellants' counsel's statements about when gasoline has seeped onto his clients' land were so consistent, plain and favorable to Coleman as to make the district court's error, in the light of the record before it, harmless in reality. Again, if there is ambiguity about what Plaintiffs' counsel has said, Plaintiffs are entitled to the construction most favorable to remand.

### III. *Conclusion*

If removal is doubtful, we remand the case. Therefore, we send this case back to the district court

to remand it to state court. [FN7] In doing so, we express no view of the ultimate outcome on the merits. Georgia's state courts--which have the final word on Georgia law--will decide all that.

> FN7. Because we decide that the district court erred by denying Plaintiffs' motion for remand based on the unamended complaint, we do not address Plaintiffs' argument that the district court erred by refusing to allow Plaintiffs to amend their complaint.

SUMMARY JUDGMENT VACATED.

REVERSED AND REMANDED.

RONEY, Senior Circuit Judge, dissenting:

I respectfully would affirm for the reasons set forth in Judge Moye's Order.

The reversal is based on the fact that there is "petroleum seeping from his [Coleman's] land onto adjoining land" and that "the preexisting contamination of the defendant's land continued to migrate onto the plaintiffs' property." The majority opinion recites that "neither the words of Plaintiffs' complaint nor the remainder of the record foreclose the possibility that petroleum has continued to seep onto Plaintiffs' property during Coleman's ownership."

This is contrary to the record, the understanding of Judge Moye, and the admissions of counsel at oral argument. Judge Moye recited as undisputed that since May 1991, prior to Coleman's ownership: "There have been no petroleum releases from the site." The parties do not dispute this fact on appeal. When asked directly about the accuracy of this statement at oral argument, counsel for plaintiffs said: "We could not prove one way or the other. So I cannot technically say that the new flow since Coleman owned it is disputed." Therefore, the case presented to this Court is based on this undisputed critical paragraph in Judge Moye's opinion:

Since at least May 14, 1991, there have been no deliveries of petroleum products to the former service station, there have been no petroleum products sold from the site, there have been no petroleum products stored at the site, and there have been no petroleum releases from the site.

On these undisputed facts, Georgia law is clear. If Coleman did not own the property or the offending tanks that caused the contamination, he cannot be

● ●

113 F.3d 1536
113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976
**(Cite as: 113 F.3d 1536)**

held responsible for the fact that the contaminants remain on the plaintiffs' property. *Citizens & So. Trust v. Phillips Petro.,* 192 Ga.App. 499, 385 S.E.2d 426, 428 (1989) ("That there was no reoccurrence of a leak from the underground storage tanks after [defendants] purchased the property and relined the tanks is undisputed.... *1544 Accordingly, the trial court did not err in granting summary judgment in favor of the [defendants].").

To the extent that plaintiffs seek to read *Hoffman v. Atlanta Gas Light Co.,* 206 Ga.App. 727, 426 S.E.2d 387 (1992), to the contrary, they overlook the critical facts of that case. "Atlanta Gas Light now holds and controls the easement *and the pipeline* which are the physical source of the contamination.... We will not hold that the alienee of the easement *and pipeline* has no legal duty to abate a continuing nuisance, *particularly under the easement agreement in effect between Atlanta Gas Light and [the complaining landowners]." Id.* 426 S.E.2d at 391. (Emphasis added). In this case, Coleman never held, controlled or owned the tanks that caused the contamination, nor did he have any contractual relation with the complaining landowners.

Plaintiffs' argument is that they made a demand of Coleman to remove the contamination on their property and that his refusal to do so amounts to a continuing nuisance. There is no authority for the proposition that by demanding the removal of a nuisance by someone who has had nothing to do with the source or maintenance of it, or the things which caused it, can somehow create a cause of action against them for a "continuing" nuisance, which they have never had anything to do with in the first place.

Under the undisputed facts as presented to this Court on appeal, plaintiffs have no cause of action against Coleman, and the district court correctly so ruled.

I would affirm.

113 F.3d 1536, 27 Envtl. L. Rep. 21,555, 10 Fla. L. Weekly Fed. C 976

**Briefs and Other Related Documents** (Back to top)

• 1996 WL 33423464 (Appellate Brief) Reply Brief of Appellants (Jul. 30, 1996)Original Image of this Document (PDF)

• 1996 WL 33498860 (Appellate Brief) Reply Brief of Appellants (Jul. 30, 1996)Original Image of this Document (PDF)

• 1996 WL 33423465 (Appellate Brief) Brief of Appellees (Jul. 01, 1996)Original Image of this Document (PDF)

• 1996 WL 33498859 (Appellate Brief) Brief of Appellees (Jul. 01, 1996)Original Image of this Document (PDF)

• 1996 WL 33423463 (Appellate Brief) Brief of Appellants (Apr. 25, 1996)Original Image of this Document (PDF)

• 1996 WL 33498858 (Appellate Brief) Brief of Appellants (Apr. 22, 1996)Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1
Not Reported in F.Supp.2d, 2006 WL 2337002 (N.D.Ala.)
**(Cite as: 2006 WL 2337002 (N.D.Ala.))**

COnly the Westlaw citation is currently available.

United States District Court,
N.D. Alabama, Eastern Division.
Dr. Gene N. GORDON, Plaintiff,
v.
PFIZER INC., et al., Defendants.
**No. CV-06-RRA-703-E.**

May 22, 2006.

Jere L. Beasley, Andy D. Birchfield, Jr., Gerald B.
Taylor, Jr., J. Paul Sizemore, Navan Ward, Jr.,
Beasley Allen Crow Methvin Portis & Miles PC,
Montgomery, AL, for Plaintiff.

Lawrence B. Clark, Michael J. Asbell, Baker
Donelson Bearman Caldwell & Berkowitz PC,
Birmingham, AL, for Defendants.

Memorandum of Opinion

JOHNSON, J.

**\*1** This matter comes before the court on the motion
to stay (doc. 5) and motion to remand (doc. 6). The
magistrate judge filed a report and recommendation
on May 10, 2006, finding that there is "no reasonable
possibility" that the plaintiff would be able to
establish a cause of action against defendant Pollard,
and recommending that the motion to remand be
denied, and that defendant Pollard be dismissed with
prejudice. It was also recommended that the motion
to stay be granted, pending transfer to multidistrict
litigation. An objection to the Report and
Recommendation was filed by the plaintiff.

Having carefully reviewed and considered *de novo*
all the materials in the court file, including the report
and recommendation, and the objection thereto, the
Court is of the opinion that the magistrate judge's
report is due to be and is hereby ADOPTED and his
recommendation is ACCEPTED. An appropriate
order will be entered.

ORDER

In accordance with the memorandum opinion
entered contemporaneously herewith, it is hereby
ORDERED, ADJUDGED, and DECREED as

follows:

 1. The motion to remand (doc. 6) is DENIED.
 2. The motion to stay (doc. 5) is GRANTED.
 3. This matter is stayed pending transfer to
 multidistrict litigation.
 4. Defendant Pollard is DISMISSED, with
 prejudice.

REPORT AND RECOMMENDATION

ARMSTRONG, Magistrate J.

I. INTRODUCTION

On February 14, 2006, Plaintiff filed this action in
the Circuit Court of Talladega County, Alabama. The
action is brought by the plaintiff, Dr. Gene N.
Gordon, against the defendants, G.D. Searle, LLC.,
Pharmacia Corporation, Monsanto Company, Pfizer,
Inc., and Ron Pollard. The complaint alleges that the
prescription drug Bextra (Valdecoxib) caused the
plaintiff to have a heart attack, and otherwise be
injured. The following causes of action are alleged
against all defendants: negligence (count I), defective
design (count II), failure to warn (count III), breach
of express warranty of merchantability (count IV),
breach of implied warranty of merchantability (count
V), fraud (count VI), and negligent misrepresentation
(count VII). The individual defendant, Ron Pollard, is
the only non-diverse defendant.

There is no dispute that Plaintiff and Defendants
Searle, Pharmacia, and Pfizer are "citizens of
different States" for purposes of 28 U.S.C. §
1332(a)(1) or that the amount in controversy exceeds
the sum or value of $75,000.00, exclusive of interest
and costs. [FN1]*See Notice of Removal,* ¶¶ 3-11;
*Brief in Support of Motion to Remand,* at 1. Plaintiff
also has named a non-diverse pharmaceutical detailer
Rod Pollard. The defendants assert that Pollard has
been fraudulently joined.

> FN1. Specifically, Plaintiff Dr. Gene
> Gordon is, and was at all relevant times, an
> adult resident and citizen of Alabama. *See*
> Notice of Removal ¶ 6. Pfizer is now, and
> was at the time of filing of the Complaint, a
> corporation organized under the laws of
> Delaware with its principal place of business

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2337002 (N.D.Ala.)
**(Cite as: 2006 WL 2337002 (N.D.Ala.))**

in New York, and therefore is and was a citizen of Delaware and New York. *Id.* ¶ 7. Pharmacia is now, and was at the time of filing of the Complaint, a corporation organized under the laws of Delaware with its principal place of business in New Jersey, and therefore is and was a citizen of Delaware and New Jersey. *Id.* ¶ 8. Searle is now, and was at the time of filing of the Complaint, a limited liability company whose sole member is (and was) Pharmacia & Upjohn Company LLC, a limited liability company whose sole member is (and was) Pharmacia & Upjohn LLC, a limited liability company whose sole member is (and was) Pharmacia Corporation which is (and was) a corporation existing under the laws of the state of New Jersey. *Id* . ¶ 9. Monsanto is not a citizen of Alabama. *Id.* ¶ 10.

On September 6, 2005, pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation ("JPML") created a Multi-district Litigation ("MDL") proceeding for Bextra cases such as this pending in federal courts across the country. *See In re Bextra & Celebrex Marketing, Sales Practices & Prods.Liab. Litig.,* 391 F.Supp.2d 1377 (J.P.M.L.2005). On April 11, 2006, Defendants sent a "tag-along" letter regarding this action to the JPML pursuant to Rules 7.4 and 7.5 of the Rules of Procedure of the JPML. On May 2, 2006, the JPML listed the instant case on a conditional transfer order ("CTO").

**\*2** The JPML routinely transfers cases in which remand motions are pending. Moreover, the JPML previously instructed federal district judges with Bextra®-related cases such as this one on their docket that although "you are free to rule on the motion [to remand], of course, or wait until the Panel has decided the transfer issue[,] [t]he latter course may be especially appropriate if the motion raises questions likely to arise in other actions in the transferee court and, in the interest of uniformity, might best be decided there." JPML Ltr. Re: MDL-1699--*In re Bextra & Celebrex Marketing, Sales Practices & Prods. Liab. Litig.* at 1 (J.P.M.L. May 13, 2005).

The defendants wish this matter stayed pending full transfer of the case, and so have filed a motion to stay all proceedings pending transfer to multidistrict litigation proceeding. (Doc. 5). Numerous cases involving the joinder of Alabama pharmaceutical representatives already have transferred, or are in the process of transferring, to the MDL Court. *See, e.g., See Jackson v. Pfizer, Inc. et al.,* CV-2:05-cv-841-F (M.D.Ala. Dec. 5, 2005) (Walker, J.); *Nelson v. Pfizer, Inc., et al.,* CV-2:05-cv-832-F (M.D.Ala. Oct. 20, 2005) (Fuller, J.); *Thomas v. Pfizer, Inc. et al.,* CV-2:05-cv-824-F (M.D.Ala. Nov. 15, 2005) (Fuller, J.); *Hall v. Pfizer, Inc., et al.,* CV-2:05-cv-941-F (M.D.Ala. Nov. 21, 2005) (McPherson, J.); *Beverly v. Pfizer, Inc., et al.,* CV-05-0542-M, (S.D.Ala. Nov. 17, 2005) (Milling, J.); *see also* February 14, 2006 Transfer Order; Conditional Transfer Order (CTO) CTO-3.

The plaintiff has filed a motion to remand, claiming that this court lacks subject matter jurisdiction over this case. (Doc. 6). Because the fraudulent joinder issue rests on the determination of Eleventh Circuit and Alabama law, it is determined that this court is the proper court to determine those issues.

## II. ANALYSIS

### A. Fraud and Misrepresentation Claims

The plaintiff does not dispute defendants' showing that there is complete diversity between plaintiff and the remaining defendants or that the amount in controversy requirement is met. The only aspect of this court's diversity jurisdiction that plaintiff challenges is whether Pollard is fraudulently joined. The citizenship of fraudulently joined defendants should is disregarded for purposes of assessing diversity and proper removal. *See e.g., Tapscott v. MS Dealer Serv. Corp.,* 77 F.3d 1353, 1360 (11th Cir.1996), *rev'd on other grounds,* 204 F.2d 1069 (11th Cir., 2000). Under the Eleventh Circuit's standard for fraudulent joinder, remand should be denied where there is "no reasonable possibility" that the named pharmaceutical representatives could be found liable on plaintiffs' claims; the potential for liability "must be reasonable, not merely theoretical." *Legg v. Wyeth,* 428 F.3d 1317, 1325, & n. 5 (11th Cir.2005).

"The removal process was created by Congress to protect defendants. Congress 'did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it." ' *See Legg v. Wyeth,* 428 F.3d 1317, 1325 (11th Cir.2005) (internal quotation marks omitted). "Federal courts should not

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2337002 (N.D.Ala.)
**(Cite as: 2006 WL 2337002 (N.D.Ala.))**

Page 3

sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court...." *Wecker v. Nat'l Enamiling & Stamping Co.,* 204 U.S. 176, 186, 27 S.Ct. 184, 51 L.Ed. 430 (1907).

**\*3** The doctrine of fraudulent joinder prevents plaintiffs from defeating federal diversity jurisdiction by simply naming in-state defendants. In *Legg v. Wyeth,* 428 F.3d 1317, 1325 (11th Cir.2005), the Eleventh Circuit recently recognized this "common strategy employed" by plaintiffs in pharmaceutical product liability cases such as this in which plaintiffs' "name local parties, often ... local sales representatives, as defendants, thus defeating [a defendant's] right to remove a case to federal court." *See Legg,* 428 F.3d at 1325. In *Legg,* the Eleventh Circuit explained the proper standard for determining whether a pharmaceutical representative defendant is fraudulently joined. Joinder of a non-diverse defendant is fraudulent where there is "no reasonable possibility" that the plaintiff would be able to establish a cause of action against a resident defendant. *See, e.g .., Legg,* 428 F.2d at 1325; *Triggs v. John Crump Toyota, Inc.,* 154 F.3d 1284, 1287 (11th Cir.1998).

Fraudulent joinder may be shown by a lack of a factual or legal basis for plaintiff's claims. *See Owens v. Life Ins. Co. of Georgia,* 289 F.Supp.2d 1319, 1323-24 (M.D.Ala.2003) (Fuller J) (denying remand and finding no possibility that plaintiff could establish a cause of action against the resident defendant and thus resident was fraudulently joined). "In considering *possible* state law claims, possible must mean 'more than such a possibility that a designated residence can be hit by a meteor tonight. That is possible. Surely, as in other instances, reason and common sense have some role." *Legg,* 428 F.3d at 1325 n. 5 (*quoting Braden v. Wyeth,* CV-04-PT-235-E, 2005 U.S. Dist LEXIS 25243) (N.D. Ala. June 30, 2004).

The thrust of Plaintiff's argument in his Motion to Remand is that numerous unnamed pharmaceutical representatives in Alabama made fraudulent and negligent misrepresentations and failed to disclose that Bextra causes heart attacks, the injury of which Plaintiff complains. *Brief in Support of Motion to Remand,* at 11-21 (focusing strictly on claims of misrepresentation, fraud and suppression as it relates to other pharmaceutical representatives).

As the Eleventh Circuit recently explained in *Legg,* Plaintiff cannot assert fraud or negligent misrepresentation claims against Pollard because Plaintiff fails to specifically allege knowledge or bad faith on his part. In *Legg,* as here, plaintiffs asserted numerous claims against the pharmaceutical companies and pharmaceutical representatives, including claims for fraud based on allegations that the defendants made misrepresentations and suppressed certain facts related to the prescription medication, Redux. Defendants removed the case on diversity grounds, arguing fraudulent joinder of the three named non-diverse pharmaceutical representatives. The defendants submitted a sworn affidavit from one of the defendant pharmaceutical representatives that she had promoted the drug in question to licensed healthcare providers and answered their questions based on information provided to her by her employer. *Id.* at 1321. The affidavit stated, in pertinent part:

> **\*4** -- My knowledge of the drugs I detailed was derived exclusively from education provided to me by Wyeth.
> -- I had no involvement in the development or preparation of package inserts for any of the drugs, and had no control over content or other written warnings.
> -- I was not expected, as a field sales representative, to conduct independent research regarding the drugs I detailed, and did not do so.
> -- I was not expected to, and did not, review independent scientific studies published in journals unless they were supplied to me by Wyeth.

*Legg,* 428 F.3d at 1321.

In response to defendants' submission, plaintiffs offered as evidence voluminous training materials used by the pharmaceutical companies and its sales representatives in marketing Redux, as well as affidavits from several physicians stating that the pharmaceutical representatives had made misrepresentations to them. *Id.* at 1322 & n. 4. Plaintiffs argued that the training materials established that pharmaceutical representatives had knowledge of adverse events associated with Redux. *See id.* at 1322-25. Plaintiffs further argued that the professional representatives learned disingenuous detailing strategies to be used in detailing Redux, including withholding information from physicians. *See id.*

Applying Alabama law, the Eleventh Circuit court

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2337002 (N.D.Ala.)
**(Cite as: 2006 WL 2337002 (N.D.Ala.))**

found "no reasonable possibility" that the named pharmaceutical representatives could be found liable on plaintiffs' claims. *See Legg,* 428 F.3d at 1324-1325 & n. 5 (stating the potential for legal liability "must be reasonable, not merely theoretical") (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 312 (5th Cir.2002)). The Eleventh Circuit held that "[q]uite simply, there is no reasonable basis to predict that an Alabama court would find [the pharmaceutical representative] as an individual employee, personally liable for any wrongful action by Wyeth in absence of evidence that [the individual pharmaceutical representative] either knew or should have known of Redux's allegedly dangerous effects." *Id.* at 1324-25.

The Court explained that when a defendant presents evidence "the court cannot then resolve the facts in the Plaintiff['s] favor based solely on the unsupported allegations in the Plaintiff['s] complaint. *Id.* at 1323.

Here, as in *Legg,* Defendant Pollard has submitted a declaration stating:

-- As a detailer, I visit physicians and healthcare providers' offices and provide them FDA-approved package inserts and other FDA-approved information about Pfizer's products, which is referred to as "detailing." My job is to make the physician aware of certain of Pfizer's products, so that he or she can consider whether to prescribe them for particular patients.

-- I am not a physician or pharmacist. I have no specialized medical or pharmacological education. All of the information and material I use to detail Pfizer's drugs, including Bextra, is derived exclusively from education provided to me by Pfizer. Pfizer provides me with the FDA-approved package inserts and other FDA-approved information for the medications I detail.

**\*5** -- I was not aware of, and did not detail physicians with, any additional information regarding the risks or benefits of Bextra other than what was provided to me by Pfizer and in the FDA-approved labeling.

-- I have no involvement in the development or preparation of package inserts for any drugs, and no control over content or other written warnings.

-- At no time did I have any involvement with the design, manufacture, development or testing of the prescription medication Bextra, nor did I have any involvement in the FDA-approved package insert for Bextra.

-- At no time did I ever sell, offer to sell, or take

orders for the sale of Bextra to health care providers, physicians or patients.

-- I have never made any presentations to the general public concerning Bextra.
*Pollard Affidavit,* at 1-3.

In response, plaintiff attaches various portions of call notes from Alabama pharmaceutical representatives other than Pollard. Indeed, Plaintiff concedes that the call notes are "from various *other* Pfizer Defendant sales representatives in Alabama ..." and are not call notes or other documentation regarding any alleged misrepresentations made by Pollard. *Brief in Support of Motion to Remand,* at 11 (emphasis added). Plaintiff fails to provide any evidence or even make any specific allegations related to any specialized knowledge by Rod Pollard. Rather, Plaintiff's Complaint and Motion to Remand contain conclusory allegations and deductions:

-- As evidenced by the call notes from various other Pfizer Defendant sales representatives in Alabama, the Plaintiff *has alleged and anticipates* he will be able to show that ... Rod Pollard, fraudulently suppressed material information ... and misrepresented the safety and efficacy of Bextra.

-- Plaintiff also *anticipates* that he will be able to show that [Rod Pollard] participated in an aggressive marketing campaign ...

-- Plaintiff *anticipates* that discovery will show that [Rod Pollard's] knowledge concerning Bextra was superior to the knowledge held by the physicians to whom he made sales calls.

-- Plaintiff also *anticipates* that discovery will show that the Plaintiff, as a physician who took Bextra, relied on information provided by Defendants.

*Id.* at 11-14 (emphasis added). The Eleventh Circuit has explained that such "unsupported allegations" do not provide a basis for remand: *"We do not, however, in the absence of any proof assume that the nonmoving party [plaintiff] could or would prove the necessary facts." Legg,* F.3d at 1323 (internal quotation omitted and emphasis original).

Plaintiff also seeks to bolster his claims by referencing documents by a separate pharmaceutical company involving a separate prescription medication. *Id.* at 22 (describing detailing material allegedly from VIOXX litigation). Plaintiff speculates that he "expects that he will be able to obtain similar documents in the present case once he has had an opportunity to conduct discovery." *Id.* at

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2337002 (N.D.Ala.)
**(Cite as: 2006 WL 2337002 (N.D.Ala.))**

Page 5

23. Plaintiff's arguments are without merit because in determining a motion to remand, a court looks to the allegations in the complaint, rather than Plaintiff's wishful speculation about what factual allegations could be made following discovery. *See Legg,* 428 F.3d at 1323 (in light of defendant's affidavits, plaintiff cannot support its motion to remand with "unsupported allegations"); *Coker v. Amoco Oil Co.,* 709 F.2d 1433, 1440 (11th Cir.1983) (holding that court should determine jurisdiction based on the plaintiff's pleadings at the time of removal).

**\*6** The plaintiff also provides his own affidavit in which he states:

-- I rely on the information that the sales representatives provide to me concerning the safety of their drugs. This information is a strong factor in whether I decide to prescribe a medication to a particular patient or to take it myself.

-- Rod Pollard ... visited my office on a few occasions in order to promote the drug Bextra. During each visit, Mr. Pollard provided me with a several months supply of Bextra for my personal use.

-- In promoting the drug Bextra, Mr. Pollard discussed the strong safety and efficacy of Bextra. Mr. Pollard also shared positive information concerning the overall safety of Bextra.

-- At no time did Mr. Pollard ever inform me of any potential cardiovascular risks associated with Bextra.

-- Based on Mr. Pollard's representations of the effacacy and safety of Bextra, I prescribed Bextra to my patients. Additionally, I used the samples that Mr. Pollard provided to me for my personal use.

*Gotdon Affidavit,* at 1-2. This language provides no evidence that Pollard either knew or should have known about any alleged risk of Bextra. Further, this language does not provide evidence or even make any allegations related to any specified knowledge by Pollard other than what was provided by his employer and in the FDA-approved labeling.

Without any competent evidence that Pollard made knowing misrepresentations or acted in bad faith-- and particularly in light of Pollard's statement that he had no specialized knowledge about Bextra and relied entirely on information provided to him by Pfizer--there is "no reasonable possibility" that an Alabama court would conclude that he is liable for fraud or misrepresentation. *See, e.g., Legg,* 428 F.3d at 1324; (*citing Fisher v. Comer Plantation, Inc.,* 772

So.2d 455 (Ala.2000)) ("those who are only conduits through which faulty information is supplied by one person to a third person cannot be held liable for fraud unless they acted in bad faith"); *see also Montgomery Rubber and Gasket Co. v. Belmont Machinery Co.,* 308 F.Supp.2d 1293, 1298 (M.D.Ala.2004) (finding agent defendant was, at most, an innocent conduit and thus plaintiff could not maintain fraud claim against him when plaintiff did not allege agent "made any representations whatsoever to [plaintiff]" or "had any knowledge of the [alleged misrepresentation]"); *Bloodsworth,* 2005 WL 3470337, at \*4 (M.D.Ala. Dec.19, 2005); *In re Prempro Prods. Liab. Litig.,* 2006 WL 617981, at \*1 (applying Alabama law and concluding that pharmaceutical representatives were fraudulently joined and not liable under either AEMLD or non-AEMLD claims).

Plaintiff's fraud and misrepresentation claims also lack the specificity required to satisfy Rule 9(b). *See*Fed.R.Civ.P. 9(b) (requiring that allegations of fraud be stated with particularity), Ala. R. Civ. P. 9(b), Comment (stating that the Alabama Rule is identical to the federal rule). Thus, Plaintiff cannot maintain any of his fraud-based claims against Pollard. To maintain a cause of action based on fraud or negligent misrepresentation, Plaintiff must prove that: 1) the defendant made a false representation to the plaintiff; 2) the representation concerned a material fact; 3) the plaintiff relied on the representation; and 4) the plaintiff incurred damage as a proximate result of the reliance. *Reeves Cedarhurst Dev. Corp. v. First American Federal Sav. and Loan Ass'n,* 607 So.2d 180 (Ala.1992); *see also*Ala.Code §§ 6-5-101 & 6-5-103 (2002). As stated, averments of fraud must be stated with particularity under either federal or Alabama law. Fed. R. Civ. Pro. 9(b); Ala. R. Civ. P. 9(b), Comment. Particularity "requires plaintiff in pleading fraud to distinguish among defendants and specify their respective role in the alleged fraud." *McAllister Towing & Transp. Co. v. Thorn's Diesel Serv. Inc.,* 131 F.Supp.2d 1296, 1302 (M.D.Ala.2001). The pleading requirements are not satisfied if plaintiff fails to "distinguish among defendants and specify their respective role in the alleged fraud." *Id.* Thus, a plaintiff must allege the time, place, content and speaker of the allegedly fraudulent misrepresentations. *Id.; accord In re Prempro Prods. Liab. Litig.,* 2006 WL 617981, at \*1 (applying Alabama law and concluding that pharmaceutical representatives were fraudulently joined where

Case 3:08-cv-01015-CRB   Document 1-10   Filed 02/20/2008   Page 45 of 47

Not Reported in F.Supp.2d                                                  Page 6
Not Reported in F.Supp.2d, 2006 WL 2337002 (N.D.Ala.)
**(Cite as: 2006 WL 2337002 (N.D.Ala.))**

plaintiff's fraud-based claims lacked specificity).

**\*7** Here, Plaintiff's allegations fail to allege the essential elements of fraud and misrepresentation. Plaintiff alleges in his Complaint:

Defendants recklessly, knowingly, intentionally, and fraudulently misrepresented to the medical, pharmaceutical and/or scientific communities, and user and/or consumers of the drug, including Plaintiff, the safety and efficacy of the drug....
*Complaint* ¶ 73.

The Complaint fails to specify time, place, content or speaker of *any* particular representations by Pollard. Such general allegations fail to meet the requirements of Rule 9(b).

B. Plaintiff fails to state legally cognizable claims against Pollard for violation of the AEMLD or for breach of express or implied warranty.

To the extent Plaintiff asserts products liability claims against Pollard for violation of the AEMLD or for breach of express or implied warranty not already addressed above, there is no reasonable basis to predict that he can prevail as these claims apply only to "sellers" and "manufacturers" and Pollard is not a "seller" or "manufacturer" of Bextra. *See Pollard Affidavit* ¶¶ 2, 5, 6. Plaintiff's negligence claims, although not denominated as AEMLD violations, are as a practical matter AEMLD claims or otherwise fail. *See, e.g., In re Prempro Prods. Liab. Litig.,* 2006 WL 617981, at *1 (applying Alabama law and concluding that pharmaceutical representatives were fraudulently joined and not liable under either AEMLD or non-AEMLD based-claims); *In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d at 287 (applying Alabama law and finding resident pharmaceutical representatives fraudulently joined in claims for product liability under AEMLD, negligence, wantonness, fraudulent misrepresentation, and fraudulent suppression).

To establish liability under the AEMLD, a plaintiff must prove defendants manufactured or sold the allegedly defective product. *Turner v. Azalea Box Co.,* 508 So.2d 253, 254 (Ala.1987). But, under Alabama law, pharmaceutical representatives under Alabama law are not considered to be sellers or suppliers of the prescription drugs they represent. *See In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d at 287. Moreover, Pollard's affidavit constitutes

affirmative proof through his declaration that he is not a "seller" or "manufacturer." To the contrary, he is simply a "detailer" on behalf of his employer, Pfizer. Therefore, he cannot be held liable under product liability causes of action.

Further, Plaintiff fails to allege any underlying facts establishing that Pollard acted outside the scope of his employment such that he can be held personally liable under the AEMLD. Alabama law requires that a corporate employee personally participate in the alleged corporate wrongdoing to be liable under the AEMLD. *See, e.g., Turner v. Hayes,* 719 So.2d 1184, 1188(Ala.Civ.App.1997) ("corporate employees are liable personally for the wrongful action of the company or its other employees only if they personally participate in the tort.") *rev'd in part on other grounds sub nom. Ex parte Attmore Cmty. Hosp.,* 719 So.2d 1190 (Ala.1998); *Mills v. Wex-Tex Indus.* 991 F.Supp. 1370, 1381-82 (M.D.Ala.1997) (employee not individually liable absent allegation of personal participation in alleged tortious conduct). Because Pollard neither manufactured, sold, designed, tested nor participated in the development of Bextra, there is no possibility that Plaintiff can state a viable negligence and/or AEMLD claim against him.

**\*8** As to Plaintiff's breach of warranty claims, Alabama law likewise precludes any possibility that Plaintiff can hold Pollard liable for breach of warranty claims. *See, e.g.,*Ala.Code §§ 7-2-313(1) & 7-2- 314(1) (2002) (both express and implied warranty claims refer to the creation of warranties by the "seller"); *Rezulin I,* 133 F.Supp.2d at 286 ("seller" who makes warranties about a prescription medicine is the "pharmaceutical manufacturer," and not the professional representative). Plaintiff alleges:

Defendants Searle, Pharmacia, Monsanto, Pfizer and Pollard ... made express representations to the consuming public at large through their aggressive marketing and advertising campaigns relative to their product, Bextra.
Complaint ¶ 54.

At the time that Defendants designed, tested, inspected, manufactured, assumed, developed, labeled, sterilized, licenses, marketed, advertised, promoted, sold, packaged, supplied and/or distributed the drug Bextra (Valdecoxib), Defendants knew of the intended, reasonably foreseeable and/or ordinary use of Bextra (Valdecoxib) and impliedly warranted the drug to be of merchantable quality and safe and fit for such

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2337002 (N.D.Ala.)
**(Cite as: 2006 WL 2337002 (N.D.Ala.))**

use.
*Id.* at ¶ 63.

Plaintiff does not attempt to offer a factual basis for his warranty claims. Yet even if he had, he cannot maintain an action for breach of warranty against Pollard who (as explained above) is not a seller and thus, cannot be liable as a warrantor of a product. Under breach of express warranty, plaintiff must prove that a manufacturer or seller of a product made "[a]ny affirmation of fact or promise ... which relates to the goods and becomes part of the basis of the bargain. ." Ala.Code § 7-2-213(1)(a) (2002). An implied warranty arises when a "seller is a merchant with respect to goods of that kind." Ala.Code § 7-2-314(1) (2002). Both breach of express and implied warranty claims require a finding that a seller or manufacturer breached a warranty. Here, Pollard is not considered a "seller" under Alabama law. *Bowman v. Coleman Co., Inc.,* No. 96-0448-P.-C, Slip Op. at 8 (S.D. Ala. Sept 3, 1996) (retail store manager is not a "seller"); *see also Johnson v. Parke-Davis,* 114 F.Supp.2d 522, 525 (S.D.Miss.2000) ("Plaintiffs have not cited any authority for the proposition that a sales representative, as opposed to the manufacturer of the product he or she was selling, would ever be liable as a warrantor of the product."); *see also* Section 20, comment g, Restatement (Third) of Torts: Product Liability § 20, cmt. g. (1998) (in defining one who sells or otherwise distributes stating that "[p]ersons assisting or providing services to product distributors ... are not subject to liability under the rules of this Restatement.... Sales personnel and commercial auctioneers are also outside the rules of this Restatement."). [FN2]

> FN2. Significantly, even if Pollard were considered to be a "seller," which he is not, mere delivery by a seller to a buyer of the manufacturer's express warranty is not sufficient to make the manufacturer's express warranty become an express warranty by the seller. *Courtesy Ford Sales, Inc. v. Farrior,* 53 Ala.App. 94, 298 So.2d 26 (Ala.App.1974), *superseded by statute on other grounds, Arnold v. Campbell,* 398 So.2d 301 (Ala.App.1981).

Accordingly, as with Plaintiff's AEMLD and negligence claim, because pharmaceutical representatives are not considered sellers or distributors under Alabama law, Pollard cannot be liable as a warrantor of Bextra under claims for breach of warranty.

C. Failure to warn.

**\*9** Under Alabama law, a prescription drug manufacturer satisfies its duty to warn under a AEMLD and negligent failure to warn theory, by distributing an adequate warning to the prescribing physician. *Stone v. Smith, Kline & French Labs., et al.,* 447 So.2d 1301, 1305 (Ala.1984) (holding that an adequate warning to the prescribing physician, but not to the ultimate consumer, is sufficient as a matter of law to avoid liability under the AEMLD in the case of a prescription drug); *id.* at 1304 (holding that the prescribing physician is best suited to evaluate the characteristics of the medication vis-a-vis the needs and background of the patient); *Gurley v. American Honda Motor Co.,* 505 So.2d 358, 361 (Ala.1987) (holding that a manufacturer fulfills its negligent failure to warn cause of action, as a matter of law, by distributing the product with reasonable warnings); *Purvis v. PPG Indus., Inc.,* 502 So.2d 714 (Ala.1987).

Plaintiff summarily argues that Pollard called upon Plaintiff and that Plaintiff allegedly ingested samples of Bextra. *Brief in Support of Motion to Remand,* at 23-24. Plaintiff contends that Pollard voluntarily assumed a duty to warn. Plaintiff's argument is without merit. *See, e.g., In re Prempro Prods. Liab. Litig.,* 2006 WL 617981, at \*1;*In re Rezulin Prods. Liab. Litig.,* 133 F.Supp.2d at 287. Plaintiff fails to allege any facts indicating that Pollard had any unique or specialized knowledge or information and warnings contained in the FDA approved physician package insert that he had an obligation to disclose to prescribing physicians. Moreover, Pollard submitted affirmative proof in his declaration that he had no knowledge about the risks and benefits of Bextra other than what was provided to him by Defendants. *Pollard Affidavit,* ¶ 4. Pollard further presented uncontested proof that he is not a physician or pharmacist and does not have any specialized medical or pharmacological education. *Id.* Thus, Plaintiff cannot state a viable cause of action against Pollard for failure to warn.

D. Design Defect.

Plaintiff can also make no viable claim against Pollard for defective design. Pollard's affidavit states that he had no involvement with the design or

manufacturing of Bextra and therefore has no possible connection to this claim. *Pollard Affidavit,* ¶ 5. In order to establish a design defect claim, Plaintiff must prove that a safer, more practical alternative design was available to the *manufacturer* at the time it manufactured the product. *See General Motors Corp. v. Edwards,* 482 So.2d 1176 (Ala.1985)(emphasis added). As such, this claim is plainly targeted at the manufacturer, not the detailer and Plaintiff cannot maintain an action for design defect against Pollard.

### III. RECOMMENDATION

As there is "no reasonable possibility" that the plaintiff would be able to establish a cause of action against defendant Pollard, it is RECOMMENDED that the motion to remand be DENIED, and that defendant Pollard be DISMISSED with prejudice. It is also recommended that the motion to stay be granted, pending transfer to multidistrict litigation.

**\*10** DONE this 10th day of May, 2006.

Not Reported in F.Supp.2d, 2006 WL 2337002 (N.D.Ala.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.